1  Charles F. A. Carbone, Esq.  (SBN 206536)
2  LAW OFFICES OF CHARLES CARBONE
   3128 16TH Street
3  PMB 212
4  San Francisco, CA 94103
   Tel: 415-981-9773
5  Fax:  415-981-9774

FILED

E-filing

RICHARD W. WIEKING
CLERK. U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10  In re DANIEL DAVID,                )    C.
11          Petitioner,                )    **C 07 4081**
    v.                                 )
12                                     )
13  Harley G. Lappin, Director of BOP, )    **PETITION FOR WRIT OF**
                                       )    **HABEAS CORPUS**
14                                     )
                                       )
15          Respondent.                )
16                                     )
                                       )
17  _____   )

18

19  **I.     INTRODUCTION**

20      Petitioner Daniel David (hereafter "David")  is a prisoner at Taft Correctional Center

21  under the jurisdiction of the Bureau of Prisons serving a sentence of thirty months for a 2004

22  conviction for mail fraud (18 U.S.C § 1341), use of a fictitous name for the purpose of

23  conducting a fraudulent scheme (18 US.C. § 1342); and money laundering (18 U.S.C. §

24  1956(a)(1)(B)(I)).

25

26      Petitioner challenges the validity and lawfulness of his conviction under 28 U.S.C.

27  §§2254(a), 2255,  because the conviction was fatally marred by prosecutorial misconduct –

28  namely, Brady violations -- variance claims, and the discovery of new evidence, each which

undermine the lawfulness of his conviction.

The thrust of the government's case against Petitioner focused on the theory that David defrauded long distance ("LD") carriers of no less than $444,198.91 by placing toll-free calls from leased pay phones which required, as per FCC rules, that the long-distance carriers reimburse Petitioner a regulatory fee known as the "pay phone surcharge." The government argued that David placed thousands of such calls solely to generate revenue from the LD carriers' payment of this regulatory surcharge.

The government, however, failed to present to the jury the actual and unmistakable fact that the supposed victims in the case – namely, the long-distance phone companies – failed to lose a single cent because of David's activity. Ironically, and astonishingly, the supposed victims – the LD carriers -- profited handsomely from David's activity – a fact conveniently acknowledged by the government only *after* the conviction when David was sentenced to prison.

For this reason, David seeks relief via Habeas to overturn, modify, or vacate his sentence; or in the alternative, for an evidentiary hearing, to undue the lie that the government told the jury and this very District Court that LD carrier victims parted with money due to David's conduct. In actuality – as acknowledged only by the government after it secured its flawed conviction – David was convicted based on a bold lie that the victim(s) here lost money when the inapposite was indeed true.

Based upon these facts, David advances four claims for Habeas relief that: (1) the government's deliberate withholding of evidence resulted in the jury falsely believing that LD carriers were victimized by David's conduct; (2) that the facts presented at trial and at sentencing were at great variance to those pled in the charging Indictment; (3) that the government's acknowledgement at sentencing of their error constituted newly discovered

evidence which undermines the validity of the conviction; and (4) that this new evidence also proves the insufficiency of the conviction against David for the charges he is now serving. It is from these four legal claims that David now brings in the instant Petition.

## II.    PARTIES

David is an inmate at Taft Correctional Center in Taft, California stemming from a 2004 conviction in U.S District Court for the Northern District of California (Case No. 02-00062 (SI)).

Harley G. Lappin is the Director of the Bureau of Prisons, and therefore responsible for the lawful custody, control, and housing of all federal prisoners under its jurisdiction.

## III.    STATEMENT OF FACTS

### (a)  Regulatory Background

In order to make sense of the instant issues, one must know the regulatory framework from which this case arose. As part of the Telecommunications Act of 1996, P.L. No. 104-104, 110 Stat. 56 (1996), Congress required that the FCC establish a compensation plan to reimburse pay phone owners when a customer used a pay phone without a coin deposit such when calling a toll free number or when using a calling card. Because such calls from pay phones did not include a coin deposit for the use of the pay phone, Congress and the FCC devised a method to "provide for compensation for access code calls and subscriber 800 and other toll-free number calls." *See* Implementation of Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Report and Order, 11 F.C.R. 20,541, 20,543 (September 20, 1996). This "compensation" was ultimately termed the "pay phone surcharge," and it ranged in cost from ¢.22-24 per call. Hence, pay phone owners levied this pay phone surcharge on a per call basis to the LD carriers who handled the calling traffic from a payphone; and this charge was paid directly by the LD carrier to the pay phone owners

although the LD carriers ultimately billed the consumer for this fee as the phone companies would then "pass it though to the 800 subscriber." Id. at 20,550. The regulatory system envisaged, in other words, that the ultimate cost of a pay phone call to a toll-free number included the cost of the payphone surcharge paid for by the customer of the toll-free phone line.

Notably, however, the toll-free subscriber's obligation to pay LD carriers for the cost of the toll-free call, plus the mark-up on the payphone surcharge, is not a charge or fee imposed by the FCC. This obligation is solely required according to the business-customer relationship between the toll-free subscriber and LD carrier. Of further consequence, the toll free customer and the pay phone owner have no agreement or consideration that the toll free subscriber pay the pay phone surcharge to the LD carrier. That obligation is solely constructed by the customer-provider relationship between toll free customer and the LD carriers.

### (b) David and Nisbet's Calling Activity

David and Scott Nisbet were childhood friends who had worked on previous phone business ventures in the past. (RT 613-14) In these endeavors, Nisbet generally provided the telecommunications expertise while David undertook the marketing and artistic responsibilities.

In 1997, Nisbet approached David concerning a telecom business arising out of the new telecommunications laws regarding payphone compensation.[1] (RT 614, 618). Based on past business dealings, Nisbet suspected that the LD carriers were not abiding by the new compensation rules for pay phone providers by failing to pay for *each* of the millions of calls coming from pay phones. (RT 618-19) At trial, David testified that he "didn't know anything" about telecommunications, but Nisbet's prodding induced him to help out a childhood friend as David had done in the past. Nisbet explained that the venture would survey the accuracy and

regularity with which the LD carriers paid payphone compensation to pay phone owners.[2] (RT 619-20)  David did not exactly understand the nature of the venture but followed Nisbet's lead in the planning and implementation.  (RT 625)  In order to assuage David's concerns about the plan, Nisbet contacted a FCC lawyer and friend named Johnny Askin, Esq.  (RT 620-21)  Nisbet told David that Askin approved of the business plan which had "an enormous effect" on David because it helped David believe that Nisbet was "doing some due diligence" in confirming the legality of the venture.  (RT 624)

Askin was, in fact, contacted by Nisbet as Askin testified at trial.  Askin testified that Nisbet contacted him while he was working in the FCC's Common Carrier Bureau and asked him whether, in the wake of the Telecommunications Act of 1996, the use of an autodialer to call toll free numbers would violate section 227 of the Act.  (RT 509-10)  Askin testified that he rendered an opinion that was neither meant as a FCC opinion or as legal advice given to Nisbet as a client.  (513-14)  Askin did remark that any alleged violation of section 227 of the Act would most likely be brought before the FCC rather than warranting a civil or criminal review. (RT 526-29)

With this "legal advice" in hand, Nisbet and David began ordering payphone lines to office spaces owned by David's father.  (RT 625)  Once the lines were connected, Nisbet attached several fax machines to the lines, and programmed the machines to dial toll-free numbers.  (RT 625-626)

In order to be reimbursed by the long distance carriers, Nisbet established a business relationship with a financial clearing house – APCC Services – who bore the task of billing the

---

[1] PL 104, 110, Stat 56.

[2] In fact, it was proven in related litigation that AT&T and other LD carriers had severely underpaid pay phone owners for the surcharge by literally hundreds of millions of dollars.  *See* APCC Services Inc. v. AT&T Corporation (USDC for District of Columbia), Case No. 1:99 CV 696 (ESH).

LD carriers on behalf of pay phone owners. (RT 242-44, 626)  Because the entire nature of the business plan was to detect the accuracy and regularity of payment by the LD carriers of the payphone surcharge without cluing the LD carriers into the nature of the survey, Nisbet called the business, "Dan David, dba Jack's Payphone." (RT 247-49, 252, 626-627)

Starting in April 1998, Nisbet and David received their first check from APCC in the amount of $11,808.41. (RT 262, 627)  Due to a warning, however, from APCC, Nisbet grew concerned that the volume of the toll-free calls would alert the LD carriers. So Nisbet closed down the operations, and then later decided to move to a small office in South San Francisco. (RT 628-30, 370-78, 388, 630-61)  At that juncture, Nisbet insisted that any new lines should be ordered under names other than their own. (RT at 633)  David objected to this plan, but ultimately caved in under reassurances from Nisbet as to the legality of the operation based on Askin's previously rendered legal opinion. (RT 631)  New lines were ordered under the names "Bill Jansen" and "David Jacobs." (RT 631, 60-661, 681)

The business' operations grew more complex as Nisbet purchased and connected an autodialer to 23 long-distance lines and rented a business mailbox in Scottsdale, Arizona under new business names. (RT 589-602, 308-09, 632-33)  This, however, created a compounding problem when Nisbet and David could not retrieve their mail without sufficient proof of identify. In an admitted error, Nisbet and David forged an identification and notary to retrieve their own mail including a number of payments from the phone companies. (RT 637-40)

### (c)    AT&T's Presentation to the FBI

Prior to the issuance of the original indictment, the long-distance carrier AT&T contacted the FBI after reviewing the call data records from David and Nisbet's phone lines and

concluding that the calling patterns (i.e. duration and volume) were indicative of an autodialer. (RT 216-18) Of notable importance, AT&T described in a memorandum to the government that AT&T was a "victim" in the case who had fooled by David and Nisbet into paying pay phone surcharges based upon toll-free calls that AT&T later contrived to appear to the FBI that the phone numbers had been dialed sequentially when no such calling took place. Such statements was meant to induce the FBI in to believing that AT&T lost revenue from its payments to David and Nisbet, and that the calls were made in a sequential manner so as to invoke additional regulatory scrutiny.[3] These facts simply were not true. As previously indicated, AT&T, like other LD carriers, passed the cost of the payphone surcharge onto its toll-free subscribers along with a considerable and profitable mark-up. Any part of the payphone surcharge paid by AT&T to Daniel and Nisbet was actually paid by the toll-free customer **plus** a sizable mark-up of anywhere between 100-300%. (RT at 228, 423-424)  David's calls were, therefore, making AT&T sizable profits because AT&T billed its customers the cost of the payphone surcharge plus 100-300% more for David's calls.  AT&T had made, not lost, money.

In October 1999, the landlord at the South San Francisco office informed Nisbet that the FBI had searched the office. (RT 650-51)  Nisbet told Daniel of the same, and the two closed down the operation.

