No. 05-10340

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DANIEL DAVID,

Defendant-Appellant.

---

**BRIEF OF THE UNITED STATES AS APPELLEE**

APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 02-00062 SI

---

KEVIN V. RYAN
United States Attorney

BARBARA J. VALLIERE
Assistant United States Attorney
Chief, Appellate Section

STACEY P. GEIS
Assistant United States Attorney
450 Golden Gate Avenue, 11th Floor
San Francisco, California 94102
Telephone: (415) 436-7126

Attorneys for Plaintiff-Appellee
United States of America

## TABLE OF CONTENTS

JURISDICTION, TIMELINESS, AND BAIL STATUS . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Government's Case-in-Chief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    The Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    The Defense Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   I.    The Government Presented Ample Evidence to Support the
        Mail Fraud Convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       A.  Standard of review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       B.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   II.   The Mail Fraud Instruction Properly Set Forth the Offense Alleged
        in the Indictment, and Informed the Jury of All of the Elements of
        the Crime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

       A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

       B.     There Was No Constructive Amendment. . . . . . . . . . . . . . 27

       C.     The Jury Instructions Included the Element of Materiality. . 36

       D.     Mail Fraud Does Not Require a Finding of Unanimity. . . . . 39

III.   The Jury Instruction for Use of Fictitious Name Was Adequate. . . 41

    A.   Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    B.   Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IV.   The Lower Court Properly Denied David's Request for Forced
      Immunity of His Co-defendant or, in the Alternative, a Continuance
      of the Trial Date Until His Co-defendant Had Been Sentenced. . . . 49

    A.   Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    B.   Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AT&T v. FCC*, 363 F.3d 504 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 5

*Bush v. United States*, 58 F.3d 482 (9th Cir. 1995) . . . . . . . . . . . . . . . . . 38

*Cheek v. United States*, 498 U.S. 192 (1991) . . . . . . . . . . . . . . . . . . . . . 47

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lincoln v. Sunn*, 807 F.2d 805 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . 28

*Lustiger v. United States*, 386 F.2d 132 (9th Cir. 1968) . . . . . . . . . . . . . 36

*Neder v. United States*, 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . 37, 44, 49

*Ratzlaf v. United States*, 510 U.S. 135 (1994) . . . . . . . . . . . . . . . . . . . . . 47

*Ross v. United States*, 103 F.2d 600 (9th Cir. 1939) . . . . . . . . . . . . . . . . 46

*Stirone v. United States*, 361 U.S. 212 (1960) . . . . . . . . . . . . . . . . . . . . . 28

*Strauss v. United States*, 516 F.2d 980 (7th Cir. 1975) . . . . . . . . . . . . . . 45

*United States v. Bohonus*, 628 F.2d 1167 (9th Cir. 1980) . . . . . . . . . . . . 17

*United States v. Bonallo*, 858 F.2d 1427 (9th Cir. 1988) . . . . . . . . . . . . . 19

*United States v. Brennan*, 938 F. Supp. 1111 (E.D.N.Y. 1996) . . . . . . . . 18

*United States v. Choy*, 309 F.3d 602 (9th Cir. 2002) . . . . . . . . . . . . . . . . 25

*United States v. Christopher*, 142 F.3d 46 (1st Cir. 1998) . . . . . . . . . . . . 20

*United States v. Crawford.*, 239 F.3d 1086 (9th Cir. 2000) . . . . . . . . . . . 19

*United States v. Croft*, 124 F.3d 1109 (9th Cir. 1997) . . . . . . . . . . . . . . . 51

*United States v. Elias*, 269 F.3d 1003 (9th Cir. 2001) . . . . . . . . . . . . . . . 25

*United States v. Frazon*, 780 F.2d 1461 (9th Cir. 1986) . . . . . . . . . . 40, 41

*United States v. Gelais*, 952 F.2d 90 (5th Cir. 1992) . . . . . . . . . . . . . . . . 32

*United States v. Green*, 745 F.2d 1205 (9th Cir. 1984), *cert. denied*, 474
    U.S. 925 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

*United States v. Griffin*, 502 U.S. 46 (1992) . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Halbert*, 640 F.2d 1000 (9th Cir. 1981) . . . . . . . . . . . . . 29

*United States v. Hancock*, 231 F.3d 557 (9th Cir. 2000) . . . . . . . . . . . . . 48

*United States v. Hart*, 291 F.3d 1084 (9th Cir.), *cert. denied*,
    537 U.S. 962 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Joetzki*, 952 F.2d 1090 (9th Cir. 1991) . . . . . . . . . . . . . 26

*United States v. Johnson*, 297 F.3d 845 (9th Cir. 2002) . . . . . . . . . . . . . 16

*United States v. Knapp*, 120 F.3d 928 (9th Cir. 1997) . . . . . . . . . . . . . . . 26

*United States v. Lew*, 875 F.2d 219 (9th Cir. 1989) . . . . . . . . . . . . . . . . . 18

*United States v. Marabelles*, 724 F.2d 1374 (9th Cir. 1984) . . . . . . . . 26, 41

*United States v. Mastelotto*, 717 F.2d 1238 (9th Cir. 1983) . . . . . . . . . . 39

*United States v. Miller*, 471 U.S. 130 (1985) . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Mollica*, 849 F.2d 723 (2d Cir. 1988) . . . . . . . . . . . . . . 28

*United States v. Odutayo*, 406 F.3d 386 (5th Cir.), *cert. denied*,
    126 S. Ct. 238 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Olano*, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Olson*, 925 F.2d 1170 (9th Cir. 1991) . . . . . . . . . . . . 35, 36

*United States v. Omer*, 395 F.3d 1087 (9th Cir. 2005) . . . . . . . . . . . . 36, 38

*United States v. Pasillas-Gaytan*, 192 F.3d 864 (9th Cir. 1999) . . . . . . . . 48

*United States v. Pollack*, 534 F.2d 964 (D.C. Cir. 1976) . . . . . . . . . . . . . . 24

*United States v. Shipsey*, 190 F.3d 1081 (9th Cir. 1999) . . . . . . . . 25, 28, 34

*United States v. Stapleton*, 293 F.3d 1111 (9th Cir. 2002)  . . . . . . . . 27, 41

*United States v. Than*, 960 F.2d 1391 (9th Cir. 1991) . . . . . . . . . . . . . . . 50

*United States v. Uchimura*, 125 F.3d 1282 (9th Cir. 1997) . . . . . . . . . . . 26

*United States v. Well*, 519 U.S. 482 (1997) . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Woods*, 335 F.3d 993 (9th Cir. 2003)  . . . . . . . . . . . passim

*Williams v. United States*, 458 U.S. 279 (1982) . . . . . . . . . . . . . . . . . . . . 22

*Williams v. Woodford*, 306 F.3d 665 (9th Cir. 2002) . . . . . . . . . . . . . 50, 51

## FEDERAL STATUTES

47 U.S.C. § 227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 39, 47

47 U.S.C. § 276 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. §1014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 339 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

18 U.S.C. § 1342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 42

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 32(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

No. 05-10340

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

         v.

DANIEL DAVID,

      Defendant-Appellant.

---

**BRIEF OF THE UNITED STATES AS APPELLEE**

**JURISDICTION, TIMELINESS, AND BAIL STATUS**

The district court had jurisdiction over this criminal case  pursuant to 18

U.S.C. § 3231.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  On

May 10, 2005, defendant Daniel David filed a timely notice of appeal.  CR 225.[1/]

David is currently out of custody pending the outcome of this appeal.  CR 262.

---

[1]    As used throughout: the Clerk's Record is abbreviated "CR" and is referenced by docket number; the Reporter's Transcript is abbreviated "RT" and is referenced by number page; and Appellant's Excerpts of Record, the Government's Excerpt of Record, and Appellant's Opening Brief are abbreviated "ER," "GER," and "AOB," respectively, and are referenced by page number.

## ISSUES PRESENTED

I.    Whether there was sufficient evidence to support defendant's mail fraud convictions where the jury heard that the defendant and his co-defendant devised and executed a scheme to defraud telephone companies and toll-free number subscribers out of money by using fictitious names to pose as payphone lessees and then unlawfully using an autodialer to call over two million toll-free subscribers and immediately hang up on them so that they could receive reimbursement fees for each call made.

II.    Whether the mail fraud instruction was infirm because it constructively amended the indictment, omitted the element of materiality, and failed to require juror unanimity on a specific false statement where (a) the record shows that the instructions narrowed rather than broadened the indictment; (b) the instruction properly informed the jury that it must conclude that the scheme to defraud was material; and (c) the government did not proceed on a "false statement" theory, and the law does not require unanimity otherwise.

III.    Whether the jury instruction on the fictitious name count was deficient because it failed to include either a materiality or a specific intent element on the promoting, conducting, and carrying on a "unlawful business" prong of the statute, where neither the text of the statute, nor the case law, supports that either materiality or specific intent to defraud is required to convict

2

under that prong.

