VOLUME 3

PAGES 351 - 549

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON, JUDGE

UNITED STATES OF AMERICA,  )
                        )
       PLAINTIFF,  )
                        )
  VS.                 )   NO. CR 02-0062 SI
                        )
DANIEL DAVID,         )   WEDNESDAY, MARCH 3, 2004
                        )
                        )   SAN FRANCISCO, CALIFORNIA
       DEFENDANT.  )
_____)

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:        KEVIN V. RYAN
                     UNITED STATES ATTORNEY
                     450 GOLDEN GATE AVENUE
                     SAN FRANCISCO, CALIFORNIA  94102
            BY:  MATTHEW JACOBS,
                     MARK C. PARRENT,
                     ASSISTANT UNITED STATES ATTORNEYS

FOR DEFENDANT:        FOLEY & LARDNER
                     ONE MARITIME PLAZA, SIXTH FLOOR
                     SAN FRANCISCO, CALIFORNIA  94111
            BY:  THOMAS F. CARLUCCI, ESQUIRE
                     RUSSELL L. CARLBERG, ESQUIRE

REPORTED BY:          DIANE E. SKILLMAN, CSR 4909
                     OFFICIAL COURT REPORTER

1    IN THE STATE OF NEVADA THAN THEY ARE IN CALIFORNIA.  AND HIS

2    CONCERN WAS THAT THESE -- THEY WERE GETTING THE REVENUE FROM

3    THESE LARGE PHONE COMPANIES AND THEY DIDN'T WANT THE PHONE

4    COMPANIES TO REALIZE WHO THE OWNERS WERE.

5    Q.  DID HE EXPLAIN WHY HE DIDN'T WANT THE PHONE COMPANIES TO

6    KNOW?

7    A.  HIS EXPLANATION, WHICH I UNDERSTOOD, WAS THAT IF THEY

8    GENERATED A LARGE AMOUNT OF REVENUE UNDER ONE COMPANY, LET'S

9    SAY, AGAIN, FOR EXAMPLE, AT&T WOULD WRITE OUT A CHECK FOR

10   $50,000 IN RENT, WOULD TURN AROUND AND BE SUSPICIOUS OF IT AND

11   EITHER INVESTIGATE IT OR SIMPLY TRY AND CHANGE THEIR SYSTEM,

12   MAYBE REWRITE THEIR SOFTWARE OR SOMETHING TO AVOID PAYING THIS

13   SORT OF EXPENSE.

14         IF IT WAS DIVIDED AMONGST FIVE COMPANIES AT 10,000

15   APIECE, TO A COMPANY LIKE AT&T, THAT MIGHT NOT BE AS NOTICEABLE

16   AND GRAB THE ATTENTION.

17   Q.  ALL RIGHT.

18         NOW, DID MR. NISBET REQUEST THAT ANY MAILING

19   ARRANGEMENTS BE MADE FOR THESE CORPORATIONS?

20   A.  YES.  THE MAIL WAS TO BE FORWARDED TO ME.  THE PROCESS

21   WOULD BE THEY WOULD -- THE MAIL THAT THEY WERE CONCERNED ABOUT

22   WAS GETTING CHECKS.

23   Q.  OKAY.

24   A.  AND --

25   Q.  LET ME ASK THIS TO GO STEP BY STEP.

1          DID YOU TAKE ANY STEPS TO SET UP AN ADDRESS FOR

2    THESE CORPORATIONS?

3    A.  YES, I DID.

4    Q.  CAN YOU EXPLAIN THAT, PLEASE?

5    A.  LET ME EXPLAIN WHAT I DID FOR SETTING IT UP, THE WHOLE

6    PROCEDURE.

7    Q.  ALL RIGHT.

8    A.  BECAUSE I HAD NEVER SET UP A NEVADA CORPORATION BEFORE,

9    WHAT I DID IS FLEW -- I RESEARCHED AHEAD OF TIME AND WENT TO

10   LAS VEGAS BECAUSE LAS VEGAS AND CARSON CITY ARE THE TWO PLACES

11   WHERE YOU CAN INCORPORATE IN NEVADA ,THE SECRETARY OF STATE

12   OFFICE FOR THE STATE OF NEVADA, AND YOU CAN PHYSICALLY FILE.

13          WENT THERE, GOT A COMPANY CALLED RESIDENT AGENTS OF

14   NEVADA, AND HAD THEM HANDLE THE INCORPORATING PROCESS FOR ONE

15   COMPANY AND SAW WHAT THEY DID.  OBVIOUSLY I KNEW THEY NEEDED TO

16   GET A FEDERAL ID NUMBER, WHICH I WAS FAMILIAR WITH, I DID THIS

17   FOR CLIENTS ALL THE TIME.  WHAT THEY DID AS FAR AS FILING THE

18   PAPERWORK WITH THE STATE AND FOR SETTING UP A BANK ACCOUNT, AND

19   FOUND OUT WHERE TO, BECAUSE I HAD NO IDEA WHERE TO GO.  AND

20   THEY USED BANK OF AMERICA BRANCH IN LAS VEGAS.

21          SO, I SAW WHAT THEY DID, AND THEY COST A FEE.  I AM

22   GUESSING SOME REASON MY MIND PROBABLY AROUND $800 FEE FOR DOING

23   THAT FOR ONE COMPANY.  THEN I WAITED UNTIL THE PAPERWORK WENT

24   THROUGH ON THAT AND WENT BACK AND RETURNED.

25   Q.  LET ME HAVE YOU PAUSE RIGHT THERE AND ASK YOU IF YOU CAN

1   RECOGNIZE A CERTAIN DOCUMENT.

2             (COUNSEL CONFER)

3             **MR. PARRENT:**  MAY I APPROACH, YOUR HONOR?

4             **THE COURT:**  YOU MAY.

5   **BY MR. PARRENT:**

6   Q.  I AM SHOWING YOU WHAT HAS BEEN MARKED AS GOVERNMENT

7   EXHIBIT 28 FOR IDENTIFICATION.  DO YOU RECOGNIZE THAT DOCUMENT?

8   **A.**  YES, I DO.

9   Q.  WHAT IS IT?

10  **A.**  IT'S THE ARTICLES OF INCORPORATION FOR A COMPANY NAMED

11  BREEZE COMMUNICATIONS INCORPORATED, AND IT'S IN MY HANDWRITING.

12  Q.  SO DID YOU PARTICIPATE IN THE FORMATION OF THIS

13  CORPORATION?

14  **A.**  YES, I DID.

15  Q.  AND WAS THIS DONE AT MR. NISBET'S DIRECTION?

16  **A.**  YES, IT WAS.

17            **MR. PARRENT:**  MOVE TO ADMIT GOVERNMENT'S 28.

18            **MR. CARLUCCI:**  NO OBJECTION.

19            **THE COURT:**  THANK YOU.  IT WILL BE RECEIVED.

