No. 05-10340

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

United States of America,

        Plaintiff-Appellee,

v.

Daniel David,

        Defendant-Appellant.

Appeal From The United States District Court
For The Northern District Court  No. CR 02-00062 SI

**APPELLANT'S OPENING BRIEF**

Dennis P. Riordan, Esq.
Donald M. Horgan, Esq.
Riordan & Horgan
523 Octavia Street
San Francisco, CA 94102
Telephone: (415) 431-3472

Attorneys for Defendant-Appellant
**DANIEL DAVID**

Nisbet had rented payphone lines and used an autodialer to call 800 numbers. Once the call would connect, the autodialer would hang up the phone. David and Nisbet then obtained reimbursement as payphone providers pursuant to the regulatory scheme described above.

### 1.     The Origins of the Plan

Mr. David took the stand in his own defense, and he essentially admitted most of the factual allegations made by the government in the case against him.

Nisbet was a friend of Mr. David since high school, and the two of them had worked on previous business ventures in the past. (RT 613-14) In 1995, for example, Nisbet came to David with a business idea involving prepaid phone cards. Nisbet was the expert in the area of telecommunications, and Mr. David's role was to provide the graphics. (RT 616-17) Although Mr. David maintained that the phone card business had been a good idea, the two of them had not been able to run it successfully, and the venture only broke even. (RT 618)

In 1997, Nisbet approached David with another idea for a business arising out of the new telecommunications laws regarding payphone reimbursement. (RT 614, 618) Nisbet, who distrusted the long distance carriers, wanted to see whether the carriers were abiding by the new reimbursement rules. (RT 618-19) David testified that he "didn't know anything" about telecommunications, but Nisbet

10

misrepresentation on the part of B. The publisher of the San Francisco Examiner may assume that those who take the free paper from street dispensers are going to read it, but that assumption, reasonable or not, cannot establish that one who uses a copy solely to wrap fish obtained the paper by implied misrepresentation.

The government's novel and broad reading of the law would mean it is a deceptive and potentially criminal act to call a company's telephone without a bona fide business purpose. A businessman who calls a competitor's 800 number to see what prices are being offered would be guilty of fraud, although the competitor's advertising encourages any member of the public to call the number. Under the government's interpretation of the statute, a payphone owner who makes a single prank phone call to an 800 number would be committing a federal crime. That interpretation has no support in the case law.

Third and finally, the government's theory was simply not supported by the evidence. The government argues that the subscribers "believed [David] was a legitimate payphone lessee." (ER 96) But there was absolutely no evidence presented in this case that the subscribers believed anything of the sort. Had the government actually put an 800 number subscriber on the stand, the witness would have no doubt testified that subscribers do *not* assume every call to their 800 number has a valid business purpose. Rather, subscribers know that they will be

29

receiving and paying for calls involving wrong numbers, crank callers, and lonely people who have no one else to talk to. Subscribers agree to pay the long distance charges for these and all other calls to their 800 numbers because they believe that on balance it will be to their economic benefit to do so. No misrepresentation by David to the subscribers was proven at trial.

### 2.     Loss Suffered by the Phone Companies

The government has argued, in the alternative, that it proved a valid fraud under the convergence theory because the phone companies were also "victims" of Mr. David's conduct. The claim that the phone companies were victims is just as flimsy as the claim that the subscribers were deceived.

Under the regulatory scheme mandating reimbursement of payphone operators, the phone companies function as "pass-throughs." In conjunction with their normal billing processes, the phone companies collect the payphone fees from 800 number subscribers and pass those fees along to the payphone operators.

Prior to trial, the government seemed to argue that the phone companies suffered a loss simply by virtue of their pass-through function. The government suggested (vaguely) that the phone companies might have had some right to the fees because they could, upon the discovery of illicit payments, stop the transfer. Of course, that phone companies can stop passing through payments once they

discover an alleged fraud does not mean that they suffer loss from the fraud.

A financial intermediary does not become an actual or intended "victim" of fraud simply by processing fraudulent transactions and passing payments from victim to fraudster. When, for example, an ordinary fraud victim sends a check to a deceiver, banks may obtain the money from the victim and send it to the deceiver's account. The banks' involvement does not convert them into additional victims (much less *intended* victims) of the fraud.

Following trial, the government shifted course. It conceded at the sentencing hearing in this matter that the phone companies suffered no monetary loss from the alleged scheme and were thus not entitled to restitution. (ER 83: "The phone companies here are not the victims. They were just unjustly [sic] enriched..." ). Yet in order to maintain the fraud convictions, the government nonetheless insisted that the phone companies were still victims in the following sense:

> They suffered a loss by wrongfully and unwittingly obtaining money from their trusting subscribers, and sending it to a fraudster. They could have faced civil liability from these subscribers. They could have suffered loss of good will or business reputation, or customers.

(ER 99)

/ /

...

31

These speculative assertions were invented post-hoc once the government realized that its theory of loss as to the telephone companies had collapsed at trial. There was no evidence presented with respect to these hypothetical losses, and the government never argued their existence to the jury. There was no evidence presented that the phone companies actually suffered such losses, or even that such losses were remotely possible. And, most importantly, there was no evidence presented that Mr. David *intended* to cause such losses by deceiving the phone companies.

The government provided sufficient evidence from which a jury could conclude that Mr. David intended to deceive the phone companies. It did not, however, present sufficient evidence, indeed any evidence, that the phone companies suffered a loss of money or property due to any act of deception on the part of Mr. David or that the phone companies were intended victims of his conduct.

Consequently, the government's theory that the phone companies were intended victims, like its theory that the subscribers were deceived, cannot function as a valid basis to uphold the conviction. The government cannot offer any theory of this case to show that the conviction complied with the requirements of Lew. A directed verdict of acquittal on the fraud charges is in order.

32