### (d)  The Indictment and Conviction

On March 7, 2002, a grand jury in the Northern District returned an indictment charging David and Scott Nisbet with various offenses under Title 18 of the United State Code.

This indictment, though, did not suffice because, for the very reasons addressed herein, the

---

[3] AT&T falsified the calling data to the FBI by rigging the calling data to appear as if David had called the toll-free numbers in a sequential manner so as to invoke great legal scrutiny because sequential dialing by auto-dialers is

1   U.S. Attorney's office discovered that its theory of the case set forth in the original indictment

2   could not hold water. In particular, a superseding indictment changed the charges from

3
4   conspiracy, mail fraud (and aiding and abetting), money laundering, IRS tax fraud, and forfeiture

5   to reflect the government's understanding that a new, superseding indictment was based on

6   charges of conspiracy, mail fraud, money laundering, and forfeiture. The superseding indictment

7   included no less than twenty-one counts against David, including 18 U.S.C. § 371 (conspiracy to

8
9   commit mail fraud and use of fictitious names); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C.

10  §§1342 (using a fictitious name for purpose of conducting a fraudulent scheme); 18 U.S.C §

11  1956(a)(1))(B)(I); and 18 U.S.C. § 982(a)(1) (forfeiture).

12      The mail fraud charges alleged that defendants David and Nisbet "devised and willfully

13  participate[d] in a scheme and artifice to defraud Pacific Bell, long-distance carriers, and toll-free

14  subscribers to obtain money and property by means of false and fraudulent pretenses.,
15
16  representation and promises." (ER 4-5, par. 18) The mail fraud charges also incorporated the

17  allegations of material false statements and omissions from the conspiracy charge. (ER 4,

18  par.17)

19      The conspiracy charge alleged that defendants David and Nisbet conspired to commit mail
20
21  fraud by failing to disclose material facts in order to obtain money and property. (ER 1-4, par.3-

22  15) The indictment specifically alleged that defendants failed to disclose to Pacific Bell and the

23  long-distance carriers "the material facts that they did not intend to and in fact did not attach

24  payphones or any other telephones to the Leased Payphone Lines" as well as by failing to

25  "disclose to Pacific Bell and the LD carriers the material fact that the thousands of calls . . .
26
27  were made by an auto dialer as opposed to actual callers." (ER 3).

28      Prior to trial, David filed a motion to dismiss, arguing that the only financial victims (if

---

any) were the toll-free subscribers, and that he had not deceived the subscribers. (ER 15a-15v) He averred that while the phone companies arguably had been deceived, they had not suffered any loss, and that while the subscribers may have suffered a loss, they had not been deceived. Id. The motion rested on the fact that the indictment alleged the use of false statements to obtain money and property, but did not allege that the David had made a single false statement to the toll-free subscriber to induce their parting with money.   In its opposition, instead of admitting what the government would later disclose, the government refused to acknowledge the obvious, namely that David had correctly identified the LD companies as beneficiaries rather than victims of his business venture.  The motion was denied based on the district court's agreement that the indictment sufficiently alleged two victims – the toll-free subscribers and the LD carriers – who were deceived.  (ER 28)

By the time David's case proceeded to trial in March 2004,  Nisbet already brokered a plea agreement with  the government, and in so doing informed David that he would invoke his Fifth Amendment right against self-incrimination, if called to testify.   In fact, the cooperation agreement written by the government required that Nisbet not be sentenced until after David's trial.  (ER 32)   David was forced to defend himself at trial without the benefit of Nisbet's testimony.

At trial, the government's theory that AT&T and the other long-distance carriers were victimized began to unravel.  The government could not present evidence that the LD industry lost money or been otherwise victimized.  The only two witnesses from the LD companies were AT&T fraud investigator Mark Zmigrodski and Sprint Billings Operations Manager Kit Cosani who testified in relevant part:

"Q. Okay. So, there is some money there, the different checks you have in there, if you add it up, does that money then belong to repaid to the people who actually have the 800 numbers who were charged?
A. I believe so yes.
Q. Do you know whether your company has ever paid back that money to those individuals?
A. Until this suit or I was notified of this, I had no knowledge of this. So I do not know that answer." (Cross-Examination of Sprint Witness Cosani (RT at 432)).

***

"Q. Okay. It's fair to state that you thought that Mr. David shouldn't get that money; that's right?
A. That was my recommendation, however, it was up to the judgment of the product manager who reviewed it also.
Q. Do you know whether AT&T ever paid that money back to the people who charged it?
A. I have no idea. It's no my realm." (Cross-Examination of AT&T Witness Mark Zmigrodski (RT at 229)).

The government's theory unraveled because contrary to the language of the indictment which had David directly deceiving the LD carriers, AT&T and others were finally seen as a mere financial intermediary who were simply processing the transaction of billing (at a considerable mark-up) the payphone surcharge to the toll-free subscriber. And as the above-testimony indicates, the alleged victims in the case – AT&T and Sprint – testified at trial indicated that they had "no idea" whether the supposedly ill-gotten gains from the toll-free subscribers were returned by AT&T and Sprint to its toll-free customers. This is compelling evidence because it can either be interpreted as the LD carrier's profiting from calls it believed were illegal and criminal and yet refusing to return its own ill-gotten gains which were piggy-backed to David's, and or the LD carriers did not believe that the toll-free subscribers were entitled to a refund for any of David's calls because the calls were legal and properly billed.

The government also could not put on a single witness from the LD industry to testify that their company had lost money from David's business venture. Nor did the government present a single witness who owned a toll-free number to state that they too were deceived (or parted with

money). Such evidence was not presented because of the plain business fact that David made no representation (or misrepresentation for that matter) in his calls to the toll-free subscriber because the calls contained no content whatsoever. The calls lasted one second each, and contained no content. (RT at 171, 692-694) Furthermore, according to routinely accepted business practices, toll-free subscribers do *not* assume that every call to their 800 number has a valid business purpose. Rather, subscribers know they must be willing to receive and pay for calls involving wrong numbers, crank calls, and other calls which do not include a bona fide business purpose. Hence, the government did not and could not prove at trial a single misrepresentation made by David to a toll-free subscriber.

Due to this evidence, or the lack thereof, the government successfully obtained court approval to depart from the Ninth Circuit Model Jury Instructions § 8.101 on mail fraud to a new instruction which instead provided:

> "First, the defendant knowingly devised or knowingly participated in a scheme or plan to defraud by obtaining money or property through a course of conduct or statements that were reasonably calculated to deceive; Second, the scheme to defraud was material, that is, it would reasonably influence a person to part with money or property." ER 46, ER 65.

Based upon these unique instructions, the jury found David guilty of mail fraud (counts 2-8), using a fictitious name for the purpose of conducting a fraudulent scheme and an unlawful business (Counts 9-15) , and money laundering (Counts 16-22). (Dkt. 175) The jury, however, found David not guilty of conspiracy. (Count 1)

### (e)   A "Strange" Thing Happens at David's Sentencing

On January 14, 2005, Nisbet is sentenced to serve a term of fifteen months and to

pay, jointly and severally, an amount of no less than $444,198.91.   Several months later, on May 6, 2005, David was sentenced.  This, however, was no ordinary sentencing.  During a discussion on restitution, the government changed its tune.  It admitted, *for the first time*, that the phone companies were not victims and suffered no monetary loss whatsoever, and thus were not entitled to a dime of restitution.  (ER 83)  At sentencing, the Assistant U.S. Attorney (AUSA) admitted, "The phone companies here are not the victims.  They were just unjustly enriched . . ." (Sentencing Transcript ("ST) dated May 6, 2005 at 17)  Instead the government argued that the phone companies were instead injured by a loss of "good will or business reputation, or customers." (ER 99)  Not only was this new theory a farce, but it had never been raised until sentencing when the government was desperate to create a new theory of David's victims in order to post-hoc justify the legality of the conviction.   But these hypothetical losses of business reputation or of customers were not only speculative; worse, such arguments were *never* presented to the jury.  There was no evidence presented that the phone companies suffered these losses, or even that such losses were remotely possible.  With no where left to hide, the government was forced to admit what it had known all along – that the phone companies made, not lost, money here, and that the case lacked a true victim who had parted with money based on intentional misrepresentations.  With this revelation in mind, the judge – the Honorable U.S. District Court Judge Susan Illston – at sentencing did not know how to fashion restitution as it was previously calculated according to the over $444,000 dollars that the phone companies had paid to David and Nisbet.  Because the companies had not lost money, Judge Illston instead ordered restitution not go to AT&T and the other LD carriers, but instead be deposited into the equivalent of a cy pres restitution fund for a general telecommunications purpose.  (ST at 22)

## IV. ARGUMENT

**(a) The Government knew prior to and during trial of the exculpatory fact that AT&T and other LD Carriers were not financial victims; and yet refused to divulge that information despite a requirement to do so thereby constituting a violation under the Brady rule.**

In order to prove a violation of Brady v. Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, in which the government withheld exculpatory evidence, a defendant must prove that: "(1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice resulted." Raly v. Y1st (9th Cir. 2006) 470 F. 3d 792. Or said in a similar manner, one must prove that: (1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his guilt or punishment. U.S. v. Jennigan (9th Cir. 2006) 451 F. 3d 1027.

Evidence is considered material if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. In particular, a showing of reasonable probability that a different result would have occurred is considered a lesser showing than that required by a preponderance of the evidence. Bailey v. Rae (9th Cir. 2003) 339 F. 3d 1107. Furthermore, the materiality of any such exculpatory evidence must be considered cumulatively in determining whether nondisclosure violated the prosecution's Brady disclosure obligations. Barker v. Fleming (9th Cir. 2005) 423 F. 3d 1085.

In deciding which evidence must be disclosed, the prosecution is required to disclose evidence favorable to the accused, that, if suppressed, would deprive the defendant of a fair trial. Morris v. Y1st (9th Cir. 2006) 06 Cal. Daily Op. Serv. 3807. In fact, a convicted person need not show that they would have been acquitted but for the lack of disclosure, but merely that the lack

of disclosure rendered the trial fundamentally unfair and a verdict not worthy of confidence. Barker, supra. Or stated differently, a Brady violation is established where undisclosed evidence can put a defendant's whole case in such a different light as to undermine confidence in the verdict. Silva v. Brown (9th Cir. 2005) 416 F. 3d 980. Moreover, the lack of disclosure or suppression of such exculpatory evidence can be either a willful or inadvertent act resulting in prejudice to the defendant. Morris, supra. The Brady rule has no good faith or inadvertence defense. Gantt v. Roe (9th Cir. 2004) 389 F. 3d 908.