    IV.    Whether the district court abused its discretion in failing to grant David's request that it force the government to immunize his co-defendant so that he could testify on his behalf, or, in the alternative, grant a continuance of the trial until after the co-defendant's sentencing, wh ere the record shows that weeks before, David had moved to sever the trial on the grounds that his co-defendant's pretrial statements would inculpate him, where David failed to proffer how his co-defendant's testimony would be at all exculpatory, and where the trial had already been delayed two years at the defendant's request.

## STATEMENT OF THE CASE

    On October 16, 2003, a grand jury indicted David and his co-defendant Scott Nisbet on one count of conspiracy under 18 U.S.C. § 371, seven counts of mail fraud under 18 U.S.C. § 1341, seven counts of using a fictitious name under 18 U.S.C. § 1342, and five counts of laundering monetary instruments under 18 U.S.C. § 1956. CR 110. The charges arose from a scheme to defraud toll-free subscribers and telephone companies by posing as payphone lessees, using an autodialer to call over two million toll free subscribers, and then receiving a fee for each call.

    On March 10, 2004, the jury found David guilty of all counts in the

indictment, except the conspiracy count.[2] CR 176.  On May 6, 2005, Judge

Illston sentenced David to 30 months in prison, and found David jointly and

severally liable with Nisbet for $444,198.91 in restitution.[3]  CR 224.

## STATEMENT OF THE FACTS

### The Government's Case-in-Chief [4]

David's convictions arose from his and Nisbet's (the "defendants")

fraudulent scheme to defraud toll-free subscribers and telephone companies by

posing as payphone lessees, and then unlawfully using an "autodialer" to call over

two million toll-free subscribers so they could receive a reimbursement fee.[5]

---

[2] On February 18, 2004, Nisbet pled guilty to Count 9 of the Indictment, Using a Fictitious Name for Fraudulent Scheme and Aiding and Abetting in violation of Title 18 U.S.C. § 1342.  CR 150.  On April 21, 2005, he was sentenced to 15 months of imprisonment and is currently serving his sentence.  CR 218.

[3]   All parties agreed that it was administratively impossible to reimburse two million victims $.24 each.  GER 2.  Accordingly, the court ordered the restitution to be paid equally to two charitable organizations with ties to the telecommunications industry.  CR 269; GER 4.

[4]   As David acknowledges (at 22), he corroborated much of the government's case-in-chief when he testified.  The government thus refers to David's testimony where corroborative in this section of the brief.

[5]   An autodialer is a software that allows a person to call programmed numbers automatically through a regular telephone line.  RT 597-98.  It is typically used to broadcast emergency notifications or other recorded announcements.  RT 599.  It is against the law to use an autodialer if the party called is charged a fee for the call.  47 U.S.C. § 227; see also RT 293; ER 68; GER 138-39.

Specifically, David and Nisbet, through various deceptive measures, obtained 23 payphone lines, attached an autodialer to these lines, called over two million toll-free subscribers knowing the call would result in a charge to those subscribers, hung up on the callers once they picked up, and then received the fee of $.24 for each call made.  Based on this conduct, David was convicted of mail fraud, money laundering, and use of a fictitious name to promote a fraudulent scheme and unlawful business.

### The Scheme

In 1997, Nisbet approached David [6] with an idea for a scheme stemming from a new telecommunications law, that required telephone companies to reimburse payphone owners or lessees for toll free calls made from their payphones.[7]  RT 284; *see* RT 618-19.  In February of 1998, defendants leased payphone lines from Pacific Bell ("PacBell") in the name of "Dan David, doing business as Jack's Payphone."  RT 626.  These lines were connected to David's home and to some office space owned by David's father, both located in the

---

[6]     David and Nisbet, friends since high school, had collaborated on business ventures in the past.  *See* RT 613-14, 698.

[7]     The 1996 Telecommunications Act (the "Act"), among other things, established a per call compensation plan to ensure that payphone owners and lessees received compensation for toll-free calls made from their payphones.  *See* 47 U.S.C. § 276.  The toll-free subscriber who received the toll-free call ultimately paid the fee, which was split between the payphone owner/lessee and the telephone company.  *See* AT&T v. FCC, 363 F.3d 504 (D.C. Cir. 2004).

East Bay. RT 299-301, 305; *see also* RT 625.[8]

In April of 1998, defendants received payment from APCC Services, a financial clearinghouse, or "aggregator," whose function it was to receive and consolidate the payphone reimbursement payments from the various long distance companies. RT 242-44, 262; *see also* RT 626-27. Because of the large amount of calls and the short duration of the calls, APCC believed that defendants were using an autodialer.[9] APCC ultimately withheld the last check made to David because of its concern that there may be fraud. RT 292-93.

Because of APCC's suspicions, defendants shut down the East Bay location and moved the operation to a leased space in South San Francisco. RT 372; *see also* RT 631-32. They ordered 23 payphone lines under the names of "Bill Jansen" and "Dave Jacobs." RT 326, 556; *see also* RT 631, 660-61, 681. David installed the 23 payphone lines into the leased office space himself,[10] and

---

[8]     David testified that several fax machines were then connected to the payphone lines and programmed to call toll free numbers. *See* RT 625-26.

[9]     The Act prohibits the use of autodialers if the party called is charged a fee. 47 U.S.C. § 227. The Act also requires that payphones must be accessible to the public. 47 U.S.C. § 276; RT 293; ER 68.

[10]    When the 23 payphone lines arrived, David testified that they did not want PacBell to install them in the leased office space because PacBell would learn that the payphone lines were not going to be attached to any payphones. RT 669.

then the defendants sealed the mail box slot of the leased space to prevent anyone from seeing what was occurring inside. RT 381; *see also* RT 671. A PacBell representative testified that PacBell would not have established an account with, or leased the 23 payphone lines to, the defendants if it had known that 1) fictitious names were used, and/or 2) the lines would not be connected to payphones. RT 337, 346.

Once the payphone lines were installed, defendants connected all 23 of them to an autodialer. RT 597-98; *see also* RT 681. Defendants purposely programmed the autodialer so that it would *not* leave a message with the caller, but would instead immediately hang up once the call was connected. RT 692. Autodialers are typically used to broadcast messages to people for emergency notification. RT 599. They can also be used for telemarketing, customer notification, reminders for businesses and to play recorded announcements. *Id.* The toll-free subscriber was charged a fee for the call, even if the dialer immediately hung up. RT 217-18, 225-26, 246.[11]

After setting up the payphone lines and the autodialer, Nisbet rented a mailbox in the names of Bill Jensen and Dave Jacobs at Mail and More, a private

---

[11]     The toll-free subscribers that were called, hung up on, and charged a fee, included both large and small businesses. RT 237. One such number was an ambulance service in Saginaw, Michigan, whose toll free number was used to receive emergency calls, among other things. RT 587.

mail outlet in Scottsdale, Arizona.  RT 308-10; *see also* RT 632-33.  Kevin

Oestmann, owner of Mail and More at the time, never met a Bill Jansen or a

Dave Jacobs, and defendants always paid him in cash, sent by courier.  RT 310,

321.  After renting the mailbox, defendants arranged to have Mail and More be

the repository for the checks that they received from the phone companies.  RT

316.  To collect their mail, however, the defendants either had to show up at the

Mail and More in Arizona and present valid identification to Oestmann, or submit

a notarized statement showing that a certified notary agent had confirmed their

identity as Jansen and/or Jacobs.  RT 312-13.  The defendants chose to do the

latter, using a fake notary stamp to create a false notarized statement claiming

that a "Bill Jansen" existed, and creating a fake driver's license for Bill Jansen,

stating that he lived in Vancouver, Canada.  RT 313, 328; *see also* RT 637.

Testimony showed and David later admitted that there was no Bill Jansen who

resided in Vancouver, and that Jansen and Jacobs were both fictitious names.  RT

327-28, 556; *see also* RT 631-32, 637.

Once Oestmann received the notarized statement, he released the mail,

including the checks.   RT 316-17, 320.  Defendants arranged to have Oestmann

send the mail by airport courier to different persons, including Christopher

Moscone and Dave Scott, at various San Francisco locations.  RT 316-20.  One

time, defendants told Oestmann to send the mail same day service to Moscone,

even though it cost $159. RT 317-18.

At first, David simply endorsed the checks written to Jansen and Jacobs in his own name and then deposited them into his own bank account at Mechanic's Bank. RT 333, 428; *see also* RT 638-40. As the amount of the checks grew,[12] however, depositing them became more difficult. RT 441. For example, when David tried to deposit a check written to Jansen and Jacobs for $126,453.89, the bank refused to take it. RT 441, 445-46; *see also* RT 640-41.

Around January of 1999, David approached a family friend and lawyer, Stephen Cornet, and asked him to deposit the checks made out to Jansen and Jacobs into his attorney trust account. RT 441. Trusting David's representation that the checks were from a wine sale, Cornet agreed to deposit them into his trust account and then write a check for the amount to David. RT 441, 443-44. David never told him about the rented payphone lines, the autodialer, the use of fictitious names, or the use of a fake notary stamp. RT 445. As a result of his laundering through Cornet's trust account, David was able to cash five checks in the approximate amounts of $110,000, $126,000, $163,000, $22,000, and $20,000. RT 440, 449-52; *see also* RT 648.