20                              (PLAINTIFF'S EXHIBIT 28

21                              RECEIVED IN EVIDENCE)

22  **BY MR. PARRENT:**

23  Q.  CAN YOU SEE IT ON THE SCREEN, SIR?

24  **A.**  I CAN SEE IT BETTER ON HERE.

25  Q.  THAT WOULD BE FINE.

1          SEE AT THE VERY TOP IT SAYS "BREEZE COMMUNICATIONS"?

2    A.   YES.

3    Q.   IS THAT THE NAME OF THE PROPOSED CORPORATION THAT IS TRYING

4    TO ESTABLISH HERE?

5    A.   YES.

6    Q.   HOW DID THAT -- HOW DID YOU HAVE THAT NAME?

7    A.   IT WAS SUGGESTED BY SCOTT IN THE CASE THERE WERE SOME -- I

8    DON'T RECALL IF THAT ONE WAS JUST FROM HIM OR FROM HIM AND

9    DANIEL COMBINED.

10          I REMEMBER FOR COMING UP WITH SOME OF THE NAMES HE

11   WOULD CONSULT WITH DANIEL.

12   Q.   WAS THIS CORPORATION THEN SUCCESSFULLY ESTABLISHED IN

13   NEVADA?

14   A.   YES, IT WAS.

15   Q.   AND THIS IS THE ONE YOU ARE DESCRIBING RESIDENT AGENTS OF

16   NEVADA WERE HELPING SET IT UP?

17   A.   YES.

18   Q.   DID YOU ESTABLISH ANY ADDITIONAL CORPORATIONS AS THIS ONE

19   WAS ESTABLISHED?

20   A.   YES, I DID.  I WENT BACK AFTER THIS, THE PAPER PROCESS WAS

21   COMPLETED FROM THE SECRETARY OF STATE'S OFFICE AND WE RECEIVED

22   THE PAPERWORK THAT WE WERE SUPPOSED TO RECEIVE, I WENT BACK TO

23   LAS VEGAS AND SET UP WHAT I BELIEVE WAS FOUR OR FIVE, I AM NOT

24   SURE, SIMILAR CORPORATIONS.

25          IN THIS CASE, RESIDENT AGENTS OF NEVADA ACTED AS THE

1    MAILING AGENT AND WOULD FORWARD MAIL AND DID FORWARD MAIL OVER

2    TO ME.  WHEN I WENT AND ESTABLISHED THE OTHER CORPORATIONS, I

3    USED THE SAME BANK, BUT I GOT DIFFERENT POST OFFICE BOXES FOR

4    THEM TO GET THE MAIL.  AND THEN HAD A FRIEND OF MY WIFE'S WHO

5    LIVES IN HENDERSON, WHICH IS RIGHT NEXT TO LAS VEGAS, SHE WAS

6    TO GO AROUND EVERY WEEK OR TWO TO THE VARIOUS POST OFFICE

7    BOXES, GET THE MAIL, STICK IT IN A BIG MANILA ENVELOPE, AND

8    FORWARD IT OVER TO ME.

9    Q.  DO YOU REMEMBER THE NAMES OF ANY OF THE OTHER CORPORATIONS?

10   A.  I DON'T RECALL ALL OF THEM.  I REMEMBER THERE WAS BAMBOO,

11   BOX CAR.  ALL OF THESE WERE COMMUNICATIONS, INC.  SO BAMBOO

12   COMMUNICATIONS, INC., BOX CAR COMMUNICATIONS, INC.  I BELIEVE

13   THERE WAS PELICAN COMMUNICATIONS, INC.

14   Q.  WHERE DID YOU GET THOSE NAMES?

15   A.  FROM SCOTT, AND I KNOW ON SOME OF THEM HE CONSULTED WITH

16   DANIEL.  THAT WAS ACTUALLY HOLDING ME UP AT ONE POINT ON SOME

17   PAPERWORK WAS TO GET THE LAST NAME OF THE CORPORATION.

18   Q.  FOR THE MAILING ADDRESSES THAT YOU DISCUSSED EARLIER, COULD

19   YOU DESCRIBE THE LOCATION THAT YOU OBTAINED FOR THE FIRST -- IN

20   THE BEGINNING FOR THE MAIL?

21   A.  WHAT I MEANT TO DO WAS GO TO DIFFERENT MAILBOXES, ET CETERA

22   AND GET A POST BOX AT EACH ONE BECAUSE THEY COULD USE THE WORD

23   SUITE.  EXAMPLE, IF THE MAILBOX NUMBER, THE MAILBOX WAS 321,

24   THEY COULD USE THE STREET ADDRESS, THE MAILBOX ET CETERA, SAY

25   SUITE 321.

1              WHEN I WENT TO THE FIRST MAILBOXES, ET CETERA, I WAS

2    TOLD THAT THE POSTAL REGULATIONS HAD CHANGED FAIRLY RECENTLY, A

3    FEW MONTHS BEFORE, AND YOU COULD NO LONGER DO THAT AND YOU WERE

4    SUPPOSED TO BE PUTTING THE WORDS, THE LETTERS, "PMB" IN FRONT

5    OF THE NUMBER, WHICH STOOD FOR PRIVATE MAILBOX.

6    Q.   WOULD THAT BE A PROBLEM IN WHAT YOU WERE TRYING TO DO?

7    A.   THAT WOULD BE A PROBLEM BECAUSE A COMPANY THAT WOULD BE

8    BILLING THESE MAJOR PHONE COMPANIES WOULD NOT LIKELY -- THEY

9    WANTED TO HAVE A LARGER IMAGE, AND USING A PRIVATE MAILBOX

10   WOULD NOT LOOK VERY PROFESSIONAL.

11             SO, I CALLED SCOTT AND WHAT WE DECIDED TO DO WAS TO

12   GO TO REGULAR U.S. POST OFFICES.

13   Q.   JUST SO WE ARE CLEAR, YOU JUST DESCRIBED THAT IT WOULD NOT

14   LOOK VERY PROFESSIONAL.  WAS THAT INITIAL CONCERN YOUR CONCERN

15   OR DID THAT COME FROM MR. NISBET OR MR. DAVID?

16   A.   THE INITIAL -- WELL, THE CONCERN ABOUT USING SUITE CAME

17   FROM THEM, SO I WAS AWARE OF THAT.

18             SO, WHEN I CAME INTO THIS PRIVATE MAILBOX SITUATION,