The prosecution in a criminal case has a duty to disclose all material evidence in its possession that is favorable to the accused. Gantt v. Roe, supra. Similarly, the government has the duty to disclose Brady material even in the absence of a request by the defense. U.S. v. Blanco (9th Cir. 2004) 392 F. 3d 382; Randolph v. People of State of California (9th Cir. 2004) 380 F. 3d 1133. In fact, the Brady duty to disclose applies to exculpatory evidence as well as evidence that the defense might use to impeach a government's witness by showing a bias or interest. Horton v. Mayle 99th Cir. 2004) 408 F. 3d 570.

Here, while the government waited to admit that AT&T and the other LD carriers were not actual victims of David's conduct until the time of David's sentencing, it is clear that the government knew long in advance of sentencing of this exculpatory fact. The first indication of such was AT&T's own "in house investigative" report delivered to the FBI pre-indictment wherein AT&T falsified the calling data records to make such appear as having been dialed sequentially, and by describing itself as a monetary victim in the case.

Secondly, the FBI's own 302 disclosures hint at the government's acknowledgement how AT&T derived a profit for the payphone surcharge.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Moreover, David himself met with FBI Agent in November 2006, during which, as

attested to herein under penalty of perjury, David swears that FBI agent Coffin admitted to David

and his counsel (also present) that the FBI knew long prior that AT&T and other LD carriers had

profited significantly from the conduct. In particular, David swears,

> I met personally with FBI agent Steven Coffin in Berkeley, California. The purpose of
> the meeting – held at my request – was to discuss the role of AT&T in my case as well as
> AT&T's non-payment of the payphone regulatory surcharge. After explaining my
> position that AT&T was reaping multi-million dollar rewards via mark-ups to consumers
> of the payphone surcharge while underpaying payphone owners, FBI Agent Coffin
> admitted that the FBI had known since nearly the inception of its investigation and
> prosecution that AT&T and the other LD carriers had financially benefited from my
> calling activity. *See* Declaration of Petitioner Daniel David, Exhibit 1, hereto

As further evidence of the FBI's admission that the long-distance carriers were not

victims, David's lawyer – John Kirke, Esq.--- who was present at the same meeting also offers

herein via a sworn Declaration the same FBI acknowledgement. *See* Exhibit 2. Based on these

two witnesses –each of whom offers a sworn statement aver that the government, in fact, the

very agent responsible for investigating David's case knew before the start of the prosecution

that AT&T and other phone companies could not possibly be called victims or an aggrieved

party in the case.

In a similar vein, further evidence of the government's lack of candor that no LD carrier

suffered a pecuniary loss presented itself during the sentencing of Nisbet. On January 14, 2005,

Nisbet was sentenced to a term of fifteen months in federal prison along with a restitution order

of four hundred and forty-four thousand dollars subject to joint and several liability. (ST at 5).

Notably absent during the sentencing hearing was the government's acknowledgement that

restitution of $444,000 could  not and should not be paid to the long distance carriers as they

suffered no financial loss. The government was quiet on this topic during Nisbet's sentencing

hearing. (ST at 17-18) In fact, the AUSA acknowledged when referring to the lack of candor at

Nisbet's sentencing that, "Looking back, I wish it had bee, but, again, I was new to the case and I

apologize for not noticing this issue, but I think he's correct in his analysis of this." (ST at 18)

At Daniel's sentencing hearing, however, held just several months later, the government

was forced to acknowledge what it had known for months, if not years -- namely, that restitution

could not be paid to the LD carriers because paying restitution to entities which made money

from Daniel's acts would have been improper. At Daniel's sentencing on May 6, 2005, the

government finally admitted what it had known all along and yet had withheld from David.

AUSA Stacey Geis when referring to the phone companies admitted, "they were unjustly

enriched." (ST at 17). AUSA Geis went on to state, "we have not seen any other claims from

other telephone companies because they don't have claim . . . they made money on this." (ST at

18) A prosecutor's actual knowledge of undisclosed information is particularly significant in

determining the severity of the non-disclosure. U.S. v. Ross (9th Cir. 2004) 372 F. 3d 1097.

And yet, here, actual knowledge of the non-disclosure was not speculative or based on conjecture

because the prosecutor admitted so in open court at sentencing. (RT at 17 of Sentencing Trans.)

Because of this prosecutorial admission, the presiding judge the Honorable Susan Illston

ruled that, "right now I'm not ordering any [restitution[ to AT&T." (ST at 22) The probative

value of this revelation to the court -- unearthed by the government-- of the lack of victims was

significant as the presiding judge then went on to change the recipients of the entire award of

restitution. (ST at 19-23)

It is well-established that prejudice due to non-disclosure of exculpatory evidence can be

inferred when the existence of such evidence would have changed the outcome of a trial *and* of

a sentencing.  *See* <u>U.S. v. Congdon</u> (9th Cir. 2002) 54 Fed. Appx. 636.  (Defendant failed to show that he was prejudiced by government's nondisclosure of Brady information absent showing that the withheld information would have changed the outcome of his sentencing) Here, the effect of the exculpatory evidence at the 11th hour dramatically changed the nature of the sentence as David's entire award of restitution was altered. (ST at 19-23)  The presiding judge was not able to award restitution to AT&T and the other LD carriers because their status as victims was finally revealed as flawed.  The judge plainly saw what the jury had been prevented from knowing that AT&T and the other LD carriers were not victims.  This reality meant that AT&T and the other LD companies should not receive compensation of any kind from David's actions.  Instead, without a means of identifying who was a victim here – if there were any – the presiding judge established the equivalent of a cy pres award.

    The government's lack of candor on this material issue is glaringly obvious when one looks at the fact of the government's silence on this same topic at Nisbet's sentencing hearing which was held just a few months prior to David. (ST 17-18)  The government's belated acknowledgment arose  only because David's attorney forced the issue by cornering the government on this undeniable fact at David's sentencing hearing. (ST at 18)  But for David's attorney's prodding, the government would have hidden this truth from the district court and David  once again.   This lack of candor at sentencing is unmistakably unlawful under the rule of law of <u>Brady.</u>    *See* <u>U.S. Nikrasch</u> (9th Cir 2001) 25 Fed. Appx. 570.  (The government's obligations under Brady, to disclose all evidence favorable to the defendant which is material either to guilt or punishment, continue through the time of the sentencing hearing).

    The government may be inclined to argue that this non-disclosure of exculpatory evidence was not so because David himself may have introduced evidence of the lack of

financial harm to the long-distance companies at trial. This argument, however, holds no water because the availability of particular statements from a defendant does not negate the government's duty to disclose exculpatory evidence under the Brady rule. U.S. Howell (9th Cir. 2000) 231 F. 3d. 615. The Constitutional guarantee of due process imposes upon the state an *affirmative* duty to disclose exculpatory evidence. Allen v. Woodford (9th Cir. 2005) 05 Cal. Daily Op. Serv. 658; Grant v. Roe (9th Cir. 2004) 389 F. 3d 908. Moreover, as previously stated, the Brady rule has no good faith or inadvertence defense. U.S. v. Antonakeas (9th Cir. 2001) 225 F. 3d. 714. The prosecution's obligation to disclose evidence favorable to the defense turns on the cumulative effect of all such evidence suppressed by the government, and the government's obligation is independent of whether, at the time, the prosecutor knew of the favorable evidence or appreciated its significance. Id.

At sentencing, the sole victim statement came from AT&T. Once examined, its contents and the declarant who offered it reveal the further lie perpetrated upon the district court and David. AT&T's professed "fraud investigator" Mark Zmigrodski signed the notably sparse victim impact statement. At trial, however, Mr. Zmigrodski testified that payphone compensation was "not in [his] realm of experience." (RT at 228) And yet, A&T selected this very person as the author of the victim impact statement who admitted that he knew markedly little about the governing regulatory scheme under which David's actions were scrutinized. Having Zmigrodski submit the *sole* victim impact statement in David's case underscored the fact that the government had prior knowledge that its case was predicated on the lie that the LD industry suffered here.

With the government's lie exposed, the Honorable Judge Illston was forced to fashion a last minute quick-fix to the government's withholding of evidence. The district court ordered

restitution in the form of a cy pres award with the restitution monies -- minus those funds

attributable to AT&T -- going to two general telecommunications funds. (ST at 19-21)

After sentencing, Daniel appealed to the 9th Circuit Court of Appeals on direct appeal. *See* Appellant's Opening Brief dated October 28, 2005. In its denial of the direct appeal, however, the Ninth Circuit made a notable identification that only one scheme to defraud was presented to the jury. In dealing with a jury instruction claim, the Ninth Circuit ruled, "No unanimity instruction was required because only one scheme to defraud was presented to the jury." *See* USA v. David, Case No., 05-10340, Order of Ninth Circuit Court of Appeals. The importance of this chosen directive of the Ninth Circuit's ruling bears upon the government's theory of the case as presented to the jury that the LD carriers were defrauded. It runs throughout the government's pitch to the jury. Numerous examples apply:

- "Let's review the evidence very quickly on this element. First, the long-distance carriers mailed the checks. Obviously the checks being sent to the defendant is a central part of the scheme, that is the central part of the scheme. That's the whole point; the checks need to get to him somehow." (RT at 824)

- "It wasn't an honest mistake that the false names were used or that there were no payphones hooked up; it was obviously an intentional attempt to deceive all of these people to make it work, and that's what happened." (RT at 824)

- "And the long-distance carriers, were the – was the deceptive conduct directed at them? Was that material? Could that have influenced them? Not only could it, but it did." (RT at 822)

Unmistakable throughout their argument at trial was the government's position that the LD carriers were defrauded and that they each lost money due to David's work. The jury was repeatedly told that David's activities wreaked financial harm on LD companies, and yet this fact was known to the government as a fallacy. Only later -- before the Ninth Circuit Court of

Appeals and at David's sentencing -- did the government attempt to cover its tracks by changing the theory of its prosecution to brand both the LD carriers and the toll free subscribers as victims. (ST at 15; and Appellee's Opening Brief at 21, dated December 30, 2005, before the Ninth Circuit Court of Appeals) The fallacy of this new theory being introduced at sentencing is exposed at several levels. One, it was never presented to the very jury who decided David's guilt. (RT 804-847); Grant v. Roe (9th Cir. 2004) 389 F. 3d. 908. Showing that the prosecution failed to disclose exculpatory evidence begins with demonstrating that David suffered prejudice by the reasonable probability that the outcome of the trial would have been different had the evidence been disclosed. And one knows that evidence is "material" for purposes of a prosecution's duty to disclose favorable, when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome. William v. Woodford (9th Cir. 2004) 384 F. 3d. 567.

The restitution order itself foreclosed any alternate theory regarding David's alleged victims because the restitution amount of $444,198.91 was calculated *exclusively* in accord with the amounts that the LD carriers paid to David rather than a single dime paid by the toll free subscriber. (ST at 21) No monies whatsoever paid by the toll-free subscribers to the long-distance companies were included in David's restitution order, thereby indicating that they were expressly excluded as a class of victims in the government's prosecution of the case and its presentation of the case to the jury.