---

[12]     David testified that at this time they were receiving checks payable to Jansen and Jacobs for hundreds of thousands of calls being made from the leased office space. RT 638.

During 1999, to further minimize the chance that the scheme would be detected, defendants decided to create sham corporations. RT 334, 396; *see also* RT 687. To that end, they hired Daniel Rosenbaum, an "enrolled agent," to set up corporations for renting telephone lines to larger telephone companies. RT 393, 395-96. They never told Rosenbaum about the leased payphone lines, or the autodialer, or that the payphone lines had been connected to conduct some sort of survey.[13] RT 405. Nisbet told Rosenbaum to set up the corporations in Nevada, because Nevada's laws made it more difficult to determine the identities of corporate officers. RT 397. Nisbet also told Rosenbaum that they wanted multiple corporations so that it would be more difficult for the large telephone companies to become suspicious when one company was receiving large payments. *Id.*

In consultation with David, Rosenbaum named the corporations Breeze Communications, Bamboo, and Box Car, and set them up at five different locations so that it would appear that they were independent of one another. RT 401, 403. Rosenbaum even used post office boxes for the company addresses, instead of private mail boxes, so that the companies would have a "bigger

---

[13]    David's principal defense was that the payphone lines and autodialer were used to collect data for a survey of whether the telephone companies were actually complying with the new law by reimbursing payphone owners/lessees for the toll-free calls. RT 619, 666.

image." RT 402. Rosenbaum arranged to have a friend collect the mail from the various post office boxes. RT 401. Once Rosenbaum established the companies, defendants changed the name on the PacBell account from Jansen and Jacobs to Breeze Communications. RT 334, 399.[14]

## The Investigation

In or around August of 1999, Mark Zmigrodski, a fraud investigator at AT&T, was monitoring calls to toll-free numbers when he noticed hundreds of thousands of calls being made to toll-free numbers from 23 payphone lines leased to Bill Jansen and Dave Jacobs. RT 213-15, 220. Zmigrodski became suspicious because of the large number and pattern of the calls, namely that they were of very short duration and were being made continuously at all hours of the day and night. RT 216-18. For that reason, Zmigrodski concluded that the calls were being made from an autodialer, and called the FBI. RT 219, 226, 555.

Around December of 1999 or January of 2000, David hired an attorney, Charles Moscone, and asked that he receive mail for him, which Moscone did without question.[15] The mail included checks made out to a Bill Jansen and/or

---

[14]    In light of the success of this scheme, David and Nisbet decided to expand their operations and, in 1999, rented space in Oakland, California. RT 654, 734. Again, David and Nisbet used fictitious names, but changed them to Dan Davidson and Scott Palmer. RT 735.

[15]    David testified that this occurred two months after the landlord of the leased office space in San Francisco contacted defendants to notify them that the

Mark Ryan. RT 720. David then asked Moscone to deposit these checks into Moscone's attorney trust account and write David a check from the account. RT 475; *see also* RT 718. Moscone discussed this request with his partners and decided not to deposit the checks because it was "not appropriate." RT 479. David was never able to launder these checks or collect the money. RT 563.

Another theme of the defense was that David had relied on Nisbet's statement that he had conferred with a friend, FCC lawyer Jonathan Askin, who said that their business scheme was legitimate. *See e.g.*, RT 624, 721. Askin testified, however, that he was never retained by Nisbet to offer legal advice and that he knew he could not be as a FCC lawyer. RT 509. Askin also testified that, at a minimum, he would have referred Nisbet to the FCC Network Services Division who knew more about the issue of dial-round compensation than he did. RT 512.

In any event, Askin testified that Nisbet never apprised him of the actual scheme. RT 514. Specifically, Nisbet never told him about the leased payphone lines under fictitious names, the false notary, the rented mailbox in a fictitious name, or the use of an autodialer. *Id.* Lastly, Nisbet never asked Askin

---

police had conducted a search of their leased space. RT 650-51. Defendants shut off the payphone lines and autodialer shortly thereafter. *Id.* He then hired Moscone and asked him to accept mail from Mail and More "since the investigation had started." RT 655.

whether their "business enterprise," which was never fully described to him,

violated any other statutes, such as the mail fraud statute.  RT 529.

### The Defense Case

As noted *supra*, David admitted most of the relevant facts establishing the

fraud when he took the stand. His defense was that he lacked the requisite intent

to defraud.  As part of that defense, he testified that his motive was to conduct a

survey of the telephone companies to determine if they were complying with the

new regulation requiring them to reimburse payphone owners/lessees for toll free

calls made on their payphones.  RT 619.  When questioned about his

methodology for conducting the "survey," however, David admitted that he did

not leave a message on the autodialer that would have informed toll-free

subscribers that they were conducting a survey for their benefit, nor did he leave

a message telling them how they could retrieve their $.24.  RT 692.  David also

admitted that he was interested in making money with this scheme, that he

deposited or attempted to deposit every check he received into his bank accounts,

and that he used the money for personal expenses.  RT 698, 700-05.  Lastly, he

admitted that the bulk of the money was spent, not on a survey or future lawsuit

against the phone companies, but on personal expenses, nice restaurants, nice

hotels, and furniture.  RT 701-05.

//

## SUMMARY OF ARGUMENT

The evidence showed that defendants, posing as payphone providers, devised a scheme to defraud the telephone companies and toll-free subscribers to obtain reimbursement fees for toll-free calls to which they were not entitled. David's claim that the evidence was insufficient because the government failed to show that he directly deceived the toll-free subscribers is legally and factually infirm. First, as a legal matter, it is not at all certain that the government had the burden of demonstrating that defendants directly deceived the toll-free subscribers. Further, the fact that the phone companies acted as a conduit for the deception does not mean the toll-free subscribers were any less deceived or any less the intended victims of the deceit. Second, as a factual matter, the evidence showed that defendants' conduct did directly deceive the ultimate victims, the toll-free subscribers, because the subscribers were only required to pay the reimbursement fees because defendants had falsely portrayed themselves as payphone providers.

Moreover, the mail fraud instruction properly set forth the offense alleged in the indictment and informed the jury of the elements. First, because the jury instruction simply narrowed the mail fraud theory alleged in the indictment, there was no constructive amendment. Second, the district court specifically instructed the jury that it must conclude that the scheme to defraud was "material" to

14

convict.  Third, given that the government proceeded only on a scheme to defraud theory at trial, there was no need for an unanimity instruction.

David's claim that the jury instruction on fictitious name was infirm because it did not require the jury to find either materiality or specific intent to defraud is also without merit because the statute is not a fraud statute.  The fictitious name statute, which is designed to ensure that the postal service is not used to conduct a fraudulent scheme or an unlawful business, can be violated in two ways: that the defendant use a fictitious name to promote, conduct, or carry on a mail fraud scheme, or to carry on an unlawful business.  The jury here was instructed that it had to find materiality and a specific intent to defraud if it convicted under the mail fraud prong.  Because fraud is not an element of the "unlawful business" prong, however, there was no need for the district court to similarly instruct on that prong.

Finally, the district court properly denied David's request to immunize his co-defendant, or, in the alternative, grant another continuance of the trial to await his co-defendant's sentencing.  In the absence of any evidence of prosecutorial misconduct or any evidence that the co-defendant would have provided exculpatory testimony, David was not entitled to this extraordinary relief.  This is especially true where the request fell on the heels of David's motion to sever because of his co-defendant's damning post-arrest statements.  The record simply

15

does not support that David's co-defendant, either at the time of trial or after he had been sentenced, could have provided credible, exculpatory testimony.

ARGUMENT

I.     ***The Government Presented Ample Evidence to Support the Mail Fraud Convictions.***

A.     Standard of review

The critical inquiry for determining sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)(emphasis in original).

B.     Argument

To obtain a conviction for mail fraud under 18 U.S.C. § 1341, the government must prove that the defendant "(1) participated in a scheme with the intent to defraud, and (2) the scheme used or caused the use of the mails in furtherance of the scheme." *United States v. Johnson*, 297 F.3d 845, 870 (9th Cir. 2002).   The disjunctive phrasing of Section 1341 specifies two "alternative routes to a mail fraud conviction": namely, (1) a scheme to defraud, or (2) a scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. *United States v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003).   The difference between the two types of schemes is that the former does

16

not necessarily involve a false statement. *See id.* Moreover, "[t]he fraudulent nature of the 'scheme or artifice to defraud' is measured by a non-technical standard. Thus, schemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980) (internal quotation marks and citations omitted).

The indictment alleged that David and Nisbet employed a scheme to defraud Pacific Bell, long-distance telephone carriers, and toll-free number subscribers by misrepresenting themselves as legitimate payphone service providers, who were thus entitled to reimbursement for their payphones' use to make toll-free calls. In other words, defendants devised a scheme to obtain reimbursement fees by posing as *bona fide* payphone service providers. At trial, the government provided ample evidence of this scheme by showing that defendants set up telephone lines using fictitious names (RT 309-10, 326, 334, 399, 556), falsely represented to the telephone company that those lines were for payphones (RT 326, 556), used an autodialer so that they could continuously make toll-free telephone calls and thereby maximize the amount of reimbursement fees they would receive from the toll-free subscribers (RT 237, 597-98), set up an out-of-state mailbox using fictitious names so that they could surreptitiously receive reimbursement checks

(RT 308-09), created sham corporations in Nevada to further minimize detection, RT 397-403), and laundered the money they received from the subscribers through an unwitting friend (RT 440-52). This evidence was more than sufficient for the jury to conclude that David devised and employed a scheme to defraud the toll-free subscribers into paying bogus reimbursement fees.