19   ACTUALLY DID RENT ONE MAILBOX, BUT WE NEVER WOUND UP USING IT

20   BECAUSE AS SOON AS I FOUND OUT OF THE RESTRICTION, I WENT AND

21   CALLED HIM AND I THINK I MIGHT HAVE BEEN THE ONE TO OFFER THE

22   ALTERNATIVE OF SAYING, WELL, I CAN INVESTIGATE AND SEE ABOUT

23   GETTING U.S. POST OFFICES.

24             BUT MY UNDERSTANDING WAS BECAUSE OF THEY WANTED TO

25   HAVE THE LARGER IMAGE.

1    Q.    DID YOU EVENTUALLY OBTAIN U.S. POST OFFICE BOXES?

2    A.    YES, I DID.  AND RATHER THAN HAVING THEM AT ONE POST

3    OFFICE, BECAUSE THAT -- WE WANTED TO KEEP THE DIFFERENT

4    CORPORATIONS LOOKING INDEPENDENT.  SO RATHER THAN GETTING THEM

5    ALL AT ONE POST OFFICE, WHICH WOULD MAKE IT LOOK LIKE THESE

6    CORPORATIONS WOULD BE UNITED OR CONSOLIDATED, I GOT THEM AT

7    FIVE DIFFERENT POST OFFICES, I BELIEVE IT WAS FOUR OR FIVE, ALL

8    IN LAS VEGAS AND THEY EACH HAD SEPARATE ZIP CODES.

9    Q.    DID YOU DISCUSS THAT ISSUE WITH MR. NISBET OR MR. DAVID?

10   A.    I DID WITH MR. NISBET.

11   Q.    ALL RIGHT.

12          NOW, HOW WERE YOU TO BE COMPENSATED FOR THIS WORK

13   THAT YOU WERE DOING FOR THEM?

14   A.    OKAY.  ORIGINALLY, IT WAS FOR THE INITIAL WORK IT WAS FEE

15   BASED.  THEY GAVE ME APPROXIMATELY $5,000 FOR THE -- THEY PAID

16   FOR SOME WORK THAT WAS AHEAD OF TIME IN PREPARATION FOR GOING

17   TO VEGAS.

18          THEN APPROXIMATELY $5,000, WHICH WAS FIRST OF ALL

19   APPLIED TOWARDS EXPENSES, MOTEL, CAR RENTAL, FLIGHT.  AND THEN

20   THE REMAINDER WAS GOING TO ME AND.  IN THE LONG-RANGE

21   SITUATION, IT WAS DISCUSSED THAT I MIGHT BECOME A MINORITY

22   STOCKHOLDER IN ONE OF THE COMPANIES, BUT WE HADN'T GOTTEN TO

23   THAT YET.  AND DUE TO REASONS OF COMMON OWNERSHIP OF MULTIPLE

24   COMPANIES, WHICH I COULD GET INTO, I DECIDED ON MY OWN I WASN'T

25   GOING TO DO THAT BECAUSE OF A CONFLICT OF INTEREST, BUT WOULD

1   A.  APPROXIMATELY TWO AND A HALF YEARS.

2   Q.  AND CAN YOU GENERALLY DESCRIBE WHAT THAT MEANS?  WHAT DID

3   YOU DO ON A DAILY BASIS?

4   A.  ON A DAILY BASIS, I HAD A STAFF WHO COLLECTED WHAT IS

5   KNOWN, CALLED DETAILED RECORDS OR CALLS PLACED OVER SPRINT'S

6   NETWORK, WHICH ORIGINATED FROM PAYPHONES.  AND THAT

7   COMPENSATION WAS DUE ON COLLECTED INFORMATION, TOTALED IT, AND

8   THEN SUBMITTED IT FOR REPAYMENT TO THE PAYPHONE OWNERS BASED ON

9   THE VOLUMES OF TRAFFIC THAT CAME FROM OR ORIGINATED FROM THAT.

10  Q.  OKAY.

11          NOW, MR. CONSANI I JUST WANT TO ASK YOU A LITTLE BIT

12  ABOUT THE STRUCTURE AND HOW SOMEBODY, IF SOMEBODY WANTED TO

13  HAVE A PAYPHONE, HOW THEY WOULD GO SETTING THAT UP.

14  A.  OKAY.  THAT'S NOT SPRINT'S BUSINESS, HOWEVER, TYPICALLY IF

15  SOMEONE WANTED TO SET UP A PAYPHONE, SAY AT A GAS STATION OR

16  HOTEL OR SOME ENTITY LIKE THAT, THEY WOULD EITHER CONTACT A

17  VENDOR WHO WOULD ACTUALLY BUILD THE PAYPHONES FOR THEM SO THEY

18  HAVE THE PHYSICAL PIECE OF PROPERTY WITH THEM, THEY WOULD THEN

19  CONTACT THE LOCAL TELEPHONE COMPANY IN THAT AREA, IDENTIFY THAT

20  THEY WOULD LIKE TO PURCHASE A PHONE LINE FOR THE PURPOSE OF A

21  PAYPHONE, AND THAT WOULD BE INSTALLED FOR THEM.

22  Q.  OKAY.

23          AND THEN WHAT PROCESS HAS TO GO THROUGH IN ORDER

24  TO -- IS THERE ANY RELATIONSHIP FORMED WITH SAY SPRINT AT THAT

25  POINT OR DOES THAT ONLY HAPPEN WHEN CALLS ARE MADE?

1    **A.**   THEY CAN CHOOSE A LONG DISTANCE CARRIER AT THAT POINT IN

2    TIME.   THEY HAVE THE OPTION OF CHOOSING WHOMEVER THEY WOULD

3    LIKE.

4              AND FOR USERS OF THOSE PAYPHONES, IF THEY DIDN'T

5    CHOOSE TO MAKE A DECISION ON WHICH LONG DISTANCE CARRIER THEY

6    WOULD LIKE, THE DEFAULT WOULD BE THE DECISION OF THE PAYPHONE

7    OWNER WHO PRESUBSCRIBES THAT LONG DISTANCE CARRIER, SIMILAR TO

8    YOUR HOME SERVICE.

9    **Q.**   OKAY.   NOW, I WANT TO TALK TO YOU ABOUT THE PAYPHONE

10   OWNERS.

11             WHAT ABOUT ON THE OTHER SIDE, THE 800 NUMBER OWNERS.

12             SOMEBODY WANTS TO GET AN 800 NUMBER, HOW DO THEY GO

13   ABOUT SETTING THAT UP?

14   **A.**   SURE.