In light of such facts, the exculpatory evidence that the government knew the case was predicated on the lie that the LD carriers were victims would have changed the outcome of trial. It had to. Jurors would have seen a financial reward to David, but no victims who parted with

money based on David's alleged misrepresentations. Without victims who parted with money under fraudulent means, the government could not have met the elements of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. §§1342 (using a fictitious name for purpose of conducting a fraudulent scheme) which both require an actual victim who parted with money through fraudulent means.

## V.    NEWLY DISCOVERED EVIDENCE

### (a) The government's final admission over the lack of bona fide victims constitutes newly discovered evidence which would have changed the outcome of the trial.

The revelation that there were no bona fide victims in David's case also falls under the rubric of newly discovered evidence which would likely have produced an acquittal had the jury been advised of such. Newly discovered evidence is grounds for relief in a habeas petition when it bears upon the constitutionality of a defendant's conviction and probably would have produced an acquittal. Spivey v. Rocha (9th Cir. 1999) 194 F. 3d 971; Quigg v. Crist (9th Cir. 1980) 616 F. 2d 1107; and Swan v. Peterson (9th Cir. 1993) 6 F. 2d. 1373.    In instances where newly discovered evidence shows that Petitioner did not commit a crime such evidence is sufficient to meet the "probability of acquittal" standard for habeas relief. Jeffries v. Blodgett (9th Cir. 1993) 5 F. 3d. 1180.

For David, evidence of the lack of actual victims would have undeniably produced a different outcome at trial given that the government was required to prove that victims parted with money through fraudulent and deceptive means as per the elements of mail fraud in 18 U.S.C. § 1341 & use of a fictitious name spelled out in 18 U.S.C. §§1342.    In short, the government's conviction was predicated on the existence of victims who Daniel directly

defrauded. And yet, as discussed herein, the government ultimately had no such victims to claim, thereby undermining its ability to secure a lawful conviction. The lack of such bona fide victims was not a small oversight or insignificant fact that was immaterial to the conviction. Whether David's business activities -- which were recognized as novel and unique (RT 137) --- were illegal hinged on the very fact that victims parted with money because of David's fraudulent acts.

The materiality and dispositive effect of the LD carriers not being bona fide victims is nearly self-evident. In an exemplar of the importance of this evidence on the outcome of the trial, the prosecuting AUSA boldly told the trial judge out of the presence of the jury that the government was required to prove an "intent to defraud victims in order to obtain money from the phone company" and "long distance carriers." (RT at 136, 763) This admission by the prosecution was more than its theory of the case. It was the very basis of the guilty verdict itself. Without actual victims, the jury was likely not to render a finding of guilt, but instead conclude that there were no victims who parted with money through David's direct misrepresentations.

In a clear illustration of the importance of casting the LD carriers as the victims of David's acts, the prosecution did not call to testify a single toll free subscriber of the hundreds of thousands that David contacted via phone. *See* generally, RT. The government could have easily contacted any number of these potential witnesses because the LD carriers and the government had the call data records generated by David. The likely reason not a single toll free subscriber was called as a witness rests on the fact that the government's theory at trial was to cast the long-distance carriers as those who had parted with money. As proof, the original indictment in the case was markedly different from the superseding one used at trial. The

original indictment listed two classes of victims including the long distance carriers and the toll-free subscribers. *See* Exhibit 3. However, the superseding indictment dated October 16, 2003, included no such reference. Instead, the superseding indictment had but one. In the second indictment, the government alleged that Nisbet "did not disclose to Pacific Bell and the long-distance carriers the material fact that the thousands of calls made to toll-free telephone numbers made over the Leased Payphone Lines were made by an autodialer as opposed to actual callers using payphones." *See* Exhibit 4. This distinction between the two indictments was not unintentional or accidental. It provided the underbelly to the government's position that David's victims were those who paid him directly. This was the position of the new indictment, and how the case was presented to the jury. And now, with the discovery of the falsity of this claim the impact of this claim on the outcome at trial is without question.

The government's own press release announcing the prosecution also smacked of highlighting the government's flawed theory of the LD carriers as victims. In a March 8, 2002, press release issued from the Northern District of California U.S. Attorney's Office, the release reads, "Then, the defendants instructed the phone companies to cut checks to them made payable to the fictitious Jansen and Jacobs, and directed that the dividend checks from the fraud be sent to a mail drop in Arizona." *See* Exhibit 5. Such verbiage suggested that it was the phone companies, not the toll-free subscribers, who were fraudulently seduced by David and Nisbet to part with money.

Similarly, discussions out of the presence of the jury on the jury instructions are further proof of the government's flawed notion of the LD as victims during the trial. The prosecuting AUSA argued in support of their jury instructions that the government was required to "prove that he [David] was intentionally deceiving people. That's the crime here." (RT at 763) This

theory was ultimately incorporated into the selected jury instructions wherein the jury was told

that the government was required to prove that David, "knowingly devised or knowingly

participated in a scheme or plan to defraud by obtaining money or property through a course of

conduct or statements that were reasonably calculated to deceive." (RT at 795)   This language

of the jury instruction could have only applied to the LD carriers because, as pointed out, there

was no conduct or statements "that were reasonably calculated to deceive" made to the toll-free

subscribers. (RT at 171) The calls bore no content and made no statement, therein begging how

David could have made statements to deceive without any conduct or words?  Clearly, he hadn't.

## VI.    VARIANCE

### (a) The Government's Admission At David's Sentencing that the Long Distance Carriers Were Beneficiaries Rather Than Victims Violates the Laws of Variance.

Variance in proof between indictment and crime proved by evidence occurs if the

charging terms of indictment are left unchallenged, but evidence offered at trial proves facts

materially different from those alleged in the indictment.  U.S. v. Anderson (9th Cir. 1976) 532 F.

2d 1218.   Variance between charge of indictment and proof at trial also may affect substantial

rights of a defendant if the effect is to prevent the defendant from presenting his defense properly

or if it takes him unfairly by surprise or if it exposes him to double jeopardy.   In fact, excluding

the rules governing lesser included offenses, a defendant may not be convicted of an offense

different from that specifically charged by the grand jury.  U.S. v. Pazsint (9th Cir. 1983) 703 F.

2d 420;  U.S. v. Stewart (9th Cir. 1981)  652 F. 2d 804.

Such rules are established so that a defendant can prepare his defense, and be protected

against another prosecution for the same offense.   U.S. v. Tsinhnahijinne (9th Cir. 1997) 112 F.

3d. 988.  More specifically, prejudicial variance occurs when evidence offered at trial is

materially different than the evidence of guilt alleged in the indictment.  U.S. v. Olano (9th Cir. 1995) 62 F. 3d. 1180;  and U.S. v. McCormick (9th Cir. 1995) 72 F. 3d. 1404.  A change in the government's theory in a criminal case constitutes prejudicial variance when the introduction of the new theory changes the offense charged, or so alters the case that the defendant has not had a fair opportunity to present a defense to the new theory.  Lincoln v. Sunn (9th Cir. 1987) 807 F. 2d. 805.  This is especially true when the defendant is not informed of the new theory so that he can prepare his defense adequately. U.S. v. Blozer (9th Cir. 1977)  556 F. 2d. 948.

Here, David was forced to present a defense at trial based on the theory that he had defrauded the LD industry which had suffered enormous financial losses from David's actions. The government argued to the jury that, "so now we have Pac Bell deceived" (RT at 817)  and "So after deceiving the customers, the customers for all practical purposes are powerless to stop this fraud, then we go on to the long-distance carriers" (RT at 819);  and the superseding indictment set forth the same charge that, David "did not disclose to Pacific Bell and the long-distance carriers the material facts that they did not intend to and in fact did not attach payphones or any other telephones to the Leased Payphone Lines.." *See* Exhibit 3 at 3.  Hence, David's defense centered on his purpose in collecting the regulatory surcharge.  At trial, David argued that his business was a survey of the LD industry for class action litigation for which he in fact initiated and successfully sued AT&T for non-disclosure of its marked-up payphone charge to calling card consumers prior to the trial with the information he gathered from his survey.  (RT at 120-122)  David did not have the benefit of presenting a defense that there were no victims here including the LD carriers who paid David because the government did not disclose this known fact.  Again, "variance" occurs when evidence at trial or sentencing proves facts materially different from those alleged in indictment.  U.S. v. Homick (9th Cir. 1992) 964 F. 2d. 899.  A

Petition for Writ of Habeas Corpus                                    25

defendant cannot be convicted or sentenced on the basis of facts not found nor even presented to a grand jury. <u>U.S. v. Keith</u> (9th Cir. 1979) 605 F. 2d. 462.   As pointed out in <u>U.S. v. Maleslotto</u> (9th Cir. 1983) 717 F. 2d 1238, a defendant can not be convicted of participation in a fraudulent scheme "Y" when the grand jury indicted based on participation in fraudulent scheme "X," even if both schemes X & Y overlap or are concentric.

For David, the grand jury was advised that David's scheme resulted in thousands of dollars in financial losses to the LD industry.  The jury accepted this as true.  And yet, at sentencing, the scheme David was sentenced for had no identifiable victim and no financial losses payable to a particular victim.  As stated herein, this was no small discrepancy.  A crime without a victim and no actual financial losses  is a far cry from a crime with identifiable victims with quantifiable losses.   Legally significant variance occurs when the evidence presented proves facts materially different from those alleged in the indictment as it exists here.  <u>U.S. v. Ramos-Oseguera</u> (9th Cir. 1997) 120 F. 3d. 1028;  <u>U.S.  v. Bhagat</u> (9th Cir. 2006)  436 F. 3d. 1140.  Given these facts, David was not convicted for a victimless crime, but he was sentenced to one.  The two different versions of the same crime create a problem of variance between the nature of the crime he defended himself against at trial and the facts of his crime which were known at sentencing.  The two inconsistent versions of the same activity prejudiced David's ability to know which crime he had to present a defense for, therein implicating the law of variance.

## VII.    SUFFICIENCY OF EVIDENCE

### (a) Given the lack of a victim, the evidence proffered against David is insufficient to warrant a conviction for his crimes involving fraud.

David was convicted of several crimes involving fraud including mail fraud (18 U.S.C. §§ 1341 and 2) and using a fictitious name for purpose of conducting a fraudulent scheme and aiding an abetting in violation of §§ 1341 and 2. Each of these crimes involves elements of fraud as their predicate acts. And as such, each requires that there either be a causal connection between the victim and the deceived or that there was a quantifiable loss of some nature to a victim.