Despite this evidence, David claims, citing *United States v. Lew*, 875 F.2d 219, 221 (9ᵗʰ Cir. 1989),[16] that his mail fraud convictions must be reversed under the so-called "convergence theory." Specifically, he claims (at 23) that because the government did not demonstrate that the telephone companies, who were the ones deceived by defendants' conduct, did not suffer any monetary loss, and the toll-free subscribers, who did suffer monetary loss, were not deceived by defendants' conduct, there was insufficient evidence to support the mail fraud count. *See, e.g., United States v. Brennan*, 938 F. Supp. 1111, 1128 (E.D.N.Y. 1996) ("the parties to whom the misrepresentations were made must be identical to the alleged victims"). The argument is without merit for the following reasons.

First, as David concedes (at 25), although it is true that *Lew* remains "good

---

[16]  In *Lew*, the defendant was convicted of mail fraud based on false statements he made to the Department of Labor to obtain work papers for his alien clients, for which his clients paid him. In that case, the district court instructed the jury that the "scheme was to make false statements to the United States for the purpose of obtaining money from defendant's clients." 875 F.2d at 221. This Court reversed Lew's mail fraud conviction because there was no evidence that he had deceived his clients. *Id.* at 221-22.

law," this Circuit has not adopted the "convergence theory," and any such impression that it might has been seriously undermined by *United States v. Crawford*. 239 F.3d 1086 (9th Cir. 2000). In *Crawford*, the defendant, a Director of Counseling at UCLA, took a valuable painting that appeared to belong to the university, then sold it through a buyer for $200,000. During the process, the defendant lied to UCLA colleagues about the whereabouts of the painting, lied to her father's trust attorney about who owned the painting, and lied to her tax accountant about how she acquired the painting. She then deposited the proceeds into the buyer's bank account, not hers, even though the money was also for her benefit. None of the lies or deception was directed at the actual victim, because the owner of the painting, if not UCLA, was never identified. This Court held that Crawford's actions still met the elements of wire fraud even if the owner was unknown, because the wire fraud statute did not require that the defendant know the victim's identity. 239 F.3d at 1093. "The wire-fraud statute requires only that [defendant] have participated in a scheme to obtain money or property by means of false or fraudulent pretenses, representations or promises with the intent to defraud." *Id.* (internal quotations omitted). Based on *Crawford*, it stands to reason that, if a defendant need not know the identity of the victim, he or she need not deceive him or her directly. *See also United States v. Bonallo*, 858 F.2d 1427 (9th Cir. 1988) (in affirming bank fraud conviction of bank employee who

unlawfully made withdrawals from customer accounts, this Court rejected

argument that defendant lacked intent to deceive the bank, who was the actual

victim since they reimbursed the deceived customers).

Second, even if this Court were to adopt the "convergence theory" or

otherwise require that the defendant *directly* deceive the victim, the government

need only show that the *scheme* deceived the same persons who were victimized,

not, as David asserts, that some specific *false statements* must be made to that

individual. *See United States v. Christopher*, 142 F.3d 46, 52 (1st Cir. 1998)

("convergence" means that the scheme must deceive the same person who was

deprived of the money or property, but not that the defendant must make a direct,

material misrepresentation to that victim). Here, there was a clear and obvious

nexus between the defendants' scheme to defraud and the collection of money

from the toll-free subscribers because it was David's deceptive conduct that

directly led to them parting with it. As David notes (at 7), Congress passed the

Telecommunications Act of 1996 to "establish a per call compensation plan to

ensure that all payphone service providers are fairly compensated for each and

every completed intrastate and interstate call using their payphones." 47 U.S.C. §

276. The provision was meant to ensure that *payphone operators* received some

compensation for "'toll-free' calls to subscribers to 800 and new 888 services."

H.R. Conf. Rep. 104-458 at 158 (Jan. 31, 1996). In fact, as David states (at 8), the

20

reimbursement mandate was designed to serve two goals: promoting competition among payphone service providers and proving the widespread deployment of payphone services to the benefit of the general public. *See also* AOB at 8-9 (quoting from FCC implementation order explaining the need for payphone services in residential areas to advance the public health, safety and welfare of the citizens). Because toll-free calls from payphones have made them less profitable, Congress and the FCC determined that payphone operators should be entitled to "levy a charge each time a 'toll-free' call to an 800 number was made from their phone." AOB at 9.

The evidence here showed that the telephone companies were led to believe that David was a legitimate payphone lessee, and thus it took money from the toll-free subscribers to reimburse David for calls that, according to the statute, the subscribers were required to pay. In other words, each time that a toll-free subscriber, by operation of law, paid the fee to the unwitting telephone company to reimburse David, they did so under the false impression and representation from the telephone companies that the fee was compensation they were required to pay because of David's status as a payphone lessee. The subscribers, therefore, were directly misled by the defendants' false claim that they were *bona fide* payphone providers. *See* Government's Closing at RT 811; GER 14-15 ("[David] was pretending to be a business person who had pay telephones . . . but did the public

ever use any payphone . . .? Of course not. That wasn't the point of it.... To get paid, you have to pretend, you have to lie, you have to deceive.") Moreover, every time the autodialer called a subscriber's number from a telephone line that had been falsely identified to the telephone company as a payphone, the defendants were creating the false impression that the subscriber has an obligation to reimburse for the call. And, by employing the autodialer, which did not make *bona fide* toll-free calls, but rather hung up on the caller as soon as the telephone was answered for the purpose of engendering the fee, defendants were using the toll-free numbers under false pretenses every time the call connected. This was substantial evidence that defendants' scheme directly deceived the subscribers.[17]

David claims (at 28) that this latter "implied representation" theory is an inadequate theory under *Williams v. United States*, 458 U.S. 279 (1982). In *Williams*, however, the Supreme Court held that a check was not a "false statement" or otherwise deceptive conduct for purposes of bank fraud, and thus depositing a check into an account could not sustain a bank fraud charge. In coming to that conclusion, the Court stated that a check itself did not make any

---

[17] Although the government did not rely exclusively on the theory at trial, David's claim (at 27) that the government did not allege in the indictment that David made misrepresentations to the toll-free number subscribers is inaccurate. The indictment specifically alleged that defendants devised and participated in a scheme and artifice to defraud "Pacific Bell, long-distance telephone carriers, and toll-free telephone subscribers to obtain money and property by means of false and fraudulent pretenses, representations and promises." ER 4-5.

representation as to the state of the defendant's bank balance. Here, however, each time that defendants called a toll-free subscriber from a line falsely designated as a payphone, and thereby created the subscriber's obligation to reimburse, which happened automatically, they falsely represented, not only that the call was legitimate, but that they were entitled to reimbursement for it.

David's attempt to analogize this scheme to that of a crank caller is similarly unavailing. Crank callers do not ordinarily induce their callers to part with money, and when they do, they may face criminal liability under the mail fraud statute. *See Woods*, 335 F.3d at 995-97 (defendant convicted of mail and wire fraud based on fraudulent telemarketing scheme). David's assertion (at 30) that toll-free subscribers "know that they will be receiving and paying for calls involving wrong numbers, crank callers, and lonely people who have no one else to talk to" and thus, presumably, were not deceived by the calls made from the autodialer from the false payphone lines is disingenuous. David himself admitted, and common sense dictates, that had the toll- free subscribers known that they would receive a hang-up call and get charged for it, they likely never would have answered the phone. *See* RT 695. Moreover, the jury heard evidence about the proper use of an autodialer, *see* RT 599, and heard that David purposely chose to use the autodialer in a deceptive manner in order to accomplish the scheme. RT 692. This evidence is more than sufficient for the jury to conclude that David used the

autodialer in a manner that was intended to deceptively obtain reimbursement fees from the toll-free subscribers.

Finally, even if this Court were to conclude that the victim must be directly deceived by the conduct and there was an insufficient nexus between the deceptive conduct and the subscribers , the evidence here still supports a conviction because the evidence also showed that the telephone companies were victims of the deception.[18/]  A Sprint representative testified that Sprint billed the toll-free subscribers for the toll-free calls made from payphones.  RT 420-426.  Although the government did not have to introduce such evidence of the telephone companies' financial loss at trial because a violation of mail fraud does not require actual loss by intended victims, *see United States v. Pollack*, 534 F.2d 964, 971 (D.C. Cir. 1976)("Success of the scheme and loss by a defrauded person are not essential elements of the crime under 18 U.S.C. § 1341"), the jury could have inferred from the testimony that Sprint would be a victim if the toll-free subscribers failed to pay their bills.