15             THEY WOULD CONTACT EITHER A LONG DISTANCE CARRIER OR

16   LOCAL COMPANY AND INDICATE THAT THEY WOULD LIKE TO SET UP A

17   TOLL FREE NUMBER FOR OUR CUSTOMER SERVICE OPERATIONS, OR

18   RESIDENTIAL CUSTOMER CAN SET ONE UP IF THEIR CHILDREN ARE AWAY

19   AT COLLEGE OR SOMETHING LIKE THAT, THEY WANTED TO CALL HOME AND

20   NOT HAVE TO BURDEN THEM WITH COST OF CALLING HOME.

21   **Q.**   SO IS IT CORRECT THEN IT'S AVAILABLE TO REALLY ANYONE, YOU

22   DON'T HAVE TO BE A BUSINESS?

23   **A.**   YOU DO NOT HAVE TO BE A BUSINESS; YOU CAN BE A RESIDENTIAL

24   CUSTOMER JUST LIKE YOU AND I.   HOWEVER, BUSINESSES DO USE THEM

25   PREDOMINANTLY.

CONSANI - DIRECT / JACOBS                    422

1   Q.  OKAY.

2   A.  SOME BUSINESSES LIKE TO HAVE A PARTICULAR NUMBER THAT

3   MATCHES SAY THEIR COMPANY NAME, OR THEIR SLOGAN, OR SOMETHING

4   LIKE THAT.  AND THEY CAN REQUEST THAT.  IF IT IS AVAILABLE, WE

5   CAN GET IT FOR THEM.  AT WHICH POINT WE SET UP AN ACCOUNT FOR

6   THEM, OPEN UP THE NETWORK, AND ALL CALLS THAT WOULD BE DIALED

7   TO THAT TOLL-FREE NUMBER WITHIN THE CONTINENTAL UNITED STATES,

8   WOULD TERMINATE TO THE NUMBER THAT THEY DECIDED.

9   Q.  DOES THE -- IS THERE A RELATIONSHIP FORMED WITH, FOR

10  EXAMPLE, SPRINT?

11  A.  YES.  YOU WOULD CHOOSE WHICHEVER COMPANY YOU SET UP THE

12  SERVICE WITH.  IT COULD BE SPRINT, IT COULD BE YOUR LOCAL

13  TELEPHONE COMPANY, IT COULD BE ANOTHER LONG DISTANCE CARRIER.

14          THEY WOULD ACTUALLY PASS THE TRAFFIC FOR THAT

15  TOLL-FREE NUMBER OVER THE SPRINT NETWORK, IN THIS CASE, AND

16  TERMINATE TO YOUR PHONE NUMBER OF CHOICE.

17  Q.  AND ARE THERE A NUMBER OF LONG DISTANCE CARRIERS WHO COULD

18  SET UP 800 NUMBERS?

19  A.  YES.

20  Q.  ANY IDEA HOW MANY?

21  A.  THE MAJOR ONES ARE AT&T, SPRINT, WORLDCOM.  THOSE ARE THE

22  MAJOR ONES.  THERE ARE SOME SMALLER PHONE COMPANIES OUT THERE.

23  Q.  LET'S TALK ABOUT WHAT HAPPENS WHEN AN ACTUAL 800 NUMBER

24  CALL IS MADE FROM A PAYPHONE.

25          SO WHAT, IN TERMS OF COMPENSATION, WHAT GETS

1    TRIGGERED AT THAT POINT?

2    **A.**  WHAT ACTUALLY HAPPENS IS, IF A PERSON COMES UP, THEY WANT

3    TO CALL A TOLL-FREE NUMBER, THEY GO TO A PAYPHONE, THEY DIAL

4    THE NUMBER DIRECTLY.

5           TYPICALLY, WITH A PAYPHONE, YOU HAVE TO PUT COINS

6    IN, 50 CENTS, 75 CENTS, WHATEVER THE APPROPRIATE COST IS.  WITH

7    A TOLL-FREE NUMBER, OBVIOUSLY, IT IS TOLL FREE, SO YOU DON'T

8    HAVE TO DO THAT.

9           IN THAT CASE, WHEN A TOLL FREE CALL IS MADE, THE

10   PAYPHONE OWNER'S SOFTWARE ON THEIR PHONE HAS THE ABILITY TO PUT

11   AN INFORMATION DIGIT ON THE CALL OR CALL DETAIL RECORD THAT'S

12   CREATED WHEN THE CALL IS MADE.  THAT INFORMATION DIGIT IS

13   ASSIGNED BY THE FCC AND HELPS THE LONG DISTANCE CARRIER

14   IDENTIFY THAT CALL WAS PLACED ON A PAYPHONE AND THEY DIDN'T PUT

15   ANY MONEY IN THE MACHINE TO MAKE THE CALL.  YOU, AS THE LONG

16   DISTANCE CARRIER, ARE REQUIRED TO COLLECT THE MONEY.

17   **Q.**  COLLECT THE MONEY FROM WHOM?

18   **A.**  COLLECT IT FROM THE OWNER OF THE 800 SERVICE.

19   **Q.**  WHAT IS THE AMOUNT THAT WOULD TYPICALLY BE COLLECTED?

20   **A.**  SPRINT CHARGES 26 CENTS.

21   **Q.**  IS ANY PART OF THAT MANDATED BY THE FCC OR IS THAT

22   SOMETHING THAT SPRINT CHOSE?

23   **A.**  THE FCC MANDATES 24 CENTS AND SPRINT ADDS AN ADDITIONAL

24   2 CENTS OR THE ADMINISTRATIVE FEES.

25   **Q.**  AND ARE THERE SOME OTHER COSTS THAT SOMEBODY WITH AN 800

CONSANI - DIRECT / JACOBS                    424

1  NUMBER MIGHT HAVE AS WELL?

2  **A.**  THE ACTUAL USAGE OF THE CALL.  SO, FOR INSTANCE, THE USAGE

3  IS 10 CENTS A MINUTE.

4  **Q.**  ARE THERE SOME ADDITIONAL FEE -- I'M SORRY.

5          ARE THERE ADDITIONAL FEES THEN THAT SOMEONE WHO

6  RECEIVES AN 800 CALL MIGHT HAVE TO PAY IN ADDITION TO THE

7  26 CENTS?

8  **A.**  YES.

9  **Q.**  OKAY.  THE 26 CENTS IS THEN PAID.  IS THAT PAID DIRECTLY TO

10  SPRINT?

11  **A.**  IN THE BEST CASES, YES.  WE SEND A BILL TO THE OWNER OF THE

12  800 NUMBER WITH THEIR CALL DETAIL RECORDS.

13          THERE WOULD BE THE SURCHARGE OF THE 26 CENTS PLUS

14  THE USAGE CHARGES ON THERE.  WE WOULD COLLECT THAT FROM THEM

15  AND HOLD THE MONEY AND PAY IT QUARTERLY.  WE ARE DESIGNATED BY

16  THE FCC TO PAY THAT MONEY QUARTERLY TO THE PAYPHONE OWNER.

17  **Q.**  NOW, WHEN -- HOW DOES THE PAYPHONE OWNER SUBMIT A DEMAND

18  FOR PAYMENT OR DO YOU JUST SEND IT AUTOMATICALLY; HOW DOES THAT

19  WORK?

20  **A.**  NO.  ACTUALLY, BASED ON THE FCC GUIDELINES, WE ARE TO GET A

21  CLAIM FROM THAT PAYPHONE OWNER THAT SAYS, "HEY, I OWN THIS

22  PAYPHONE AND THIS PAYPHONE NUMBER BELONGS TO ME."  WE THEN TAKE

23  THAT CLAIM FORM, ACTUALLY WE HAVE A THIRD-PARTY VENDOR THAT

24  DOES THIS FOR US.  THEY GO --

25  **Q.**  WHO IS THAT THIRD-PARTY VENDOR?

1   IS A PAYPHONE ON THE SECOND FLOOR HERE.  IF I WENT DOWN TO THE

2   SECOND FLOOR AND I STARTED TO DIAL HOME DEPOT'S 1-800 NUMBER,

3   AND YOU CAME BY AND ASKED ME A QUESTION AND I HUNG UP, BUT IT

4   ACTUALLY CONNECTED, HOME DEPOT WOULD ACTUALLY GET CHARGED

5   26 CENTS FOR THAT CALL, RIGHT?