With the lack of an actual victim now established, the sufficiency of the evidence relied upon to support David's criminal convictions for crimes involving fraud is paper thin. The standard of review for a claim of sufficiency of the evidence is based on whether jurors could have reasonably arrived at their conclusion given the evidence presented. U.S. v. Larios (9th Cir. 1981) 640 F. 2d. 938. The question presented by a sufficiency of evidence claim is whether the court is satisfied that jurors reasonably could decide the guilt of the defendant. U.S. v. Rich (9th Cir. 1978) 580 F. 2d. 929; and U.S. v. Kaplan (9th Cir. 1977) 554 F. 2d 958. And this test is exactly the same for direct appeals as it is on habeas review. Mikes v. Borg (9th Cir. 1991) 947 F. 2d. 353.

David was convicted of crimes relating to mail fraud and use of a fictitious name for purpose of conducting a fraudulent scheme. On their face, and as part of the statutory language both crimes involve the element of fraud. For David, had the government's actual theory of the case naming AT&T and the LD carriers as non-victims been know earlier, the jury would have been forced to deal with a problem of a lack of "convergence" between the persons for whom misrepresentations were made (AT&T and others) and the toll free subscribers who received no communication from David except for a content-free one second phone call, and yet who paid money to their LD carrier directly and David indirectly. As noted, the toll-free subscribers were

under no regulatory obligation or mandate to directly pay the LD carrier as such fees are set and

imposed only by market forces; and by implication, the toll-free subscribers were under no

regulatory or market driven requirement to pay David indirectly or directly the cost of the

payphone surcharge.  David can not be said to have known with any quantum of certainty that

these fees would be paid or that the toll-free subscriber need part with money to cover fees

imposed at the LD carrier's discretion.  In a strong showing of how evidence presented at

sentencing – rather than at trial – was insufficient to warrant a conviction involving fraud, courts

generally follow a convergence theory under which the parties to whom misrepresentations were

made are identical to the victims.    U.S. v. Brennan (E.D.N.Y. 1996) 938 F. Supp. 1111, *reversed*

183 F. 3d. 139.  The preferred rule on convergence in fraud cases is to require convergence of

identity of the injured and the deceived in order to establish violation of mail and wire fraud

statutes.  Lifschultz Fast Freight Inc. v. Consolidated Freightways Corp. of Delaware (D.S.C.

1992) 805 F.Supp. 1277, *affirmed* 998 F. 2d. 1009, *cert. denied* 114 S. Ct. 553, 510 U U.S. 993,

126 L.Ed. 2d. 454.  And where a scheme does not cause actual harm to victims, the government

must produce evidence independent of an alleged scheme to show a defendant's fraudulent intent

to support a conviction for mail fraud. U.S. v. Jain (8 Cir. 1996) 93 F. 3d. 436, *rehearing denied,*

*certiorari denied* 117 S. Ct. 2452, 520 U.S. 1273, 138 L.Ed. 2d 210.   Here, however, the

government could show neither convergence between those who were arguably deceived and

those who suffered a financial loss by David's conduct.  To the contrary, David testified at trial

that his intent was far from fraudulent.  His intent was to conduct a survey of the pay rate of the

LD industry for the pay phone surcharge. (RT at 130, 618-620, 664, 666, and 727)  This can

hardly be said to constitute a fraudulent intent by David to have victims depart with money via

mis-representations.   Hence, the combination of a lack of an independently proven fraudulent

intent and no convergence between victim and misrepresentation, the government's case – once fully understood at sentencing – was insufficient for any reasonable juror to conclude that a crime had occurred.   Even crimes of fraud that have no actual losses to victims still require the potential for such losses which were not present here.  U.S. v. Barber (7th Cir. 1989) 881 F. 2d. 345, *rehearing denied, certiorari denie*d, 110 S.Ct. 1956, 495 U.S. 922, 109 L.Ed. 2d. 318.  A loss of any intangible measure without proof of the probability of actual harm is insufficient to support a mail fraud conviction.  U.S. v. Asher (3rd Cir. 1988)  854 F. 2d. 1483,  *certiorari denied*  109 S. Ct. 836, 488 U.S. 1029, 102 L.Ed. 2d 969.  In fact, courts have proven quite reluctant in sustaining convictions of fraud when no financial harm has resulted because of either the circumstances of proof or the lack of fraudulent intent.   U.S. v. Ballard (5th Cir. 1982) 680 F. 2d. 352 (insufficient evidence when ones who did not receive disclosure existence of manipulative system of reselling oil suffered no actual monetary loss).  Surely, the government was required to prove, at minimum, that David contemplated some actual harm or injury.  U.S. v. Brennan (E.D.N .Y. 1996) 938 F. Supp. 1111, *reversed* 183 F. 3d. 139.  At trial, David demonstrated the opposite that his intentions did not contemplate harm, but rather a public benefit through his researched survey work.  (RT at 130, 618-620, 664, 666, and 727)   Without actual victims, the probability of financial harm, or fraudulent intent, there simply was no showing of fraud or a fraudulent scheme to speak of, and no reasonable trier of fact could have concluded so.


**VIII.   CONCLUSION**

David will spend well-over two years in prison  without the Habeas relief which he is

1    due and should be afforded.   The startling revelation that his case's primary victims did not

2    actually exist warrants a careful review under the legal theories argued above.  For these reasons,

3    and those which the court may conclude, David seeks habeas relief.

4

5

6    Respectfully submitted,

7    DATED:  8/8/07



8

9                                            Charles F.A. Carbone, Esq.

10                                           LAW OFFICES OF CHARLES CARBONE
                                             3128 16TH Street
11                                           PMB 212
                                             San Francisco, CA 94103
12                                           Tel: 415-981-9773
                                             Fax:  415-981-9774
13

14
                                             Attorney for Petitioner Daniel David
15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Daniel David, state:

I am the petitioner in this action. I have read the foregoing Petition for Writ of Habeas Corpus and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June 30, 2007, in California.

Petitioner Daniel David

# PROOF OF SERVICE

I, _Charles Carter_, hereby certify that I am over the age of 18, not a party to this action and have served via U.S. first class mail In DANIEL DAVID Case No. _____ in the USDC for the Northern District of California on this _8_ day of August 2007 on the following parties:

United States Attorney's Office
450 Golden Gate Avenue
11th Floor
San Francisco, CA 94102

_8 /8 /07_
Date

Name

# Exhibit One

Charles F. A. Carbone, Esq. (SBN 206536)
LAW OFFICES OF CHARLES CARBONE
3128 16TH Street
PMB 212
San Francisco, CA 94103
Tel: 415-981-9773
Fax: 415-981-9774

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re DANIEL DAVID,<br>     Petitioner,<br>v.<br><br>Harley G. Lappin, Director, BOP,<br>     Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C._____ |

## DECLARATION OF PETITIONER DANIEL DAVID

I, Daniel David, hereby declares as follows:

1. I am the petitioner in the above-captioned matter and could and would competently testify to the following matters if called to testify.

2. On or near November 2006, I contacted FBI Senior Agent Steve Coffin to arrange an informal meeting to discuss matters concerning my criminal case.

3. After initial speaking via telephone with Agent Coffin, I contacted my private criminal attorney Dennis Riordan -- at Agent Coffin's request -- so that attorney Riordan could execute a waiver of an otherwise ex parte communication in order to allow Agent Coffin and I to speak freely. Attorney Riordan promptly did so, thereby resolving any such concerns.

4.  In a subsequent conversation shortly thereafter, Agent Coffin and I agreed to meet at Peet's Coffee in Berkeley, California at 11:00 a.m. on November 20, 2006.

5.  I attended the meeting with another privately retained attorney -- John Kirke, Esq. -- who acted as my legal counsel during the course of the meeting.  Agent Coffin was joined by another FBI agent whose identity is not presently known.

6.  The conversation between myself and Agent Coffin centered on whether the FBI and the U.S. Attorney's Office was aware prior to seeking the grand jury indictment that AT&T and the other long-distance carriers were beneficiaries, rather than victims, of my business activity which ultimately was the subject of the instant criminal prosecution.  Agent Coffin unequivocally admitted that the government -- including the FBI and the U.S. Attorney's Office -- was aware of the plain fact that AT&T and the other LD carriers were beneficiaries who parted with no monies based upon my calling activity.

7.  After explaining my position that AT&T was reaping multi-million dollar rewards via mark-ups to consumers of the payphone surcharge while underpaying payphone owners, Agent Coffin admitted that the FBI had known since nearly the inception of the investigation and prosecution that AT&T and the other LD carriers had financially benefited from my calling activity.

I hereby declare, under penalty of perjury, that the aforementioned is true and accurate to the best of my knowledge as sworn on this 23 day of July 2007 in the County of Kern.

DANIEL DAVID

# Exhibit Two

Charles F. A. Carbone, Esq. (SBN 206536)
LAW OFFICES OF CHARLES CARBONE
3128 16TH Street
PMB 212
San Francisco, CA 94103
Tel: 415-981-9773
Fax: 415-981-9774

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re DANIEL DAVID, | C. _____ |
| Petitioner, | |
| v. | |
| Harley G. Lappin, Director, BOP, | |
| Respondent. | |

## DECLARATION OF JOHN KIRKE, ESQ.

I, John Kirke, Esq., hereby declares as follows:

1. I am a member in good standing with the State Bar of California, and would competently testify to the following matters if called to do so:

2. On or near November 20, 2006, I attended a meeting with Daniel N. David and FBI Agent Steve Coffin and another FBI agent at the request of Daniel David to act as Mr. David's counsel for the sole purposes of this meeting.

3. Although I did not directly participate in the conversation, I did observe that the discussion concerned whether the government was aware prior to Mr. David's trial that AT&T and other

DECLARATION OF JOHN KIRKE, ESQ.

1  long-distance ("LD") carriers were beneficiaries, rather than victims, of David's business activity
2  which ultimately was the subject of a criminal prosecution.

3

4  4. In my presence, Agent Coffin admitted that the government was aware of the plain fact that
5  AT&T and other LD carriers were beneficiaries who did not incur financial loss based upon Mr.
6  David's calling activity.

7

8  I hereby declare, under penalty of perjury, that the aforementioned is true and accurate to the best
9  of my knowledge as sworn on this 7th day of August 2007 in the County of Alameda.