II.   ***The Mail Fraud Instruction Properly Set Forth the Offense Alleged in the Indictment, and Informed the Jury of All of the Elements of the Crime.***

---

[18]      David claims (at 25) that the government conceded during sentencing that the *only* victims in this case were the toll-free subscribers.  That is incorrect. At sentencing, the government focused on the victims entitled to *restitution, i.e.,* those who had suffered a financial loss.  ER 83.

David contends (at 33-46) that the lower court's jury instructions defining the elements of mail fraud (1) failed to define the materiality element of the crime; (2) failed to include an unanimity requirement; and (3) constructively amended the indictment, by enabling the petit jury to convict him of crimes different from those charged by the grand jury.  First, David failed to preserve the constructive amendment issue for appeal and thus must meet the plain-error test to merit reversal.   Second, the jury was properly instructed on the government's mail fraud theory and the district court properly rejected an unanimity instruction.

###    A.    Standard of Review

Because David did not claim at trial that the proposed jury instruction for mail fraud would result in a constructive amendment of the indictment (*see e.g.*, 43-44b; RT 759-60), this Court reviews for plain error only.  *See United States v. Choy*, 309 F.3d 602, 607 (9th Cir. 2002) (when a defendant does not object that a jury instruction is a variance or constructive amendment of the indictment, court reviews for plain error); *United States v. Shipsey*, 190 F.3d 1081, 1085 (9th Cir. 1999) (because Shipsey did not timely raise constructive amendment objection before the district court, review is for plain error); *see also United States v. Elias*, 269 F.3d 1003, 1017-18 (9th Cir. 2001) (Federal Rule of Criminal Procedure 30 requires that defendant object to a jury instruction with adequate specificity "'an objection must state distinctly the matter to which the party objects as well as the

25

grounds of the objection" and "[a] defendant's mere proposal of an alternate instruction does not satisfy Rule 30's standard of specificity'") (quoting *United States v. Klinger*, 128 F.3d 705, 710 (9th Cir. 1997)).  Under the plain-error test, this Court may reverse a conviction if there exists (1) an error, (2) that is plain and (3) that affects substantial rights. *United States v. Uchimura*, 125 F.3d 1282, 1287 (9th Cir. 1997).  "If these three elements are present, we have discretion to correct an error under Rule 52(b) if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (internal quotations omitted).

As to David's other claims of error regarding the mail fraud instructions, because they rest on a challenge to a single jury instruction, this Court must determine "whether the jury instructions as a whole [we]re misleading or inadequate to guide the jury's deliberations." *United States v. Joetzki*, 952 F.2d 1090, 1095 (9th Cir. 1991); *see id.* ("Even imperfect jury instructions will not form the basis for reversing a conviction unless they constitute an abuse of discretion"). If the instructions "fairly and adequately covered the elements of the offense," this Court will review the instruction's "precise formulation" only for an abuse of discretion. *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997)  Moreover, the adequacy of the entire charge must be evaluated in the context of the trial. *United States v. Marabelles,* 724 F.2d 1374, 1382 (9th Cir. 1984).

26

Finally, this Court will review *de novo* whether the jury instructions omitted or misstated an element of the charged offense. *United States v. Stapleton*, 293 F.3d 1111, 1114 (9th Cir. 2002).

### B.    There Was No Constructive Amendment.

David claims (at 42-46) that the government obtained an indictment on the mail fraud count on one theory:  that defendants obtained money and property by material omission and false statements.  For that reason, David argues that the government constructively amended the indictment by asking that the petit jury be instructed on a scheme to defraud theory instead.   On the contrary, the record shows that the government indicted David on alternative theories, and elected to present the scheme to defraud theory to the petit jury.  This is entirely appropriate. *See United States v. Miller*, 471 U.S. 130, 145 (1985) ("[W]here an indictment charges several offenses, or the commission of one offense in several ways, the withdrawal from the jury consideration of one offense or one alleged method of committing it does not constitute a forbidden amendment of the indictment.")

The Fifth Amendment affords every defendant a "substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Miller*, 471 U.S. at 140 (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)).  A constructive amendment of an indictment occurs where the evidence offered at trial, together with the jury instructions, present a "real likelihood" that the jury

"actually convicted" the defendant "of a crime for which the grand jury did not indict him." *Shipsey*, 190 F.3d at 1087. The concern is that, if the indictment "cannot fairly be read as charging" the conduct for which the accused is convicted, no court can know whether the grand jury would have been willing to indict him for the crime of which he was found guilty. *Stirone*, 361 U.S. at 217.

The critical consideration in determining whether a constructive amendment has occurred is whether the district court's jury instructions or the complex set of facts proven by the government at trial, or both, so "chang[ed] the offense charged . . . or so alte[red] the case that the defendant has not had a fair opportunity to defend." *Lincoln v. Sunn*, 807 F.2d 805, 813 (9th Cir. 1987); *see also United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988). Convictions will generally be sustained, however, "as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." *Miller*, 471 U.S. at 136; *see id.* ("As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime").

Here, for each of the mail fraud counts, the indictment charged that

> David . . . having devised and intending to devise and
> willfully participate in a scheme and artifice to defraud
> Pacific Bell, the long-distance telephone carriers, and
> toll-free telephone number subscribers to obtain money

> and property by means of false and fraudulent pretenses, representations and promises, did for the purpose of executing that scheme . . . knowingly cause to be placed in a post office . . . ER 4-5. [19/]

The mail fraud count incorporated by reference the fraudulent scheme set forth in the conspiracy count. *See* ER 4. That scheme alleged various deceptive measures employed, including certain material omissions *and* misrepresentations to PacBell and the long-distance companies to obtain reimbursement for calls made from the payphone lines that the defendants leased using fictitious names.  ER 2-4.

At trial, the government never shifted or broadened the theory of liability identified in the indictment. The indictment alleged that David devised a scheme to defraud through various deceptive measures, including false pretenses, representations, and promises, and, at trial, the petit jury heard evidence of precisely that: namely, that David and Nisbet

- obtained telephone lines and concealed the fact from PacBell and the long distance carriers that they had no intention of

---

[19]   The language used in the indictment suggests that the grand jury considered both mail fraud theories: *i.e.*, "(1) a scheme or artifice to defraud, and (2) obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Halbert*, 640 F.2d 1000, 1007 (9th Cir. 1981).  In fact, it is clear that both parties viewed the indictment as alleging both theories. *See e.g.*, ER 15i (Defendant's Motion to Dismiss agreeing that the Superseding Indictment contains a scheme to defraud theory); ER 42 (Defendant's Proposed Jury Instructions wherein David includes an instruction for the "Scheme to Defraud Theory").

using the lines for payphones (RT 326, 556, 631, 660);

- directed telephone companies to send them money for payphone fees although they did not intend to install any payphones that would entitle them to the fees (RT 337, 346, 669);

- used an autodialer unlawfully to make more than 1.8 million telephone calls to various toll-free subscribers with the intent to immediately hang up, and collect subscriber fees (RT 237, 597-98, 681, 692);

- used false names for both the accounts with the telephone companies and the mail box to which the monies were received, and then changed the names during the course of the scheme to make it appear as if a large volume of calls were not being made by one entity (RT 309-10, 326, 334, 399, 556, 631, 660-61, 681);

- created a fake notary stamp and submitted a false notarized statement to Oestmann at Mail and More to ensure that they could receive the monies from the illegal scheme (RT 327-28, 556, 632, 637); and

- laundered the money through a family attorney (RT 440-52).

Throughout the trial, the government consistently argued that David deliberately set out to deceive the telephone companies and toll free subscribers to obtain the reimbursement fees.

Consistent with the government's theory, the jury was instructed that to convict of mail fraud, it must conclude that:

> First, the defendant knowingly devised or knowingly participated in a scheme or plan to defraud by obtaining money or property through a course of conduct or statements that were reasonably calculated to deceive;
>
> Second, the scheme to defraud was material, that is, it would reasonably influence a person to part with money or property.

ER 65. The mail fraud instruction went a step further to include the language from the indictment that described the alleged scheme, including material facts that David and Nisbet either misrepresented or concealed, and the false pretenses under which David and Nisbet operated to accomplish their scheme. Specifically, the jury was instructed that:

> The general nature of the scheme to defraud in Counts Two through Eight of the indictment is that the defendant devised and intended to devise and willfully participate in a scheme to defraud Pacific Bell, long-distance telephone carriers, and toll-free telephone numbers subscribers.
>
> The scheme is alleged to have included leasing 23 lines from Pacific Bell using the fictitious names Bill Jansen and Dave Jacobs and concealing from Pacific Bell and the long-distance carriers the material fact that they did not intend to and in fact did not attach

payphones . . . to the phone lines.  It is alleged that as part of the scheme, an automatic telephone dialing system was connected to the payphone lines for the purpose of calling toll-free telephone numbers in order to collect fees of approximately 24 cents per call made to toll-free numbers.  It is further alleged that as part of the scheme, it was concealed from Pacific Bell and the long-distance carriers that thousands of call made over the payphone lines to toll-free numbers were made by an autodialer as opposed to actual callers using payphones.