6   A.  IF IT WAS A COMPLETED CALL, YES.

7   Q.  IN OTHER WORDS, IT WENT THROUGH, I HUNG UP AFTER TWO

8   SECONDS, BUT IT CONNECTED, RIGHT?

9   A.  THAT'S A COMPLETED CALL, YES.

10  Q.  AS SOON AS I FINISHED TALKING TO YOU, MR. JACOBS CAME TO ME

11  AND SAID THE SAME THING, I MADE ANOTHER CALL AND HUNG UP, THEY

12  GET CHARGED 26 CENTS AGAIN?

13  A.  THAT WOULD BE ACCURATE.

14  Q.  AND IN THIS PROCESS, SPRINT WOULD COLLECT 2 CENTS EACH TIME

15  THOSE CALLS WERE MADE TO COVER ITS COST, RIGHT?

16  A.  THAT IS CORRECT.

17  Q.  NOW, WITH RESPECT TO THE CHECKS THAT YOU TALKED ABOUT, DO

18  YOU KNOW WHETHER ALL THOSE CHECKS WERE CASHED?

19  A.  I DO NOT.

20          ACTUALLY, I COULD LOOK AT THEM, AGAIN.  I BELIEVE

21  THAT THEY WERE ENDORSED BY THE BANK ON THE BACK, SO I WOULD

22  MAKE THE ASSUMPTION THAT THEY WERE CASHED.

23  Q.  LET'S GO ON THAT ASSUMPTION FOR A MOMENT THAT IT IS CASHED.

24          IF, IN FACT, THAT MONEY WAS IMPROPERLY OBTAINED FROM

25  THE PERSON WHO HAS THAT 800 NUMBER --

1   REPRESENTATION ON BEHALF OF THE DEFENDANT?

2   A.   ACTIVE, NO.

3   Q.   DID THERE EVER COME A TIME, MR. CORNET, WHEN MR. DAVID

4   APPROACHED YOU ABOUT DEPOSITING CERTAIN CHECKS?

5   A.   YES, SIR.

6              (COUNSEL CONFER.)

7   BY MR. JACOBS:

8   Q.   MR. CORNET, I AM GOING TO SHOW YOU WHAT HAS BEEN ADMITTED

9   INTO EVIDENCE AS EXHIBIT 23 AND JUST HAVE YOU LOOK THROUGH THAT

10  AND TELL ME IF YOU RECOGNIZE ANY OF THOSE CHECKS.

11  A.   THE CHECKS OR THE DEPOSITS?   THERE'S ENDORSEMENTS ON THE

12  BACK.

13  Q.   TELL ME IF THERE IS ANYTHING IN THAT EXHIBIT THAT YOU DON'T

14  RECOGNIZE.

15  A.   OKAY.

16             (WITNESS REVIEWS EXHIBIT.)