10

11

12            JOHN KIRKE, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOHN KIRKE, ESQ.

# Exhibit Three

1  DAVID W. SHAPIRO (NYSBN 2054054)
   United States Attorney

2

3

4

5

6

7

8

9

10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

13

UNITED STATES OF AMERICA,    **CR · 02 - 0062**

14                                    )
           Plaintiff,                 )  VIOLATIONS: 18 U.S.C. § 371 –

15                                    )  Conspiracy; 18 U.S.C. § 1341 – Mail Fraud;
           v.                         )  18 U.S.C. §§ 1956(a)(1)(B)(i) & (a)(1)(A)(i)

16                                    )  – Laundering of Monetary Instruments; 18
   DANIEL DAVID and                   )  U.S.C. § 2 – Aiding & Abetting; 26 U.S.C. §

17  SCOTT D. NISBET,                  )  7206(1) – Making and Subscribing a False
                                      )  Return; 18 U.S.C. § 982(a)(1) – Forfeiture

18         Defendants.                )
                                      )  SAN FRANCISCO VENUE

19                                    )
                                      )

20  _____  )

21                          I N D I C T M E N T

22  The Grand Jury charges:

23                              INTRODUCTION

24      1.      At all times relevant to this Indictment, Pacific Bell Telephone Company

25  (hereafter "Pacific Bell") engaged in the business of leasing payphone lines, primarily to

26  businesses and commercial establishments (hereafter "Payphone Leasors"). Pacific Bell charged

27  a fee for each local telephone call made from a leased payphone. Similarly, long-distance

28  telephone carriers charged a fee for each long-distance telephone call made from a leased

INDICTMENT
DAVID/NISBET

1 payphone. The fee was collected when the caller deposited money into the Pacific Bell

2 payphone, used a calling card, or called collect. Fees for toll-free or 800-number telephone calls

3 from leased Pacific Bell payphones were paid to long-distance telephone carriers by the business

4 or entity which had established the toll-free number.

5     2.     At all times relevant to this Indictment, long-distance telephone carriers agreed to

6 split the profits from payphone calls with the Payphone Leasors. In the case of toll-free calls,

7 Payphone Leasors were paid approximately 24 cents per call.

8 COUNT ONE: (18 U.S.C. § 371 – Conspiracy)

9     3.     The allegations contained in paragraphs One and Two are realleged and

10 incorporated by reference as if set forth herein.

11     4.     In or about and between April 1998 and April 2000, both dates being approximate

12 and inclusive, in the Northern District of California and elsewhere, the defendants

13
DANIEL DAVID and<br/>SCOTT D. NISBET

14
15 did knowingly and intentionally combine, conspire and agree to commit mail fraud, in violation

of Title 18, United States Code, Section 1341 as follows:

16
17 MEANS AND METHODS OF CONSPIRACY AND FRAUDULENT SCHEME

    5.     DAVID and NISBET leased 24 payphone lines from Pacific Bell (hereafter

18 "Leased Payphone Lines") using the fictitious names Bill Jansen and Dave Jacobs.

19
20     6.     DAVID and NISBET arranged for Pacific Bell to install the Leased Payphone

Lines at 139 Mitchell Ave., No. 107, South San Francisco, California.

21
22     7.     DAVID and NISBET programmed an automatic telephone dialing system to make

calls to toll-free numbers from the Leased Payphone Lines in order to collect fees.

23
24     8.     DAVID and NISBET rented a mailbox at Mail & More in Scottsdale, Arizona in

the names of Bill Jansen and Dave Jacobs using a fictitious notary stamp.

25
26     9.     DAVID and NISBET directed long-distance telephone carriers through Pacific

Bell to mail dividend checks made payable to "Bill Jansen and Dave Jacobs" for toll calls made

27 from the Leased Payphone Lines to Mail & More in Arizona.

28

INDICTMENT
DAVID/NISBET          2

1    10.   DAVID and NISBET directed Mail & More to send the Leased Payphone Lines
2    dividend checks to San Francisco.

3    11.   A friend of DAVID's who is an attorney (hereafter "Attorney Doe") deposited
4    Leased Payphone Lines dividend checks made payable to Bill Jansen and Dave Jacobs from the
5    Leased Payphone Lines into Attorney Doe's trust account and Doe wrote checks made payable to
6    DAVID in identical amounts.

7    12.   DAVID and NISBET created four shell corporations in Nevada, including Breeze
8    Communications.

9    13.   DAVID and NISBET informed Pacific Bell that the identity of the Payphone
10   Leasors for the Leased Payphone Lines had been changed from Bill Jansen and Dave Jacobs to
11   Breeze Communications and Mark Ryan, a fictitious person, and asked that future dividend
12   checks for toll calls from the Leased Payphone Lines be made payable to "Breeze
13   Communications and Mark Ryan".

14                                    OVERT ACTS

15   14.   In furtherance of the conspiracy and to effect the objects thereof, in the Northern
16   District of California, and elsewhere, DAVID and NISBET committed the following overt acts,
17   among others:

18        a.   On or about April 22, 1998, NISBET rented office space at 139 Mitchell
19   Ave., No. 107, South San Francisco, California.

20        b.   On or about May 1998, NISBET purchased a 24-line Audisys automatic
21   telephone dialing system from Buffalo, International, Inc. in Valhalla, New York.

22        c.   On or about October 5, 1999, an unidentified person using the name
23   "David Scott" picked up a package mailed from Mail & More containing Leased Payphone Lines
24   dividend checks made payable to Bill Jansen and Dave Jacobs at the United Airlines cargo desk
25   at San Francisco International Airport in San Bruno, California.

26        d.   On or about May 3, 1999, NISBET requested that his tax accountant
27   (hereafter "Tax Accountant") create four shell corporations in Nevada named Breeze
28   Communications, Boxcar Communications, Bamboo Communications and Pelican

INDICTMENT
DAVID/NISBET                          3

1   Communications.

2           All in violation of 18 U.S.C. § 371.

3   COUNTS TWO THROUGH EIGHT: (18 U.S.C. §§ 1341 & 2 – Mail Fraud and Aiding and
    Abetting)

4
        15.     The allegations contained in paragraphs One through Thirteen are realleged and
5
    incorporated by reference as if set forth herein.
6
        16.     In or about the dates indicated below, which are approximate and inclusive, in the
7
    Northern District of California and elsewhere, the defendants
8
                                         DANIEL DAVID and
9                                        SCOTT D. NISBET

10  having devised and intending to devise a scheme and artifice to defraud, and to obtain money and

11  property by means of false and fraudulent pretenses, representations and promises, did for the

12  purpose of executing that scheme, knowingly cause to be placed in a post office and authorized

13  depository for mail matter, the following:

14

| COUNT | APPROXIMATE DATE OF MAILING | ITEM MAILED |
|-------|------------------------------|-------------|
| 2 | January 4, 1999 | NPC check in the amount of $126,453.89 made payable to "Bill Jansen and Dave Jacobs" |
| 3 | March 23, 1999 | Sprint check in the amount of $22,157.68 made payable to "Bill Jansen and Dave Jacobs c/o Jansen, Bill, Ryan, Mark" |
| 4 | April 1, 1999 | NPC check in the amount of $88,779.96 made payable to "Bill Jansen and Dave Jacobs" |
| 5 | June 24, 1999 | Sprint check in the amount of $15,473.17 made payable to "Bill Jansen and Dave Jacobs c/o Jansen, Bill, Ryan, Mark" |
| 6 | July 1, 1999 | NPC check in the amount of $147,759.74 made payable to "Bill Jansen and Dave Jacobs" |
| 7 | September 22, 1999 | Sprint check in the amount of $22,790.89 made payable to "Bill Jansen and Dave Jacobs c/o Jansen, Bill, Ryan, Mark" |
| 8 | October 1, 1999 | NPC check in the amount of $20,783.58 made payable to "Bill Jansen and Dave Jacobs" |

27

28          All in violation of Title 18, United States Code, Sections 1341 and 2.

    INDICTMENT
    DAVID/NISBET                             4

COUNT NINE THROUGH THIRTEEN: (18 U.S.C. § 18 U.S.C. 1956(a)(1)(B)(i) – Laundering of Monetary Instruments.)

17.     The allegations contained in paragraphs One through Thirteen and Counts One through Eight are realleged and incorporated by reference as if set forth.

18.     In or about the dates indicated below, which are approximate and inclusive, in the Northern District of California and elsewhere, the defendant

## DANIEL DAVID

did knowingly conduct financial transactions with the proceeds of a specified unlawful activity, to wit, mail fraud, a violation of Title 18 United States Code, Section 1341, knowing that the financial transactions were designed, in whole or in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, as follows:

| Count | Date | Financial Transaction | Amount |
|-------|------|----------------------|--------|
| 9 | February 5, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05319-11191 | $100,000 |
| 10 | February 5, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05314-09803 | $26,453.89 |
| 11 | April 26, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05319-11191 | $110,937.64 |
| 12 | July 20, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05319-11191 | $163,232.91 |
| 13 | October 28, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05314-09803 | $43,574.47 |

All in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

COUNTS FOURTEEN AND FIFTEEN: (18 U.S.C. § 18 U.S.C. 1956(a)(1)(A)(i) – Laundering of Monetary Instruments.)

19.     The allegations contained in paragraphs One through Thirteen and Counts One Through Eight are realleged and incorporated by reference as if set forth fully herein.

INDICTMENT
DAVID/NISBET                                     5

1    20.    In or about the dates indicated below, which are approximate and inclusive, in the

2  Northern District of California and elsewhere, the defendant

3                                SCOTT D. NISBET

4  did knowingly conduct financial transactions with the proceeds of a specified unlawful activity,

5  to wit, mail fraud, a violation of Title 18 United States Code, Section 1341, with the intent to

6  promote the carrying on of a specified unlawful activity, as follows:

7

| Count | Date | Financial Transaction | Amount |
|-------|------|------------------------|--------|
| 14 | April 27, 1999 | Check # 921 from Bank of America Account # 10872-15165 to Tax Accountant | $3,000 |
| 15 | April 29, 1999 | Check #922 from Bank of America Account # 10872-15165 to Tax Accountant | $2,500 |

11

12    All in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

13  COUNT SIXTEEN: (26 U.S.C. § 7206(1) – Making and Subscribing a False Return)

14    21.    On or about October 16, 2000, in the Northern District of California and

15  elsewhere, the defendant

16                                DANIEL DAVID,

17  then a resident of Berkeley, California, did willfully make and subscribe a False United States

18  Individual Income Tax Return, Form 1040, which was verified by a written declaration that it

19  was made under the penalties of perjury and which was filed with the Internal Revenue Service,

20  which he did not believe to be true and correct as to every material matter in that the said United

21  States Individual Income Tax Return, Form 1040, included a fraudulent bad debt expense

22  deduction of $349,750, in violation of Title 26, United States Code, Section 7206(1).

23  COUNT SEVENTEEN: (18 U.S.C. § 982(a)(1) – Forfeiture)

24    22.    The allegations contained in paragraphs One through Twenty-One and Counts

25  One through Fifteen are realleged and incorporated by reference as if set forth herein.

26    23.    As a result of the offenses alleged in Counts One through Thirteen above,

27  defendant

28                                DANIEL DAVID

INDICTMENT
DAVID/NISBET                                6

1    shall forfeit to the United States the sum of $444,198.91, as property involved in or traceable to

2    said money laundering violations.