The scheme is alleged to have included the use of a mailbox facility rented under the assumed names of Bill Jansen and Dave Jacobs using a fictitious notary stamp.  The long-distance carriers and their representatives were directed to make checks for the fees payable to the fictitious names.  The scheme also is alleged to have included the establishment of shell corporations including Breeze Communications.  In addition, it is alleged that the scheme included informing Pacific Bell that the identity of the lessor of the payphone lines had been changed to Mark Ryan, a fictitious person.

ER 65-66.

Contrary to David's claim (at 45), therefore, on their face, the instructions

perfectly matched the theory of mail fraud alleged in the indictment.  The mail

fraud instruction, taken as a whole, accurately reflects that David participated in a

scheme to defraud "by means of false and fraudulent pretense, representations, and

promises." ER 5.  In fact, by including language regarding the actual scheme that

was alleged in the indictment, the district court's instruction ensured that the petit

jury was not returning a verdict based on a scheme not presented to the grand jury.

*See e.g., United States v. Gelais*, 952 F.2d 90, 95 (5th Cir. 1992) (a charge that

instructs the jury that the government must prove scheme alleged in the indictment

"guarantee[s] [that] the jury did not return a guilty verdict on a theory which broadened the scheme outlined in the indictment").

Ignoring that the instructions viewed as a whole referred to the exact scheme alleged in the indictment in roughly the same language, David simply claims that the government's theory as alleged in the indictment is narrower than the text suggests. Specifically, he claims (at 22) that the indictment alleges only that the defendants attempted to obtain money and property by means of "false statements." The indictment, however, alleges that defendants devised a scheme or artifice to defraud by using, not only false statements and omissions, but by using *false pretenses* and other *deceptive conduct*. The jury was presented with evidence of false statements, omissions, false pretenses, and this deceptive conduct.

In this way, the government's case resembles *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003). In *Woods*, this Court upheld the conviction of defendants involved in a telemarketing scheme in the face of a similar challenge that the mail fraud jury instruction worked a constructive amendment of the indictment because the government shifted its theory from "false pretenses" to a "scheme to defraud." *Id.* at 1000. In *Woods*, defendants argued that the court should have instructed the jury to find that there was a specific false statement made and that by instructing the jury on the scheme to defraud theory, without any finding as to a specific false

33

statement, the court improperly broadened the indictment.[20]    This Court rejected

Wood's argument, finding that because the indictment charged both theories, there

was no broadening of the indictment. *Id.*

The indictment in this case is nearly identical to the indictment in *Woods*,

because both theories of mail fraud were alleged, and, as noted *supra*, the record

reflects that the parties understood and acknowledged that both theories – scheme

to defraud and obtain money by false representations and omissions – were

alleged. Indeed, David never claimed that the jury should be instructed and that it

may only convict if it found defendants obtained money by false pretenses.

Rather, he proposed jury instructions that encompassed both theories – a scheme

to defraud theory, and a theory for the obtaining money by false pretense. ER 43-

44b.

The cases that David cites as support that there was a constructive

amendment here involve instances where the government's evidence and the jury's

instructions permitted the jury to find guilt based on a factual theory not fairly

contained within the indictment. For instance, in *United States v. Shipsey*, 190

---

[20]    The indictment in *Woods* read:
[D]efendants...knowingly devised, participated in, and executed a scheme to
defraud elderly victims, and to obtain money and property from such
victims by means of false and fraudulent pretenses, statements,
representations, promises, and innuendo, and the concealment and omission
of material facts, in connection with the conduct of telemarketing. 335 F.3d
at 1000.

F.3d 1081, 1086-87 (9th Cir. 1999), this Court found a constructive amendment because there was a "real likelihood" that the defendant was convicted on a "wrongful taking" theory of theft that was entirely distinct from, and not fairly included within, the "false pretenses" theft theory alleged in the indictment. Here, the same scheme to defraud that was articulated in the indictment was presented to the petit jury, both through evidence and the actual mail fraud instruction. There is no risk that the petit jury convicted on a different theory.

Finally, even if David could establish that there was plain error, he is not necessarily entitled to reversal. This Court has held that a defendant is not denied his or her right to a grand jury when the jury instructions and proof at trial diverge insignificantly from the indictment. *See United States v. Olson*, 925 F.2d 1170, 1175 (9th Cir. 1991) (affirming conviction where jury instruction identified scheme to "obtain money or property" when indictment only charged scheme "to obtain money"). Here, the proof at trial, relying on precisely the facts alleged in the indictment, showed that David and Nisbet engaged in a series of deceptive acts and made numerous misrepresentations to defraud the telephone companies and toll free subscribers out of reimbursement fees. Nothing in the district court's instructions to the petit jury could be viewed as allowing a conviction on any theory other than that.

//

35

Because the indictment here provided David with more than fair notice of what the government eventually proved at trial, the indictment served its intended function, and any difference between the indictment and the instruction was merely a "variance," and not an amendment. *United States v. Olson,* 925 F.2d 1170, 1176 (9th Cir. 1991).

          C.     The Jury Instructions Included the Element of Materiality.

Improperly concluding that the government could proceed only on a claim of false representations, David scoffs (at 38) that the government's proposed instruction on materiality was meaningless. On the contrary, because the government was proceeding on both theories, the instruction properly informed the petit jury that it must conclude that the scheme to defraud was "material" in order to convict. *See United States v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005).

As this Court has noted, "[i]f a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial. It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail service of the United States was used and intended to be used in the execution of the scheme." *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1968); *id.* at 136 ("[w]hile the statements in the advertising materials may not have been literally false, taken as a whole they were fraudulently misleading and deceptive").

Again, this case resembles *Woods*. In that case, the defendants also

challenged their conviction on the grounds that the mail fraud jury instruction did

not comport with *Neder v. United States*, 527 U.S. 1 (1999), because the district

court had failed to properly allege materiality.  335 F.3d at 997.  Specifically, the

jury was instructed that to convict on mail fraud, the government must prove:

> (1) that the defendant knowingly devised. . . a scheme or plan to
> defraud or a scheme or plan for obtaining money or property by
> means of false or fraudulent pretenses, representations or promises;
>
> (2) that the statements made or the facts omitted as part of the scheme
> were material;
>
> (3) that the defendant acted with the intent to defraud; and
>
> (4) that in advancing or furthering or carrying out the scheme, the
> defendant used the mails. . . or caused the mails. . .to be used.

*Id.*  The court further charged that:

> In determining whether a scheme to defraud exists, you are entitled to
> consider not only the defendant's words and statements, but also the
> circumstances in which they are used as a whole.  A defendant's
> actions can constitute a scheme to defraud even if there are no
> specific false statements involved.  The deception need not be
> premised upon words or statements standing alone.  The arrangement
> of the words or the circumstances in which they are used may create
> an appearance which is false or deceptive, even if the words
> themselves fall short of this.  Thus, even if statements as part of the
> scheme are not literally false, you may consider whether the
> statements taken as a whole were misleading and deceptive.

*Id.* at 997-98.  The defendant argued that *Neder* required that the government

prove a specific material false statement, but the Court rejected this argument,

finding instead that the instructions adequately charged materiality. *Id.* at 1000.

Indeed, the jury does not have to agree upon a specific, material misrepresentation

to find there was a "scheme to defraud . . . through a course of conduct or

statements that were reasonably calculated to deceive." *Id.*; *see also Omer*, 395

F.3d at 1089 ("pursuant to *Neder*, materiality of the *scheme* is an essential element

of bank fraud"). As this Court stated in *Woods*,

> '[i]f a scheme is devised with the intent to defraud, and the mails are
> used in executing the scheme, *the fact that there is no*
> *misrepresentation of a single existing fact is immaterial.* It is only
> necessary to prove that it is a scheme reasonably calculated to
> deceive, and that the mail service of the United States was used and
> intended to be used in the execution of the scheme.' (emphasis
> included).

*Woods,* 335 F.3d at 998 (quoting *Lustiger*, 386 F.2d at 138).   Here, the mail fraud

instruction read "the scheme to defraud was material; that is, it would reasonably

influence a person to part with money or property." ER 65-66. Based on *Woods*

and *Omer*, the district court thus properly instructed the jury as to the materiality

of the scheme.

Finally, David's reliance on *Bush v. United States*, 58 F.3d 482 (9th Cir.

1995) is misplaced. In *Bush*, this Court found there was no actual fraud because

the two unions from whom the defendant sought *per diem* compensation for the

same day had no rules that such conduct was prohibited and the Court found the

unions not only tolerated the behavior, but "actually approved" it. *Id.* at 485-6. In

other words, there was no fraud, let along a scheme to defraud that was material.

Here, no one can say that what David did was authorized by law (indeed it was against the law to use an autodialer as they did (*see* 47 U.S.C. § 227)), or that the use of deceptive measures was *not* undertaken to accomplish the fraud. Indeed, the government's evidence showed that if PacBell had known the lines were ordered with fictitious names, they would not have provided them to defendants. *See* RT 347. And, if PacBell had known the defendants planned to set up lines to use with an autodialer, they would not have provided lines to defendants. *See* RT 337. Not only was materiality properly alleged in the jury instructions, there was sufficient evidence at trial to show that both the deceptive conduct and the scheme itself was material in that it caused people to part with money.