17             NO, I RECOGNIZE ALL OF THEM.

18  Q.   MR. CORNET, THE CHECKS THAT ARE IN EXHIBIT 23, ARE THOSE

19  THE CHECKS THAT MR. DAVID ASKED YOU TO DEPOSIT FOR HIM?

20             DID HE ASK YOU TO DEPOSIT SOME CHECKS?

21  A.   YES, BUT NOT ALL AT ONCE.

22  Q.   I UNDERSTAND.

23  A.   THEY CAME AT DIFFERENT PERIODS OF TIME.

24  Q.   BUT ULTIMATELY THE CHECKS THAT ARE IN THAT EXHIBIT, DID HE

25  ASK YOU TO DEPOSIT THEM FOR HIM?

1    A.  YES, SIR.

2    Q.  NOW, DID THESE CHECKS, I AM GOING TO COME BACK AND TALK

3    ABOUT THE DISCUSSIONS YOU HAD ABOUT IT, BUT DID THESE CHECKS

4    HAVE ANYTHING TO DO WITH ANY LEGAL REPRESENTATION THAT YOU WERE

5    DOING ON MR. DAVID'S BEHALF?

6    A.  NO, SIR.

7    Q.  AND WE HAVE A CHECK UP ON THE SCREEN, WHICH IS THE FIRST

8    PAGE OF THIS EXHIBIT, AND WHAT IS THE AMOUNT OF THAT CHECK?

9    A.  CAN I LOOK AT THE EXHIBIT INSTEAD?

10   Q.  I AM SORRY?

11   A.  MAY I LOOK DIRECTLY AT THE EXHIBIT?

12   Q.  YES.

13   A.  $126,453.89.

14   Q.  HOW DID IT COME ABOUT THAT MR. DAVID ASKED YOU TO DEPOSIT

15   THIS CHECK?

16   A.  HE CAME BY MY OFFICE.  HE DID NOT WANT TO USE HIS ACCOUNT

17   AT THE MECHANICS BANK, AND HE TOLD ME THE REASON HE DIDN'T WANT

18   TO USE IT.

19   Q.  WHAT REASON DID HE GIVE YOU?

20   A.  HE THOUGHT THAT THE MANAGER OF THE MECHANICS BANK WOULD

21   TELL HIS FATHER HOW WELL HE WAS DOING AND HE WANTED TO TELL HIS

22   FATHER AFTERWARDS, BUT NOT THEN.  AND I ACCEPTED THAT.  I HAD

23   NO PROBLEMS WITH THAT.

24            SO HE DIDN'T WANT TO USE THE MECHANICS BANK AND I

25   PUT IT THROUGH THE TRUST ACCOUNT.

1  Q.  HE ASKED YOU TO PUT IT IN YOUR ATTORNEY TRUST ACCOUNT?

2  A.  I DON'T THINK HE SPECIFICALLY ASKED FOR THE ATTORNEY TRUST

3  ACCOUNT.  I DON'T THINK HE SPECIFICALLY ASKED FOR IT.  AN

4  ACCOUNT.  SOMEHOW WE ENDED UP PUTTING IT IN THE ATTORNEY TRUST

5  ACCOUNT.

6  Q.  HE ASKED YOU TO DEPOSIT THE CHECKS INTO YOUR ACCOUNT?

7  A.  YES.

8  Q.  WHAT IS ON ATTORNEY TRUST ACCOUNT?

9  A.  THAT'S THE ACCOUNT THAT ATTORNEYS GENERALLY MAINTAIN FOR

10  CLIENT FUNDS.  NOT FOR THEIR OWN FUNDS, ALTHOUGH THEY MAY HAVE

11  THEIR OWN FUNDS IN THERE FOR PART OF THE TIME, BUT FOR THE

12  CLIENT'S FUNDS.

13  Q.  OKAY.

14          AND, AGAIN, WHAT WAS HIS REASON FOR WANTING TO HAVE

15  YOU PUT THIS IN THE -- IN YOUR ACCOUNT?

16  A.  HE THOUGHT THAT THE MANAGER AT THE MECHANICS BANK THAT HE

17  BANKED AT WOULD TELL HIS DAD BECAUSE THEY BANK AT THE SAME

18  PLACE.

19          I KNOW HIS FATHER BANKED AT MECHANICS BANK.  I GOT

20  THAT FROM DANNY AT THE TIME.  AND I HAD MY OWN PROBLEMS WITH A

21  MANAGER AT THE BANK, AT MECHANICS BANK BEFORE, SOME YEARS

22  BEFORE, SO I HAD NO PROBLEM REALIZING THAT THE MANAGERS DO

23  TALK.

24  Q.  SO, AFTER YOU WOULD DEPOSIT A CHECK INTO YOUR ATTORNEY

25  TRUST ACCOUNT, WOULD YOU -- WHAT DID YOU DO THEN?

 1   A.  WELL, I PUT IT IN THE TRUST ACCOUNT, YOU WAIT UNTIL IT

 2   CLEARS NORMALLY, AND THEN YOU WRITE A CHECK TO THE CLIENT FOR

 3   THEIR MONIES.

 4   Q.  LET'S NOT TALK ABOUT -- LET'S TALK SPECIFICALLY WITH

 5   RESPECT TO THESE CHECKS AND MR. DAVID.

 6           WHAT WAS -- WHAT WERE YOU ASKED TO DO WITH RESPECT

 7   TO THE MONEY THAT YOU DEPOSITED INTO YOUR ATTORNEY TRUST

 8   ACCOUNT?

 9   A.  WELL, I PUT IT INTO THE TRUST ACCOUNT, AND WHEN IT CLEARED,

10   I WROTE HIM A CHECK AND HE CAME BY AND PICKED IT UP.

11   Q.  A CHECK TO MR. DAVID?

12   A.  TO MR. DAVID.

13   Q.  DID THIS ALL HAPPEN AT ONE TIME OR WOULD HE COME TO YOU

14   FIRST, GIVE YOU THE CHECK, AND THEN COME BACK TO PICK UP THE

15   CHECK TO HIM?

16   A.  WELL, MY SPECIFIC RECOLLECTION IS THAT I WAITED UNTIL THE

17   CHECK HAD CLEARED THE ACCOUNT.

18   Q.  WHAT DID MR. DAVID TELL YOU ABOUT THE SOURCE OF THE FUNDS?

19   A.  WHETHER HE BROUGHT IT UP FIRST OR WHETHER I BROUGHT IT UP

20   FIRST, I CAN'T TELL YOU, BUT CLEAR UNDERSTANDING I HAD WAS THIS

21   WAS A WINE DEAL.

22   Q.  SO YOU HAD SOME DISCUSSION WITH HIM, WHETHER HE BROUGHT IT

23   UP OR YOU BROUGHT IT UP YOU ARE NOT SURE, BUT YOU DISCUSSED

24   THIS WAS FROM A WINE DEAL?

25   A.  THAT'S MY RECOLLECTION, YES, SIR.

1    Q.   OKAY.  AND WHO -- HAD YOU EVER MET THE INDIVIDUALS TO WHOM

2    THIS CHECK WAS MADE OUT, BILL JANSEN OR DAVE JACOBS?

3    A.   NO, SIR.

4    Q.   WHAT DID MR. DAVID TELL YOU ABOUT BILL JANSEN AND DAVE

5    JACOBS?

6    A.   JUST THAT THEY WERE BUSINESS PARTNERS.

7    Q.   AND DID YOU UNDERSTAND THAT THEY WERE PARTNERS IN HIS WINE

8    BUSINESS?

9    A.   NO.  I UNDERSTOOD THAT AS BEING PEOPLE WHO WERE EITHER

10   BUYING WINES FROM HIM OR DEALING IN WINES WITH HIM.

11   Q.   BUT THAT THEY WERE HIS BUSINESS PARTNERS?

12   A.   THEY WERE PEOPLE HE WAS DOING A BUSINESS DEAL WITH.

13   Q.   DID YOU ASK TO MEET WITH MR. JANSEN OR MR. JACOBS IN ORDER

14   TO VERIFY THAT THEY WERE -- THAT THIS WAS, IN FACT, THEIR CHECK

15   AND THAT THEY WERE SIGNING IT OVER TO DANIEL DAVID?

16   A.   NO, SIR.

17   Q.   WHY NOT?

18   A.   I HAD TOTAL TRUST IN DANNY.