3        24.    If, as a result of any act or omission of the defendant, any of said property

4                a.    cannot be located upon the exercise of due diligence;

5                b.    has been transferred or sold to or deposited with, a third person;

6                c.    has been placed beyond the jurisdiction of the Court;

7                d.    has been substantially diminished in value; or

8                e.    has been commingled with other property which without difficulty cannot

9                      be subdivided;

10    then the defendant shall forfeit to the United States any and all interest defendant has in any other

11    property (not to exceed the value of the above forfeitable property), including but not limited to

12    the following:

13                Real property and improvements located at 406 Berkeley Park Boulevard,
                 Kensington, California 94707, identified by Assessor's Parcel Number 571-332-

14                008, an more particularly described in attachment A.

15        All in violation of Title 18, United States Code, Section 982(a)(1).

16    DATED:                                     A TRUE BILL.

17

18                                           FOREPERSON

19
     DAVID W. SHAPIRO
20    United States Attorney

21

22    J. DOUGLAS WILSON

23    Chief, Criminal Division

24    (Approved as to form:

25                       AUSA JACOBS

26

27

28

INDICTMENT
DAVID/NISBET                7

# Exhibit Four

1  KEVIN V. RYAN (CSBN 118321)
   United States Attorney

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10               SAN FRANCISCO DIVISION

11

12  UNITED STATES OF AMERICA,        )    No. CR-02-0062-SI
                                     )
13        Plaintiff,                 )    VIOLATIONS: 18 U.S.C. § 371 –
                                     )    Conspiracy; 18 U.S.C. § 1341 – Mail Fraud;
14     v.                            )    18 U.S.C. § 1342 – Using Fictitious Names
                                     )    for Fraudulent Scheme; 18 U.S.C. §§
15  DANIEL DAVID and                 )    1956(a)(1)(B)(i) & (a)(1)(A)(i) – Laundering
    SCOTT D. NISBET,                 )    of Monetary Instruments; 18 U.S.C. § 2 –
16                                   )    Aiding & Abetting;  18 U.S.C. § 982(a)(1) –
          Defendants.                )    Forfeiture
17                                   )
                                     )    SAN FRANCISCO VENUE
18                                   )

19           S U P E R S E D I N G   I N D I C T M E N T

20  The Grand Jury charges:

21                      INTRODUCTION

22       1.    At all times relevant to this Indictment, Pacific Bell Telephone Company

23  (hereafter "Pacific Bell") engaged in the business of leasing payphone lines, primarily to

24  businesses and commercial establishments (hereafter "Payphone Leasors"). Pacific Bell charged

25  a fee for each local telephone call made from a leased payphone line. Similarly, long-distance

26  telephone carriers charged a fee for each long-distance telephone call made from a leased

27  payphone line. A caller using a payphone typically would pay for using the payphone line by

28

    SUPERSEDING INDICTMENT
    DAVID/NISBET CR-02-0062-SI

1   depositing money into the payphone, using a calling card, or calling collect. A caller using a

2   payphone to call a toll-free number (such as an "800" number), however, typically would not

3   have to make any payment. In such cases, the toll-free number subscriber would pay for the call

4   by paying a fee to a long-distance carrier. The long-distance carrier would use part of that fee to

5   pay Payphone Leasors for allowing their payphones to be used to call toll-free numbers.

6       2.    At all times relevant to this Indictment, toll-free number subscribers paid fees to

7   long-distance telephone carriers directly for toll-free calls made to the toll-free numbers from

8   payphones. In turn, the long-distance carriers agreed to pay to Payphone Leasors a fee of

9   approximately 24 cents for each call made from the payphone line to toll-free telephone numbers.

10  Some long-distance carriers made payments to Payphone Leasors through a service called the

11  National Payphone Clearinghouse.

12

13  COUNT ONE: (18 U.S.C. § 371 – Conspiracy)

14      3.    The allegations contained in paragraphs One and Two are realleged and

15  incorporated by reference as if set forth herein.

16      4.    In or about and between April 1998 and April 2000, both dates being approximate

17  and inclusive, in the Northern District of California and elsewhere, the defendants

18                    DANIEL DAVID and
                      SCOTT D. NISBET

19

20  did knowingly and intentionally combine, conspire and agree to commit mail fraud and to use

21  fictitious names for the purpose of conducting mail fraud and conducting an unlawful business in

22  violation of Title 18, United States Code, Sections 1341 and 1342 as follows:

23          MEANS AND METHODS OF CONSPIRACY AND FRAUDULENT SCHEME

24      5.    DAVID and NISBET leased 23 payphone lines from Pacific Bell (hereafter

25  "Leased Payphone Lines") using the fictitious names Bill Jansen and Dave Jacobs.

26      6.    DAVID and NISBET arranged for Pacific Bell to install the Leased Payphone

27  Lines at 139 Mitchell Ave., No. 107, South San Francisco, California.

28      7.    DAVID and NISBET, through concealment and omission, did not disclose to

SUPERSEDING INDICTMENT
DAVID/NISBET CR-02-0062-SI       2

1   Pacific Bell and the long-distance carriers the material facts that they did not intend to and in fact
2   did not attach payphones or any other telephones to the Leased Payphone Lines.

3       8.      DAVID and NISBET programmed and operated an automatic telephone dialing
4   system to make calls to toll-free numbers from the Leased Payphone Lines so they could collect a
5   portion of the fees the toll-free number owners paid the long-distance carriers.

6       9.      DAVID and NISBET, through concealment and omission, did not disclose to
7   Pacific Bell and the long-distance carriers the material fact that the thousands of calls made to
8   toll-free telephone numbers over the Leased Payphone Lines were made by an autodialer as
9   opposed to actual callers using payphones.

10      10.     DAVID and NISBET rented a mailbox at Mail & More in Scottsdale, Arizona in
11  the fictitious, false, and assumed names of Bill Jansen and Dave Jacobs using a fictitious notary
12  stamp.

13      11.     DAVID and NISBET directed long-distance telephone carriers and their
14  representatives, through Pacific Bell, to mail the checks for the fees accumulated by the
15  fraudulent calls to toll-free telephone numbers over the Leased Payphone Lines to the fictitious,
16  false, and assumed names "Bill Jansen" and "Dave Jacobs" at the Mail & More mailbox in
17  Arizona.

18      12.     DAVID and NISBET directed long-distance telephone carriers and their
19  representatives, through Pacific Bell, to make the checks for the fees payable to the fictitious,
20  false, and assumed names "Bill Jansen" and "Dave Jacobs."

21      13.     DAVID and NISBET directed Mail & More to send the checks for the fees to
22  locations in the Northern District of California.

23      14.     DAVID and NISBET created four shell corporations in Nevada, including Breeze
24  Communications.

25      15.     DAVID and NISBET informed Pacific Bell that the identity of the Payphone
26  Leasors for the Leased Payphone Lines had been changed from Bill Jansen and Dave Jacobs to
27  Breeze Communications and Mark Ryan, a fictitious person, and asked that future checks for fees
28  //

SUPERSEDING INDICTMENT
DAVID/NISBET CR-02-0062-SI            3

1  for calls made to toll-free numbers over the Leased Payphone Lines be made payable to "Breeze
2  Communications and Mark Ryan."
3
4  OVERT ACTS
5      16.    In furtherance of the conspiracy and to effect the objects thereof, in the Northern
6  District of California, and elsewhere, DAVID and NISBET committed the following overt acts,
7  among others:
8      a.    On or about April 22, 1998, NISBET rented office space at 139 Mitchell
9  Ave., No. 107, South San Francisco, California.
10     b.    On or about May 1998, NISBET purchased a 24-line Audisys automatic
11 telephone dialing system from Buffalo, International, Inc. in Valhalla, New York.
12     c.    On or about October 5, 1999, a coconspirator using the name "David
13 Scott" picked up a package mailed from Mail & More containing Leased Payphone Lines
14 dividend checks made payable to Bill Jansen and Dave Jacobs at the United Airlines cargo desk
15 at San Francisco International Airport in San Bruno, California.
16     d.    On or about May 3, 1999, NISBET requested that his tax accountant create
17 four shell corporations in Nevada named Breeze Communications, Boxcar Communications,
18 Bamboo Communications and Pelican Communications.
19     All in violation of Title 18, United States Code, Section 371.
20
21 COUNTS TWO THROUGH EIGHT: (18 U.S.C. §§ 1341 & 2 – Mail Fraud and Aiding and
                                        Abetting)
22
23     17.    The allegations contained in paragraphs One through Fifteen are realleged and
incorporated by reference as if set forth herein.
24
25     18.    On or about the dates indicated below, which are approximate and inclusive, in
the Northern District of California and elsewhere, the defendants
26
                              DANIEL DAVID and
27                               SCOTT D. NISBET
28 having devised and intending to devise and willfully participate in a scheme and artifice to

SUPERSEDING INDICTMENT
DAVID/NISBET CR-02-0062-SI                4

1  defraud Pacific Bell, long-distance telephone carriers, and toll-free telephone number subscribers

2  to obtain money and property by means of false and fraudulent pretenses, representations and

3  promises, did for the purpose of executing that scheme and attempting to do so, knowingly cause

4  to be placed in a post office and authorized depository for mail matter, to be delivered by the

5  U.S. Postal Service to Scottsdale, Arizona and later by private and commercial interstate carrier

6  to the Northern District of California, the following:

7

| COUNT | APPROXIMATE DATE OF MAILINGS | ITEM MAILED |
|-------|------------------------------|-------------|
| 2 | January 4, 1999 to January 21, 1999 | NPC check in the amount of $126,453.89 made payable to "Jansen, Bill & Jacobs, Dave" |
| 3 | March 23, 1999 to April 13, 1999 | Sprint check in the amount of $22,157.68 made payable to "Jansen, Bill & Jacobs, Dave c/o Jansen, Bill Ryan, Mark" |
| 4 | April 1, 1999 to April 13, 1999 | NPC check in the amount of $88,779.96 made payable to "Jansen, Bill & Jacobs, Dave" |
| 5 | June 24, 1999 to July 9, 1999 | Sprint check in the amount of $15,473.17 made payable to "Jansen, Bill & Jacobs, Dave c/o Jansen, Bill Ryan, Mark" |
| 6 | July 1, 1999 to July 9, 1999 | NPC check in the amount of $147,759.74 made payable to "Jansen, Bill & Jacobs, Dave" |
| 7 | September 22, 1999 to October 8, 1999 | Sprint check in the amount of $22,790.89 made payable to "Jansen, Bill & Jacobs, Dave c/o Jansen, Bill Ryan, Mark" |
| 8 | October 1, 1999 to October 8, 1999 | NPC check in the amount of $20,783.58 made payable to "Jansen, Bill & Jacobs, Dave" |

All in violation of Title 18, United States Code, Sections 1341 and 2.


COUNTS NINE THROUGH FIFTEEN: (18 U.S.C. §§ 1342 and 2 – Using Fictitious Name for Fraudulent Scheme and Aiding and Abetting)

19.    The allegations contained in paragraphs One through Fifteen are realleged and

incorporated by reference as if set forth herein.