D.    Mail Fraud Does Not Require a Finding of Unanimity.

At trial, the government requested that the jury be instructed on one theory of mail fraud; namely, that defendants engaged in a course of conduct that included making false statements or omissions, that was designed to deceive. The district court's jury instruction informed the jury that it must find that the scheme was "substantially as charged in the indictment." The instruction then laid out the actual scheme alleged in the indictment in the jury instruction. Given this clear instruction, nothing more was required. *Cf. United States v. Mastelotto*, 717 F.2d

1238 (9th Cir. 1983)(finding need for unanimity as to a specific scheme where

there are two distinct schemes).

David claims (at 41) that a specific unanimity instruction was required

because the government was relying solely on a mail fraud theory that involved

obtaining money by false statements, representations, or false pretenses.   As

mentioned *supra*, the government alleged both theories in its indictment, which

the defense acknowledged below. *See, e.g.*, ER 15i, 42.  At trial, the government

agreed to proceed on only one theory, that defendants engaged in a scheme to

defraud.  Because the government narrowed its theory at trial, there was no need

for an instruction requiring the jurors to be unanimous as to a particular false

statement.

Even if he were correct that the government proceeded on a false

representation theory, David fails to cite to any case holding that a specific

unanimity instruction is required.   In *United States v. Frazon*, 780 F.2d 1461 (9th

Cir. 1986), on which he relies, this Court held that a more specific instruction is

required

> *only* where it appears that a conviction might rest upon different
> jurors having found the existence of different facts. . . That situation
> arises where the complex nature of the evidence a discrepancy
> between the evidence and the indictment, or some other particular
> factor creates a genuine possibility of juror confusion.

*Id.* at 1468 (emphasis added).   Here, the government presented one scheme that

the judge summarized in the jury instruction itself. The judge also specifically instructed the jury that it must find that the scheme itself was "substantially as charged in the indictment." ER 65. Given that the jury was told it must find one scheme to convict, there was simply no chance of juror confusion.

Finally, the special unanimity instruction that David proposed for the scheme to defraud theory (*see* ER at 44b) was hardly a model of clarity. David wanted the jurors instructed that they must find that "the defendants made up a scheme or plan for obtaining money or property by deceiving toll free number subscribers" with all of them "agreeing that there were statements made or omissions that were material that by themselves may not be false, but taken together as a group of communication, was on the whole deceptive." *Id.* The district court hardly abused its discretion by refusing to give that instruction.

## III.   *The Jury Instruction for Use of Fictitious Name Was Adequate.*

### A.   Standard of Review

When reviewing an allegedly erroneous jury instruction, this Court considers the instructions as a whole, *United States v. Green*, 745 F.2d 1205, 1209 (9th Cir. 1984), *cert. denied*, 474 U.S. 925 (1985), and the adequacy of the entire charge must be evaluated in the context of the trial. *Marabelles,* 724 F.2d at 1382. This Court will review *de novo* whether the jury instructions omitted or misstated an element of the charged offense, *Stapleton*, 293 F.3d at 1114, but challenge to

the language or to the formulation of the instruction is reviewed for an abuse of discretion. *Green*, 745 F.2d at 1209.

B. Argument

David was also charged and convicted of knowingly using a fictitious name to conduct, promote, or carry on a mail fraud scheme or an unlawful business, in violation of 18 U.S.C. § 1342.[21] On that charge, the district court instructed as follows:

> First, the defendant used, assumed, or requested to be addressed by a fictitious name other than his proper name by means of the Postal Service, or did receive mail matter addressed to such a fictitious name; and
>
> Second, the defendant knowingly used the fictitious name for the purpose of carrying on either (1) a mail fraud scheme as alleged in the indictment and meeting all of the elements of mail fraud as described to you in these instructions, or (2) an unlawful business involving an automatic telephone dialing system, or both. You must all agree that defendant's use of fictitious name was to carry out a mail fraud scheme, or you must all agree the use of fictitious names was to carry out an unlawful business. Alternatively, you may unanimously find that it was done for both purposes.

---

[21]    The government disagrees with David's claim that the section 1342 convictions must be dismissed if the Court finds that the evidence supporting the mail fraud convictions is insufficient. There was sufficient evidence to find David guilty of the second theory of liability under section 1342 – using a fictitious name to promote an unlawful business. *See United States v. Griffin*, 502 U.S. 46 (1992)(upholding conviction even though one of the possible bases of conviction was factually insufficient). At trial, there was never any dispute that the defendants' use of an autodialer violated the law, and the government submitted sufficient evidence, including the testimony of several witnesses, who testified that the use of an autodialer as here was unlawful. RT 226, 264, 292-93, 337, 511.

ER 68.

David argues that Counts 9 through 15 should have been dismissed because the government did not allege materiality. Section 1342, however, has no express materiality requirement, no court has ever held that section 1342 has a materiality requirement, there is no indication in the legislative history of section 1342 that it includes a materiality requirement (GER 112, 118), and analogous case law does not support the argument that a materiality requirement should be read into the statute.

Indeed, in our view, David's argument is foreclosed by *United States v. Well*, 519 U.S. 482 (1997). In *Wells*, what was at issue was whether 18 U.S.C. § 1014 -- which punishes a person who "knowingly makes any false statement or report . . . for the purpose of influencing in any way the action" of a Federal Deposit Insurance Corporation insured bank "upon any application, advance, . . . commitment, or loan" -- required proof of the materiality of the "false statement." The defendants in *Wells* argued that because materiality was a required element of "false statement"-type offenses at common law, it must also be required by section 1014. The Supreme Court disagreed. Examining the text of the statute, the Court concluded that "[n]owhere does it further say that a material fact must be the subject of the false statement or so much as mention materiality." *Id.* at 490. Moreover, the Court concluded that the defendant failed to show that "at common

43

law the term 'false statement' acquired any implication of materiality that came with it into § 1014." *Id.* at 491; *see id.* (noting that Congress is presumed to incorporate the common-law meaning of the terms it uses if those terms have accumulated settled meaning under the common law and the statute does not otherwise dictate) (additional citations omitted).

Here, the text of section 1342 does not contain or make reference to a materiality element, and David has not advanced a persuasive argument that the common law has implied a materiality requirement into the term "false or fictitious name." *Cf. United States v. Hart*, 291 F.3d 1084, 1085 (9th Cir.) (refusing to read a materiality requirement into crime of making a false statement in an application for a passport where the statement makes no mention of materiality, and the phrase "false statement" has not accumulated settled meaning requiring proof of materiality under common law), *cert. denied*, 537 U.S. 962 (2002).

David relies on *Neder v. United States*, 527 U.S. 1 (1999) to claim that "materiality" is an element of a section 1342 violation. In *Neder*, however, the Supreme Court, applying the framework set forth in *Wells*, found that materiality is an element of a scheme or artifice to defraud under the mail, wire, and bank fraud statutes because Congress incorporated the common law meaning of *defraud*, including its requirement of materiality into the statute. Section 1342 is not a fraud statute, however, but a statute that prohibits the use of a false name in

carrying out a scheme to defraud, as defined in section 1341, or an unlawful

business. In any event, the court's instruction on the section 1342 count ensured

that, should the jurors find the false name was used to carry out a mail fraud

scheme, they had to find materiality -- specifically, they had to find mail fraud "as

alleged in the indictment and *meeting all of the elements of mail fraud as*

*described to you in these instructions.*"

Because the instruction did require materiality if the jury relied on the mail

fraud prong, David argues that a materiality requirement is also required if the jury

concluded that he used the fictitious name to promote or conduct an unlawful

business. He is wrong. Section 1342 addresses the use of a fictitious name to

carry out an unlawful business by using the postal service. The jury is required by

the language of the statute itself to conclude that the fictitious name was being

used to carry on, promote, or conduct the unlawful business. This aspect of the

statute is distinct from the use of a fictitious name to carry out a fraudulent

scheme. Indeed, the Seventh Circuit acknowledged as such in *Strauss v. United*

*States*, 516 F.2d 980 (7th Cir. 1975), the case on which David relies. Specifically,

that Court noted that "[o]f course, since 18 U.S.C. § 1342 reached the use of a

false name or address in connection with any 'unlawful business,' its substantive

sweep may *exceed* that of Section 1341 which reaches fraud and similar crimes."

*Id.* at 985 (emphasis added). Given that an unlawful business need not involve

fraud, there is no need to instruct on materiality.

In fact, applying the plain language of the statute, one can envision many circumstances in which the statute is violated under the "unlawful business" clause where there is no fraud. For example, use of a fictitious name to carry on businesses that involve the mail order contraband, like drugs, firearms, or child pornography. Although the customers of the contraband are in no way defrauded, the individual using the fictitious name to carry on or promote the unlawful business has clearly violated the plain language of the statute. *See, e.g., United States v. Odutayo*, 406 F.3d 386, 393 (5th Cir.) (noting that "by promoting an unlawful business that does not involve fraud" a defendant "may violate § 1342 without concurrently violating § 1341"), *cert. denied*, 126 S. Ct. 238 (2005); *Ross v. United States*, 103 F.2d 600, 606 (9th Cir. 1939) (interpreting identically worded predecessor statute 18 U.S.C. § 339, and noting statute precludes use of fictitious names and addresses by one conducting the unlawful business, or one dealing with him in connection with the unlawful business, of distribution by mail of obscene writings and pictures). The purpose of the statute, therefore, is to ensure that the postal service is not an unwitting accomplice to the carrying on of a scheme to defraud or an unlawful business, not strictly to prevent fraud.