19   Q.   DID MR. DAVID EVER TELL YOU ABOUT A COMMUNICATIONS

20   BUSINESS?

21   A.   NO, SIR.

22   Q.   UM --

23   A.   WELL --

24   Q.   -- IN CONNECTION WITH THE DEPOSIT OF THESE CHECKS?

25   A.   IN CONNECTION WITH THE DEPOSIT OF THESE CHECKS, NO, SIR.

1  Q.  AND SO ALL MY QUESTIONS GO TO THAT TIME PERIOD.

2  A.  CORRECT.

3  Q.  DID MR. DAVID, IN ASKING YOU TO DEPOSIT THESE CHECKS, EVER

4  TELL YOU THAT HE HAD A BUSINESS OF CALLING 800 NUMBERS?

5  A.  NO, SIR.

6  Q.  DID HE EVER TELL YOU ABOUT ANY AUTODIALERS?

7  A.  NO, SIR.

8  Q.  DID HE EVER TELL YOU ABOUT AN OFFICE SPACE IN SOUTH SAN

9  FRANCISCO WITH 23 PAYPHONE LINES?

10  A.  NO, SIR.

11  Q.  DID YOU KNOW THAT MR. DAVID HAD PAYPHONE LINES?

12  A.  NO, SIR.

13  Q.  DID HE EVER TELL YOU ABOUT A SURVEY TO GATHER INFORMATION

14  IN ORDER TO SUE THE TELEPHONE COMPANIES?

15  A.  NO, SIR.

16  Q.  LET'S GO THROUGH THIS EXHIBIT.

17        IS THIS FIRST CHECK, IS THAT THE VERY FIRST CHECK

18  THAT MR. DAVID PRESENTED TO YOU?

19  A.  I WOULD ASSUME SO.  THEY STARTED IN 1999 AND THIS IS

20  JANUARY 4 OF 1999.

21  Q.  SO WHAT DID YOU DO AFTER YOU RECEIVED THIS CHECK?

22  A.  I PUT IT INTO THE TRUST ACCOUNT, AND SOMETIME LATER I

23  CHECKED WITH THE BANK AND IT CLEARED.  I WROTE DANNY HIS CHECK.

24        AND I DON'T REMEMBER IF I MAILED IT TO HIM OR JUST

25  CALLED HIM.  I PROBABLY JUST CALLED HIM.

1   Q.  IS THAT THE DEPOSIT SLIP?

2   A.  THE SECOND PAGE OF THIS EXHIBIT, WHICH YOU HAVE BATES

3   STAMPED 186, IS THE DEPOSIT SLIP.

4   Q.  IF WE CAN LOOK AT THE BACK OF THIS JANUARY 4TH CHECK.

5   A.  YES, SIR.

6           MR. JACOBS:  IS IT POSSIBLE TO FLIP IT ON THE SCREEN

7   THERE?

8           THE WITNESS:  HOPEFULLY THE JURY HAS BETTER EYESIGHT

9   THAN I DO.  I CAN BARELY READ IT FROM HERE.

10          MR. JACOBS:  LET'S SEE IF WE CAN BLOW THAT UP A

11  LITTLE BIT MORE.

12          THE WITNESS:  I HAVE THIS SO IT'S OKAY.

13  BY MR. JACOBS:

14  Q.  OKAY.

15          WHEN MR. DAVID PRESENTED THIS CHECK TO YOU, WHAT WAS

16  ON IT?  THERE'S VARIOUS WRITINGS, BUT THERE ARE THREE

17  SIGNATURES.  WERE THOSE SIGNATURES ON THE CHECK WHEN HE GAVE IT

18  TO YOU?

19  A.  ALL THREE SIGNATURES WERE ON THE CHECK.

20  Q.  SO, YOU DIDN'T SEE MR. JANSEN OR MR. JACOBS SIGN THE CHECK?

21  A.  NOR MR. DAVID.  CORRECT.

22  Q.  I ASSUME, SINCE YOU BELIEVE THEY WERE BUSINESS PARTNERS,

23  MR. DAVID DIDN'T TELL YOU THAT JANSEN AND JACOBS WERE

24  FICTITIOUS PEOPLE, DID HE?

25  A.  I HAD NO IDEA.

CORNET - DIRECT / JACOBS                    447

1    Q.  IF YOU HAD KNOWN THEY WERE FICTITIOUS PEOPLE, WOULD YOU

2    HAVE DEPOSITED THIS CHECK INTO YOUR ATTORNEY TRUST ACCOUNT?

3    A.  OF COURSE NOT.

4    Q.  WHOSE HANDWRITING IS NEXT TO THE -- WHOSE PRINTING IS NEXT

5    TO THE SIGNATURES?

6    A.  THAT'S MINE.  I PRINTED OUT THE SPELLINGS OF EACH OF THE

7    NAMES.

8    Q.  WHY DID YOU DO THAT?

9    A.  BECAUSE THE BANK OF AMERICA WILL OCCASIONALLY REJECT THE

10   CHECK IF THE SIGNATURE IS ILLEGIBLE.  AND SO, PARTICULARLY WITH

11   DANNY'S SIGNATURE, I HAD TO WRITE IT, AND I WROTE IT FOR ALL

12   THREE.

13            I ALSO WROTE THE HANDWRITING AT THE TOP, "FOR

14   DEPOSIT TO STEPHEN H. CORNET TRUST ACCOUNT."  THAT'S ALL MY

15   HANDWRITING.

16   Q.  OKAY.

17            MR. CORNET, WHY DID YOU DO -- WHY DIDN'T

18   MR. DAVID -- I WANT TO KNOW YOUR UNDERSTANDING -- WHY DIDN'T

19   MR. DAVID SIMPLY, IF HE DIDN'T WANT THE MECHANICS BANK BUSINESS

20   MANAGER TO TELL HIS FATHER, WHY DIDN'T HE JUST TELL THE

21   BUSINESS MANAGER NOT TO TELL NARSAI DAVID?

22            MR. CARLUCCI:  OBJECTION, YOUR HONOR.

23   BY MR. JACOBS:

24   Q.  LET ME ASK IT A DIFFERENT WAY.

25            DID YOU ASK MR. DAVID WHY HE DIDN'T JUST ASK THE

1   MANAGER NOT TO TELL NARSAI DAVID?

2   **A.**   WELL, WE ACTUALLY TALKED ABOUT THE MANAGER AT THE MECHANICS

3   BANK THAT I ONCE HAD AN -- IT'S A LONG STORY.

4         I HAD A GIRLFRIEND WHO OPENED UP AN ACCOUNT AT

5   MECHANICS BANK.  AND THE MANAGER AT THE PARTICULAR BANK WAS, I

6   BELIEVE, HIS NAME WAS BILL MORROW.  I ASSUMED IT WAS THE SAME

7   MANAGER, BUT HE MAY NOT HAVE BEEN.

8         IN ANY EVENT, IN THE CONVERSATION IT COMES DOWN THAT

9   SHE KNOWS ME AND THE NEXT THING I KNOW, SHE COMES BACK AND

10  TALKS TO ME ABOUT EVERY DETAIL THAT BILL MORROW HAS EVER KNOWN

11  ABOUT MY ENTIRE LIFE.  AND THAT WAS THE MANAGER AT MECHANICS

12  BANK.

13        SO, IF YOU ASSUME THAT -- MAYBE IF YOU ASSUME THAT

14  ANY BANK MANAGER IS DISCREET, THAT'S AN IMPROPER ASSUMPTION.  I

15  DON'T KNOW.  CERTAINLY MECHANICS BANK, MY EXPERIENCE WOULD BE

16  THAT MANAGERS WOULD TALK.  AND ESPECIALLY FOR SOMEBODY THAT'S

17  AS WELL-KNOWN AS DAN'S FATHER IS.

18  **Q.**   DID YOU ASK MR. DAVID WHY HE DIDN'T THEN GO TO A DIFFERENT

19  BANK OR A DIFFERENT BRANCH AND OPEN AN ACCOUNT THERE OR DEPOSIT

20  IT THERE?

21  **A.**   WE DIDN'T TALK ABOUT A DIFFERENT BRANCH.  I OFFERED HIM AN

22  INTRODUCTION TO MY BANKER AT THE BANK OF AMERICA.