20.    On or about the dates indicated below, which are approximate and inclusive, in


SUPERSEDING INDICTMENT
DAVID/NISBET CR-02-0062-SI                    5

1  the Northern District of California and elsewhere, the defendants

2                          DANIEL DAVID and
                           SCOTT D. NISBET

3  for the purpose of conducting, promoting, and carrying on by means of the Postal Service, a

4  scheme mentioned in Title 18, United States Code, Section 1341, and an unlawful business, that

5  is, the operation of an automatic telephone dialing system to make calls to numbers for which the

6  called party is charged for the call, in violation of Title 47, United States Code, Section

7  227(b)(1)(A)(iii), did use, assume, and request to be addressed by fictitious, false, and assumed

8  names other than their proper names, and did take and receive mail matter from an authorized

9  depository of mail matter addressed to any such fictitious, false, and assumed names other than

10  their proper names as follows:

11

12
| COUNT | APPROXIMATE DATE OF MAILING | FICTITIOUS NAMES USED |
|-------|------------------------------|------------------------|
| 9     | January 4, 1999              | Bill Jansen and Dave Jacobs |
| 10    | March 23, 1999               | Bill Jansen, Dave Jacobs, and Mark Ryan |
| 11    | April 1, 1999                | Bill Jansen and Dave Jacobs |
| 12    | June 24, 1999                | Bill Jansen, Dave Jacobs, and Mark Ryan |
| 13    | July 1, 1999                 | Bill Jansen and Dave Jacobs |
| 14    | September 22, 1999.          | Bill Jansen, Dave Jacobs, and Mark Ryan |
| 15    | October 1, 1999              | Bill Jansen and Dave Jacobs |

20      All in violation of Title 18, United States Code, Sections 1342 and 2.

21

22

23  COUNT SIXTEEN THROUGH TWENTY: (18 U.S.C. § 18 U.S.C. 1956(a)(1)(B)(i) –
                                    Laundering of Monetary Instruments)

24      21.    On or about the dates indicated below, which are approximate and inclusive, in

25  the Northern District of California and elsewhere, the defendant

26                          DANIEL DAVID

27  did knowingly conduct financial transactions with the proceeds of a specified unlawful activity,

28

SUPERSEDING INDICTMENT
DAVID/NISBET CR-02-0062-SI              6

to wit, mail fraud, a violation of Title 18 United States Code, Section 1341, knowing that the financial transactions were designed at least in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activity, as follows:

| Count | Date | Financial Transaction | Amount |
|-------|------|----------------------|--------|
| 16 | February 5, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05319-11191 | $100,000 |
| 17 | February 5, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05314-09803 | $26,453.89 |
| 18 | April 26, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05319-11191 | $110,937.64 |
| 19 | July 20, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05319-11191 | $163,232.91 |
| 20 | October 28, 1999 | Deposit of check from Attorney Doe into DAVID's Bank of America Account #05314-09803 | $43,574.47 |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

COUNTS TWENTY-ONE AND TWENTY-TWO: (18 U.S.C. § 1956(a)(1)(A)(i) – Laundering of Monetary Instruments.)

22.    On or about the dates indicated below, which are approximate and inclusive, in the Northern District of California and elsewhere, the defendant

SCOTT D. NISBET

did knowingly conduct financial transactions with the proceeds of a specified unlawful activity, to wit, mail fraud, a violation of Title 18 United States Code, Section 1341, with the intent to promote the carrying on of a specified unlawful activity, as follows:

| Count | Date | Financial Transaction | Amount |
|-------|------|----------------------|--------|
| 21 | April 27, 1999 | Check # 921 from Bank of America Account # 10872-15165 to Tax Accountant | $3,000 |
| 22 | April 29, 1999 | Check #922 from Bank of America Account # 10872-15165 to Tax Accountant | $2,500 |

1   All in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

2

3   COUNT TWENTY-THREE: (18 U.S.C. § 982(a)(1) – Forfeiture)

4       23.    The allegations contained in paragraphs One through Sixteen and Counts One

5   through Fifteen are realleged and incorporated by reference as if set forth herein.

6       24.    As a result of the offenses alleged in Counts One through Eight and Sixteen

7   through Twenty above, defendant

8                                   DANIEL DAVID

9   shall forfeit to the United States the sum of $444,198.91, as property involved in or traceable to

10  said money laundering violations.

11      25.    If, as a result of any act or omission of the defendant, any of said property

12          a.    cannot be located upon the exercise of due diligence;

13          b.    has been transferred or sold to or deposited with, a third person;

14          c.    has been placed beyond the jurisdiction of the Court;

15          d.    has been substantially diminished in value; or

16          e.    has been commingled with other property which without difficulty cannot

17              be subdivided;

18  then the defendant shall forfeit to the United States any and all interest defendant has in any other

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

SUPERSEDING INDICTMENT
DAVID/NISBET CR-02-0062-SI          8

1    property (not to exceed the value of the above forfeitable property), including but not limited to

2    the following:

3           Real property and improvements located at 406 Berkeley Park Boulevard,
           Kensington, California 94707, identified by Assessor's Parcel Number 571-332-

4           008.

5       All in violation of Title 18, United States Code, Section 982(a)(1).

6    DATED:                         A TRUE BILL.

7

8                                  ___FOREPERSON___

9    KEVIN V. RYAN
     United States Attorney

10

11

     ROSS W. NADEL

12    Chief, Criminal Division

13

     (Approved as to form: _____)

14               AUSA Parrent

15

16

17

18

19

20

21

22

23

24

25

26

27

28

     SUPERSEDING INDICTMENT
     DAVID/NISBET CR-02-0062-SI         9

# Exhibit Five



**United States Attorney's Office**
Northern District Of California

| About Us ▾ | Divisions ▾ | Press ▾ | Community ▾ | Employment ▾ |

☒ David & Nisbet

Text Only Version

July 2001

June 2001

May 2001

April 2001

March 2001

Febuary 2001

January 2001

December 2000

November 2000

October 2000

September 2000

August 2000



🏠 Home
📑 Index
🔍 Search



## U.S. Department of Justice

*United States Attorney*
*Northern District of California*

11th Floor, Federal Building
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102

Tel: (415) 436-7200
Fax: (415) 436-7234

### FOR IMMEDIATE RELEASE

March 8, 2002

The United States Attorney's Office for the Northern District of California announced that Daniel David and Scott D. Nisbet were indicted late yesterday on charges of mail fraud, conspiracy and money laundering, as well as tax fraud for Mr. David. Mr. David and Mr. Nisbet are alleged to have engaged in a scheme in which they leased two dozen payphone lines from Pacific Bell, routed the phone lines to an empty office, hooked up the lines to an autodialer and made countless telephone calls to 800-numbers in order to collect money from the phone companies. The defendants are alleged to have received nearly half a million dollars in their scheme.

Mr. David, age 36, and Mr. Nisbet, age 38, both of whom live in Berkeley, are charged in a 17-count indictment returned yesterday afternoon by a federal grand jury in San Francisco. They are charged with conspiracy in violation of 18 U.S.C., Section 371, mail fraud in violation of 18 U.S.C., Section 1341, and money laundering in violation of 18 U.S.C. 1956. In addition, the indictment charges Daniel David with tax fraud in violation of 26 U.S.C., Section 7306(1)(making and subscribing a false return), and seeks forfeiture of $444,198.91 in a house owned by Mr. David in Kensington, California.

According to the indictment, the defendants leased 24 payphone lines, 23 of which were routed to an office space in South San Francisco. The defendants knew that they would receive approximately 24 cents for evert toll-free call made from each payphone. This financial arrangement occurs because payphone owners or leasors receive some share of the profits from the phone companies as a result of the calls made from their payphones. In the case of toll-free calls, the 800 number which is called has to pay a fee per call to the long-distance carrier. The long-distance carrier in turn shares the profit with the owners or leasors of the payphone from which the call is made. That amount is approximately 24 cents.

The indictment charges that the defendants leased the phone lines using fictitious names: Bill Jansen and Dave Jacobs. After the

numbers. Then the defendants instructed the phone companies to cut checks to them made payable to the fictitious Jansen and Jacobs, and directed that the dividend checks from the fraud be sent to a mail drop in Arizona. The mail box drop was opened in the name of Jacobs and Jansen using a fake notary stamp. Daniel David and Scott Nisbet then arranged to have the checks, which were made payable to Jansen and Jacobs, sent to them in San Francisco. In one case, the checks were sent via United Airlines cargo service and picked up by an individual using another apparently fake name made up of one defendant's last name and the other's first name: David Scott.

The defendants are also charged with laundering the proceeds of their fraudulent scheme. In particular, Daniel David is alleged to have arranged with a friend who was an attorney to have the checks made payable to Jansen and Jacobs deposited into the attorney's client trust account. At Mr. David's direction, the attorney wrote checks to Mr. David in identical amounts. Mr. David then deposited those checks into his personal account at the Bank of America. Mr. Nisbet is also alleged to have committed money laundering by using proceeds from the illegal scheme to pay a tax accountant to set up four shell corporations in Nevada for the purpose of further concealing the fraud from the telephone companies.

Mr. David is charged with tax fraud as well. After laundering approximately $444,000 from the scheme, Daniel David reported the proceeds as income on his tax returns, but then claimed, falsely, that he had not been paid $349,750 and deducted that amount as a bad debt expense.

The maximum statutory penalty for each count in violation of 18 U.S.C., Section 1341 (mail fraud) is five years in prison, three years of supervised release, a $250,000 fine and restitution. The maximum statutory penalty for each count in violation of 18 U.S.C., Section 1956 (money laundering) is 20 years in prison, three years of supervised release, and a $500,000 fine or twice the value of the laundered funds, whichever is greater. The maximum statutory penalty for making and subscribing a false return in violation of Title 26 U.S.C., Section 7206 (1) is three years in prison, a $100,000 fine, a $100 special assessment plus the costs of prosecution. However, any sentence following conviction would be dictated by the Federal Sentencing Guidelines, which take into account a number of factors, and would be imposed in the discretion of the Court. An indictment simply contains allegations against an individual and, as with all defendants, Mr. David and Mr. Nisbet must be presumed innocent unless and until convicted.

The prosecution is the result of a three-year investigation by agents of the Federal Bureau of Investigation and the Internal Revenue Service-Criminal Investigation division. Matthew J. Jacobs is the Assistant U.S. Attorney who is prosecuting the case with the assistance of legal technician Elaine Rene-McCoy.

The defendant's first appearance in federal court will be March 18, 2002 at 9:30 a.m. before Magistrate Judge Joseph C. Spero.

A copy of this press release and related court documents may be found on the U.S. Attorney's Office's website at

All press inquiries to the U.S. Attorney's Office should be directed to Assistant U.S. Attorney Matthew J. Jacobs at (415)436-7181.