David also argues that this Court should inject an intent to defraud standard that would arguably make committing a section 1342 violation a specific intent

crime as it relates to the unlawful business theory of liability.[22]   Just as David

presents no cases supporting that materiality is an element of a section 1342

violation, David presents no support for his claim that to prove a section 1342

violation, one must show that the defendant knew that he/she was violating a

specific statute which created the unlawful business.

Defendants never disputed that the use of an autodialer was unlawful under

47 U.S.C. § 227, nor did they challenge their conduct fell within the statute's

proscriptions.  They simply argued, as they do on appeal, that they cannot be

convicted under section 1342 unless the jury concludes that they *knew* use of the

autodialer was unlawful.

This, quite simply, is not the law.  "The general rule that ignorance of the

law or a mistake of law is no defense to criminal prosecution is deeply rooted in

the American legal system." *Cheek v. United States*, 498 U.S. 192, 199 (1991).

Although there is a limited exception to this rule where the statute explicitly

requires that the government demonstrate that the violation was "willful" – *see,*

*e.g., Ratzlaf v. United States*, 510 U.S. 135, 137 (1994) (to establish a "willful"

violation of a statute, "the Government must prove that the defendant acted with

knowledge that his conduct was unlawful"); *Cheek*, 498 U.S. at 201 (requiring

---

[22]     For a conviction of section 1342, David requested that the district
court require the jury to find that the defendant "consciously intended to violate 42
U.S.C. § 227." ER 42a.

proof that a criminal "defendant knew of the duty purportedly imposed by the provision of the statute or regulation he is accused of violating") – that exception does not apply here where the government was required to prove that David purposefully used a fictitious name to promote, conduct, or carry on an unlawful business. *See, e.g., United States v. Hancock*, 231 F.3d 557, 562-63 (9th Cir. 2000) (affirming rejection of defendants' request that jury be instructed that "at the time defendant possessed the . . . firearms, he knew that it was illegal for him to possess firearms because he had a misdemeanor conviction for domestic violence" because cases on which he relied to claim exception to the maxim "ignorance of the law is no excuse" are "cases in which the Supreme Court read the element of 'actual knowledge of the law' into complex statutes that punished 'willful' failures to perform statutory duties") (citing *Ratzlaf*, 510 U.S. at 149); *United States v. Pasillas-Gaytan*, 192 F.3d 864, 867-68 (9th Cir. 1999) (noting distinction between the requirements of "willful" and "knowing" behavior and declining to import the *Cheek/ Ratzlaf* requirement of actual knowledge of law into statute that punished "knowing" behavior, even when the statute arguably is "highly technical").

David's analogy to the innocent employee of a business that uses autodialers improperly and who happens to receive mail from a fictitious name is therefore misplaced. In his example, the employee did not create the fictitious name and then use it to promote an unlawful business or scheme to defraud

through the use of the mails. Here, David created the fictitious names and then used the mails to promote the unlawful business. That is the crime with which section 1342 is concerned – the use of fictitious names to promote something unlawful and using the mails to do so.

Finally, even if the Court were to find that section 1342 is a fraud statute, thus, there must be an intent to defraud and materiality requirement in the instruction for both the mail fraud and unlawful business theories of liability, the conviction on Counts 9-15 should be affirmed, because any error is harmless, given that the jury convicted on the mail fraud charges. In other words, it is "beyond reasonable doubt that the error complained of [here] did not contribute to the verdict obtained," because, given the conviction on the mail fraud counts, the jury most likely based their section 1342 convictions on the fraud portion of the statute. *Neder*, 527 U.S. at 15. Because the district court's instruction on the mail fraud theory included both a materiality and an intent to defraud element, any error in failing to include the same instruction as to the unlawful business theory was harmless.

IV. ***The Lower Court Properly Denied David's Request for Forced Immunity of His Co-defendant or, in the Alternative, a Continuance of the Trial Date Until His Co-defendant Had Been Sentenced.***

A.    Standard of Review

The Court applies an abuse of discretion standard for this issue and will

only reverse if the decision is "arbitrary and unreasonable." *United States v. Than*, 960 F.2d 1391, 1396 (9th Cir. 1991).    Accordingly, David faces a high hurdle in reversing the denial of a continuance or the denial of a request to force the government to immunize a witness.

> B.    Argument

Less than two weeks before trial, David filed a motion seeking to sever his trial from that of his co-defendant, Scott Nisbet, on the grounds that Nisbet's pretrial statements so incriminated David that he could not receive a fair trial if they were tried together. GER 132. After Nisbet pleaded guilty, David argued that the government should be compelled to grant Nisbet immunity so that David could call him as a *defense* witness. In the alternative, David sought to continue the trial until after Nisbet's sentencing. This was after more than *two* years of continuances requested by the defense, and when the parties were finally ready for trial. GER 121. The lower court denied both requests.

There are extremely limited circumstances under which a court may order the government to confer immunity on a witness, and this case clearly was not one of them. To grant such relief, the defendant must show, first, prosecutorial misconduct and, second, that the proffered testimony would be relevant. *Williams v. Woodford*, 306 F.3d 665, 697-98 (9th Cir. 2002).    To prove prosecutorial misconduct, the defense must show that the government refused to grant witness

immunity with the deliberate intention of distorting the fact-finding process. *Id.* Although the law generally requires a showing that the prosecutor affirmatively induced the witness to invoke the Fifth Amendment privilege, the Court may also find prosecutorial misconduct through the intentional distortion of the fact-finding process where the government "grant[s] immunity to a witness in order to obtain his testimony, while denying immunity to a defense witness whose testimony would directly contradict that of the government witness." *United States v. Croft,* 124 F.3d 1109, 1116 (9th Cir. 1997).

David failed to present *any* evidence of misconduct under either theory. Leading up to and throughout the trial, the government never granted immunity to any witness, so it could not be seen as handing out immunity to its own witnesses while refusing to do so for the defense. Moreover, David could not cite one case where the government was compelled to immunize a witness under David's circumstances. In any event, David has never shown how Nisbet's testimony would be relevant to his defense or at all exculpatory. Indeed, the government contends that Nisbet's testimony would not have contradicted any of the evidence that the government introduced in its case-in-chief, and, thus, far from exculpating David, would only have further implicated him in the scheme. GER 121; 132. And, the fact that Nisbet's pretrial statements so incriminated David that David sought severance of their trials severely undercuts any claim that Nisbet's

testimony would have been of assistance to him at his trial.  Moreover, even if, as

David now claims (at 55), Nisbet "was by all accounts the mastermind of the

plan," that fact does not absolve David of criminal responsibility for his own

criminal conduct.

Finally, the motion to continue was also properly denied, given that there

had been a two year gap between arraignment and trial, the government was ready

to proceed, the witnesses had been subpoenaed, and the district court's calendar

was free.  The fact that Nisbet would not testify for him was not new to David, and

did not merit a last-minute disruption of the trial.   On this record, the court's

decision to eschew a continuance can hardly be characterized as an abuse of

discretion.

## CONCLUSION

For the reasons stated above, David's conviction and sentence should be

affirmed.

DATED: December 30, 2005          Respectfully submitted,

                                  KEVIN V. RYAN
                                  United States Attorney

                                  BARBARA J. VALLIERE
                                  Assistant United States Attorney
                                  Chief, Appellate Section


                                  STACEY P. GEIS
                                  Assistant United States Attorney

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Circuit Rule 32-1, I certify that:

<u>X</u>   Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, the attached answering brief is:

    <u>X</u>   Proportionately spaced, has a typeface of 14 points or more and contains <u>12,840</u> words; or,

    _   Monospaced, has 10.5 or fewer characters per inch, and contains _____ words or ___ lines of text

Date: December 30, 2005

STACEY P. GEIS
Assistant U.S. Attorney

## STATEMENT OF RELATED CASES

Pursuant to Rule 28-2.6(a) of the United States Court of Appeals for the

Ninth Circuit, counsel for plaintiff-appellee hereby states she is unaware of any

related case.

STACEY P. GEIS
Assistant United States Attorney

December 30, 2005.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee of the Office of the United States Attorney for the Northern District of California and is a person of such age and discretion to be competent to serve papers. The undersigned further certifies that she caused a copy of the

**BRIEF OF THE UNITED STATES AS APPELLEE**

to be served this date by U.S. Mail upon the persons below at the addresses shown:

> Dennis P. Riordan
> RIORDAN & HORGAN
> 523 Octavia Street
> San Francisco, CA 94102
> (415) 431-3472

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 30th day December of 2005, in San Francisco, California.

Ana M. Guerra
Legal Assistant to
AUSA STACEY P. GEIS