23  **Q.**   YOU SAY YOU OFFERED HIM AN INTRODUCTION; WHAT DOES THAT

24  MEAN?

25  **A.**   I GAVE HIM THE NAME AND THE PHONE NUMBER AND SAID THE

1   PERSON WAS REALLY GOOD.  IN FACT, THE PERSON WAS A REALLY GOOD

2   MANAGER.

3   Q.  SO WHY DID -- WHY THEN DID HE NEED YOU TO DEPOSIT THESE

4   CHECKS INTO YOUR TRUST ACCOUNT?  WHY DIDN'T HE SIMPLY GO TO THE

5   BANK OF AMERICA AND DEPOSIT THIS CHECK?

6              MR. CARLUCCI:  OBJECTION, YOUR HONOR.  IT IS CALLING

7   FOR SPECULATION.

8   BY MR. JACOBS:

9   Q.  DID YOU ASK HIM WHY HE SIMPLY DIDN'T DO THAT?

10  A.  NO.

11  Q.  DID YOU ASK HIM WHY BILL JANSEN AND DAVE JACOBS DIDN'T

12  DEPOSIT THIS CHECK INTO THEIR BANK ACCOUNT?

13  A.  NO.

14  Q.  HAD YOU EVER HEARD OF MARK RYAN?

15  A.  OF WHO?

16  Q.  MARK RYAN.

17  A.  NO, SIR.

18  Q.  LET'S JUST HAVE YOU LOOK AT THE OTHER DOCUMENTS IN THE

19  EXHIBIT.  YOU SHOULD GO TO THE BACK OF THE CHECK.  THIS IS

20  BATES NUMBER 187.

21              IS THIS ONE OF THE CHECKS THAT YOU DEPOSITED FOR

22  MR. DAVID?

23  A.  I WOULD ASSUME SO.  YES.

24  Q.  IS THAT YOUR HANDWRITING NEXT TO THE SIGNATURES?

25  A.  YES.

1    Q.  LET'S GO TO THE NEXT PAGE.

2           DID YOU DEPOSIT THIS CHECK AT PAGE 188 AS WELL?

3    A.  YES, SIR.

4    Q.  AND ALL OF THESE CHECKS WERE AT MR. DAVID'S REQUEST; IS

5    THAT CORRECT?

6    A.  YES, SIR.

7    Q.  DID YOU EVER MEET SCOTT NISBET?

8    A.  NO, SIR.

9    Q.  DID YOU KNOW WHO SCOTT NISBET WAS?

10   A.  AT THE TIME, NO, SIR.

11   Q.  DID MR. DAVID MAKE ANY REFERENCE TO SCOTT NISBET WHEN HE

12   WAS ASKING YOU TO DEPOSIT THESE CHECKS?

13   A.  NO, SIR.

14   Q.  LET'S GO TO THE NEXT EXHIBIT.

15          IS THAT A DEPOSIT SLIP THAT YOU FILLED OUT FOR

16   $110,000?

17   A.  THIS IS AT PAGE 189?

18   Q.  PAGE 189.

19   A.  YES, SIR.

20   Q.  LET'S GO TO THE NEXT PAGE.

21          AT PAGE 190, DID YOU DEPOSIT THAT CHECK INTO YOUR

22   ATTORNEY TRUST ACCOUNT?

23   A.  YES, SIR.

24   Q.  LET'S GO TO THE NEXT PAGE.

25   A.  191?

1   Q.  YES, 191.

2           IS THIS A CHECK THAT YOU DEPOSITED INTO YOUR

3   ATTORNEY TRUST ACCOUNT?

4   A.  YES, SIR.

5   Q.  NEXT PAGE.

6           IS THAT THE DEPOSIT SLIP FROM THAT DEPOSIT FOR

7   $163,000?  PAGE 192.

8   A.  I AM ADDING UP THESE AMOUNTS.  THE AMOUNTS FROM THESE TWO

9   AMOUNTS, THEY DO TOTAL 162 OR 163,000, YES, SIR.

10  Q.  OKAY.

11          THE NEXT, THIS IS ANOTHER CHECK FOR 22,000 THAT YOU

12  DEPOSITED INTO YOUR ATTORNEY TRUST ACCOUNT FOR MR. DAVID?

13  A.  YES, SIR.

14  Q.  THAT'S PAGE 193.

15          GO TO THE NEXT EXHIBIT.  I AM SORRY, NEXT PAGE.

16          THIS IS ANOTHER CHECK FOR APPROXIMATELY 20,000 THAT

17  MR. DAVID ASKED YOU TO DEPOSIT INTO YOUR ATTORNEY TRUST

18  ACCOUNT?

19  A.  YES, SIR.

20  Q.  DID YOU DO THAT?

21  A.  YES, SIR.

22  Q.  AND IN EACH OF THESE CASES, THOSE SIGNATURES WERE ALREADY

23  ON THE CHECK WHEN YOU RECEIVED IT?

24  A.  YES, SIR.

25  Q.  LET'S GO TO THE NEXT PAGE.

1        IS THAT A DEPOSIT SLIP REFLECTING SOME OF THE CHECKS

2   WE HAVE SEEN FOR APPROXIMATELY $43,000?

3   A.  YES, SIR.

4   Q.  ALL RIGHT.

5             (COUNSEL CONFER.)

6             **MR. JACOBS:**  MAY I APPROACH?

7             **THE COURT:**  YOU MAY.

8   **BY MR. JACOBS:**

9   Q.  MR. CORNET, I AM NOW SHOWING YOU EXHIBIT 24, WHICH I

10  BELIEVE IS ADMITTED INTO EVIDENCE.

11            **THE COURT:**  IT IS.

12            **MR. JACOBS:**  THANK YOU, YOUR HONOR.

13  **BY MR. JACOBS:**

14  Q.  DO YOU RECOGNIZE EXHIBIT 24?

15  A.  IN PART.

16  Q.  WHAT PART DO YOU RECOGNIZE?

17  A.  THE CHECKS WHICH APPEAR, THERE ARE THREE CHECKS THAT APPEAR

18  AT PAGE 196.

19  Q.  OKAY.  SO THAT'S THE CHECKS ON THE PAGE THAT'S NOW

20  DISPLAYED ON THE SCREEN?

21  A.  THAT IS CORRECT, SIR.

22            I ASSUME THAT THE SECOND PAGE, PAGE 197, IS THE

23  ENDORSEMENT ON THESE CHECKS, BUT I HAVE NEVER SEEN THOSE

24  BEFORE.

25  Q.  OKAY.

1                          DIRECT EXAMINATION

2    BY MR. JACOBS:

3    Q.  GOOD AFTERNOON, AGENT COFFIN.

4    A.  HELLO.

5    Q.  WHERE DO YOU WORK?

6    A.  I AM A SPECIAL AGENT WITH THE FEDERAL BUREAU OF

7    INVESTIGATION.

8    Q.  AND HOW LONG HAVE YOU BEEN A SPECIAL AGENT WITH THE FEDERAL

9    BUREAU OF INVESTIGATION?

10   A.  FIVE YEARS.

11   Q.  WHERE -- ARE YOU ASSIGNED TO A PARTICULAR UNIT?

12   A.  YES.

13          THE FBI IS BROKEN DOWN INTO SQUADS, AND I AM ON

14   THE -- I AM CURRENTLY, ACTUALLY, IN TRANSITION FROM THE WHITE

15   COLLAR CRIME FRAUD SQUAD IN THE CITY TO THE PUBLIC CORRUPTION

16   SQUAD IN OAKLAND.

17   Q.  AND, AGENT COFFIN, WHAT IS YOUR EDUCATIONAL BACKGROUND?

18   A.  I HAVE A BACHELOR OF ARTS FROM OHIO STATE UNIVERSITY AND I

19   HAVE A JURIS DOCTORATE, I AM A LAWYER, FROM THE UNIVERSITY OF

20   VIRGINIA.

21   Q.  BEFORE YOU JOINED THE FBI, WERE YOU EVER IN THE MILITARY?

22   A.  I WAS.  I WAS A CAPTAIN IN THE AIR FORCE.  I SERVED AS A

23   JAG OR JUDGE ADVOCATE.

24   Q.  IS THAT A LAWYER FOR THE AIR FORCE?

25   A.  YES.  I SERVED ABOUT THREE YEARS AS A PROSECUTOR AND